UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| **SHERI WADE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18cv828** |
| | ) | |
| **INTERWORKS UNLIMITED, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT

Plaintiff Sheri Wade ("Ms. Wade"), by counsel, hereby submits her Memorandum in Support of Motion for Default Judgment (the "Motion"). In support of her request for entry of default judgment against Defendant Interworks Unlimited, Inc. ("Interworks"), Ms. Wade respectfully states as follows:

## LEGAL STANDARD

Rule 55(b) governs the entry of default judgment. On application of default judgment, the Court may conduct any hearings or make any referrals needed to "(A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2). This Court has previously held that "[p]rior to entering a default judgment, the Court must ensure that: (1) it possesses personal jurisdiction over the defaulting party; (2) it possesses subject-matter jurisdiction over each of the claims; (3) the action is in the proper venue; and, (4) the defaulting party received proper service of process." Victoria Select Ins. Co. v. R&G Transp., No. 3:16cv624, 2017 U.S. Dist. LEXIS 221531, at *7-8 (E.D. Va. Sep. 7, 2017). Additionally, the Court will consider whether the well-

pleaded allegations of the Complaint support the relief sought in the case.  Id. at *8. (citations omitted).

## STATEMENT OF FACTS

### I.       Interworks Becomes the Exclusive Distributor of the Model C.

Interworks was, at all relevant times to this suit, a California-based company operating as a distributor of games, toys, and electronic goods.  Lu Dep. (Ex. 1) at 7:1-5, 7:20-24; Lu Dec. (Ex. 2) ¶ 3.  Moreover, at all times relevant to this lawsuit, Interworks owned and used the trademark "EMiO" to sell consumer goods.  Interworks EMiO Trademark Application (Ex. 3) at *1, 5.[1]  On its website, Interworks identifies its clients as being "top national retailers" and "major distributors" including, inter alia, GameStop, Walmart, Toys "R" Us, and amazon.com. Interworks Website Screenshot (Ex. 4) at 1.[2]  At all times relevant to this suit, Interworks was the exclusive U.S. distributor of hoverboards manufactured by the Chinese company Hangzhou Chic Intelligent Technology CO., Ltd. ("Chic"), including the hoverboards designated as the "Chic High Roller Self Balancing Hoverboard Model C" ("Model C").  Lu Dep. (Ex. 1) at 9:24-10:1; Lu Dec. (Ex. 2) ¶ 4.  Chic had selected Interworks to be its exclusive distributor because Interworks had the ability to sell the Model C to nationwide "retail channels," to include Walmart, Target, Best Buy, and Toys "R" Us.  Lu Dep. (Ex. 1) at 10:10-11:5.

### II.      Interworks Seeks to Sell the Model C Through QVC.

In approximately April 2016, Interworks' owner, Eric Lu ("Mr. Lu"), contacted Megan Kane ("Ms. Kane"), a purchaser with a television retailer known as QVC, Inc. ("QVC"), to propose selling the Model C through QVC.  Lu Dep. (Ex. A) at 7:6-7, 14:14-19.  Interworks

---

[1] A * will be used to reference the actual page number of an exhibit where pages in the exhibit are unnumbered or their organic numbering creates confusion.
[2] The website is dated 2014 (i.e., prior to the events at issue in this litigation) and remains active at https://www.interworks-usa.com/clients.

2

contacted QVC because it perceived a "lucrative opportunity" to "capitalize" on the "increasing market" for hoverboards by selling the Model C "through QVC."  Interworks' Mem. in Supp. Summ. J. (Ex. 5) at vii, 1-2; <u>see also</u> Lu Dec. (Ex. 2) ¶¶ 5, 16.  Accordingly, Interworks pitched the Model C to QVC and, during the June/July 2016 timeframe, QVC agreed to provide Interworks an "airing" for the Model C in or around November 2016.  Lu Dep. (Ex. 1) at 14:20-16:3.  QVC committed to selling 10,000 Model C units as a "warehouse item."  <u>Id.</u> at 25:1-10; Lu Dec. (Ex. 2) ¶ 9.  This means that Interworks would be responsible for acquiring and storing inventory earmarked for QVC and, only <u>after</u> a consumer purchased a Model C through QVC. Interworks would deliver the product to a QVC distribution center, which would then deliver the product to the customer.  Lu Dec. (Ex. 2) ¶ 9.  In essence, the arrangement was one in which Interworks was selling its products through QVC.  <u>Id.</u> ¶¶ 5, 16; Interworks' Mem. in Supp. Summ. J. (Ex. 5) at vii, 1-2.

QVC's marketing and advertising strategy of "showcasing" and "story-telling" products, along with its sales velocity, is what attracts vendors to work with it.  QVC 2016 10-K Rep. (Ex. 6) at I-4.   These marketing and advertising components also differentiate QVC from traditional "brick and mortar" retailers and online retailers in that QVC exposes shoppers to the "people and places behind [the] product."  <u>Id.</u>  Indeed, QVC solicits product vendors by highlighting that its marketing and advertising efforts provide vendors the necessary tools to promote a product narrative and build relationships with millions of QVC customers:

> At QVC, we don't just display items on shelves or in online galleries. We create a multiplatform experience that brings products and brands to life through people and stories. <u>Does your product solve a problem, fill a void, or make day-to-day life a bit easier? Does your brand have a compelling narrative that will resonate with consumers? With our unique utilization of multiple platforms—broadcast, online, mobile, and social channels—we offer vendors and entrepreneurs the tools to begin and build</u>

> relationships with our engaged community of millions of shoppers
> worldwide. So… what's your story?

QVC Vendor Website Screenshot (Ex. 7) at *1 (emphasis added).[3]

Vendors are able to provide input on the marketing and advertising process through submitting product "claims" to QVC.  QVC Vendor Claims Overview (Ex. 8) at 5-6.[4]  In this context, a "claim" is any "statement about a product that relates to its benefits, performance, efficacy, safety, price, or other characteristic that is used to incentivize a customer to purchase it."  Id. at 2.  In addition to identifying such claims, the vendor determines the relative priority and importance of the various product claims provided.  Id. at 5.

The significance of Interworks' decision to sell the Model C through QVC cannot be understated.  With respect to its operations in 2016, QVC described itself as a "global leader in television retailing and a leading multimedia retailer" and "the U.S.'s largest television shopping retailer."  QVC 2016 10-K Rep. (Ex. 6) at I-1, I-12.  QVC markets the products it sells "primarily through merchandise-focused live television programs and interactive features on our websites and other interactive media."  Id. at I-1.  QVC also employs "[t]his efficient sales/marketing strategy" on its websites. Id. at I-4.

With respect to its U.S. operations in 2016, QVC distributed its live television programming nationally (including Virginia) 24 hours per day, 364 days per year, reaching approximately 104 million television households.  Id. at I-2.  In essence, QVC was ever-present and omni-present throughout the United States, distributing its live programming to 96% of U.S.

---

[3] This content is currently posted QVC's website and available at:
 https://corporate.qvc.com/lp/vendors//
[4] This document is currently posted on  QVC's website and available at:
https://vendorportal.qvc.com/documents/10184/0/QVC+Legal+Claims+Overview/b0263466-b64e-4487-b629-a3e337a5f5cc

households subscribing to services offered by its television distributors,[5] and nearly 83% of all U.S. households.[6] Compare id., with Table HH-1 (Ex. 9) at *1. QVC also made its domestic programming available on its U.S. website (QVC.com), mobile applications via streaming video, over-the-air broadcasters in 93 markets, and the Roku platform. QVC 2016 10-K Rep. (Ex. 6) at I-2. In addition to QVC's pervasive presence through its live programming, QVC broadcasted on an additional channel, QVC Plus, which was distributed through cable and satellite systems. Id. The channel generally offers the same programming as the live channel, but on a three hour pre-recorded delay, which allows viewers to have access to a broader range of QVC programming options as well as more relevant programming for viewers in differing time zones. Id.

        As of December 31, 2016, QVC had shipped over 1.95 billion packages in the U.S. alone. Id. at I-1. QVC's operations in the U.S. yielded over $6,000,000,000 of revenue in 2016. Id. at I-2.   Throughout 2016, QVC owned and operated 5 distribution centers in the U.S. (including one in Suffolk, Virginia) and two domestic call centers to receive customer orders (including one in Chesapeake, Virginia). Id. at I-23.

**III.    Interworks Acquires and Uses Proprietary Rights in "High Roller" Trademarks**.

        While awaiting the QVC airing that was scheduled to occur in or around November 2016, Interworks took a number of steps to acquire and use certain trademarks related to the "High

---

[5] These major U.S. television distributors included cable operators such as Comcast and Cox, satellite television providers such as DISH Network and DIRECTV, and telecommunications companies such as Verizon and AT&T. QVC 2016 10-K Rep. (Ex. 6) at I-1. QVC's relationship with these media giants provided it "broad distribution, favorable channel positioning and significant competitive advantages" throughout the U.S. market. Id.
[6] The latter number is calculated by comparing QVC's broadcasting reach of 104,000,000 U.S. households with 2016 data compiled by the United States Census Bureau in Table HH-1. Specifically, that data states the total number of households in the United States as being 125,819,000, and is available at:
 https://www.census.gov/data/tables/timex-series/demo/families/households.html.

Roller" brand of hoverboards.   On August 12, 2016, Interworks submitted a trademark application to register a "High Roller" graphic logo with the United States Patent and Trademark Office ("USPTO").   See Interworks Logo Trademark Application (Ex. 10) at *1.   As part of that application, Interworks claimed that it owned the logo and was "using the mark in commerce." Id. at *4-5.   Interworks also attached a specimen photo to the application "showing the mark as used in commerce . . . ."   Id.   The specimen photo, in turn, reflected an EMiO website screenshot showing the use of the logo in connection with a page soliciting sales of a High Roller hoverboard (the screenshot also noted that shipment was available within the United States and included with the purchase of the product).   Id. at *7.

Shortly thereafter, Interworks posted a video to YouTube on August 22, 2016, which displayed its High Roller logo, marketed High Roller hoverboards, and solicited purchases of High Roller hoverboards from YouTube viewers by highlighting the relative safety of the product compared to its competitors' products and including a link to the EMiO website in the video's description where High Roller hoverboards could be purchased.   Interworks YouTube Video Screenshot (Ex. 11) at *1.[7]   To date, the video has accumulated over 10,700 views.   Id.

On September 14, 2016, Interworks acquired the entire proprietary interest and good will associated with the trademark "High Roller" pursuant to an assignment agreement from the owner of the same—4WRD USA International LLC.   High Roller Trademark Assignment Agreement (Ex. 13) at 1.   The assignment authorized Interworks to use the trademark throughout the entire United States to carry out its distribution agreement with Chic.   Id.   After acquiring the High Roller trademark, Interworks submitted a Trademark Amendment to Allege Use ("TAAU")

---

[7] This video advertisement is being submitted under separate cover as Exhibit 12.   The video advertisement remains active to this day and is available at: https://www.youtube.com/watch?v=OETmIjH_IRM.

to the USPTO on October 8, 2016, which stated that Interworks was using the trademark in commerce and included photos of High Roller hoverboards for sale on the EMiO website as "specimen" photos of such use. TAAU (Ex. 14) at *2-3.  The specimen photos of the EMiO website that were appended to the TAAU reflected that High Roller hoverboards were eligible for shipment only in the United States and also depicted a shopping cart checkout screen.  Id. at *5-7.

### IV.  Interworks Sells the Model C Through QVC.

In the months prior to the scheduled airing, QVC required Interworks to perform several undertakings before selling the Model C on QVC.  These undertakings included submitting the Model C to QVC for QA testing.  Lu Dec. ¶ 6.  Interworks also purchased general liability insurance which named QVC as an "additional insured" and covered claims related to the Model C itself and advertising of the Model C.  Id. ¶ 7; QVC QA Rep. (Ex. 15) at *2.  QVC also required Interworks to provide customer service phone numbers and website information, as well as a copy of the User Manual that would be included with the Model Cs sold on QVC.  Id. at *1, 3, 5.  As part of the QVC approval process, Interworks also submitted various product "claims" to QVC regarding the Model C for use in marketing and advertising the product, and created an account with the QVC vendor portal where it set the cost of the Model C.  Id. at 2; Lu Dep. (Ex. 1) at 33:2-8.

QVC aired the Model C on at least four separate occasions from October 2016 to the end of November 2016.[8]  Additionally, QVC uploaded these airings to its YouTube channel, with each video description also containing a link to direct viewers back to QVC's website to

---

[8] The airings of the Model C that occurred during this period of time are being filed under separate cover as Exhibits 16 - 19.

purchase the Model C.[9]  QVC YouTube Channel Screenshots (Ex. 20) at *1-4.  At all times during the arrangement, Interworks stored the Model C inventory earmarked for QVC in its warehouse, only sending units to QVC's distribution center as they were purchased by consumers.  Lu Dec. (Ex. 2) ¶ 9.  Ultimately, Interworks sold approximately 10,000 units through QVC in November 2016.  Id. ¶ 16; Lu Dep. (Ex. 1) at 14:1-10, 16:21-22.

## V.    Interworks Partners with Digital Gadgets to Continue Selling the Model C Through QVC.

Given the number of Model Cs sold in November 2016, QVC wanted to continue to sell the Model C through the holiday season.  Lu. Dep. (Ex. 1) at 23:8-18; Lu Dec. (Ex. 2) ¶ 10.  To do so, however, QVC needed a vendor who could ship the Model Cs directly to customers (as opposed to sending the product to a QVC distribution center for shipment) to ensure purchases would be delivered to QVC customers in time for Christmas.  Lu Dep. (Ex. 1) at 20:14-21:3; Lu Dec. (Ex. 2) ¶¶ 10-11.  QVC referred to such vendors as "drop ship vendors" or "drop ship partners."  Lu Dep. (Ex. 1) at 86:7-13; Lu. Dec. (Ex. 2) ¶¶ 10-11; QVC 2016 10-K Rep. (Ex. 6) at I-6. Interworks, however, was not able to drop ship as it was not a certified QVC drop ship vendor.  Lu Dep. (Ex. 1) at 85:24-86:17; Lu Dec. (Ex. 2) ¶ 12;

Ms. Kane and Mr. Lu spoke to discuss how best to expedite provision of Model C inventory and sell more units over the holidays.  Lu Dep. (Ex. 1) at 23:8-21.  As a result of those communications, Interworks and QVC decided to involve another company to be a drop ship vendor.  Id.  QVC identified potential drop ship vendors for Interworks, but Interworks retained

---

[9] The videos are still active on QVC's YouTube channel and can be viewed at:
https://www.youtube.com/watch?v=4aDfdohG_58&t=2s
https://www.youtube.com/watch?v=UwwvCUx_uVY
https://www.youtube.com/watch?v=SBQxJSkksXQ
https://www.youtube.com/watch?v=FwBWy49IT2I

the right to ultimately decide who would be used.  Lu Dep. (Ex. 1) at 85:5-24.  Interworks ultimately selected Digital Gadgets, LLC ("Digital Gadgets") to "fill Interworks' shoes as the exclusive [QVC] partner." [10]  Tebele Dep. (Ex. 21) at 38:25-39:14; [11] Lu Dep. (Ex. 1) at 23:15-21, 85:5-24.   Under this arrangement, Interworks would sell Model C inventory to Digital Gadgets for the specific and sole purpose of "servicing" QVC orders as a drop ship vendor along with the right to "sell Interworks products to and through QVC."  Tebele Dep. (Ex. 21) at 38:10-20; 127:3-18; Lu Dep. (Ex. 1) at 18:24-19:3, 22:3-11, 23:8-21, 83:5-10, 85:5-24; Kane Dep. (Ex. 22) at 79:17-80:2.  This arrangement would allow the QVC to continue to sell the Model C through the holiday season.  Kane Dep. (Ex. 22) at 79:17-80:2.

Although the arrangement was framed as one in which Interworks simply sold Model C inventory to Digital Gadgets for purposes of resale, Interworks and Digital Gadgets actually regarded each other as partners in selling Model Cs to QVC, a perspective shared by QVC as well.  Lu Dec. (Ex. 2) ¶ 29; Lu Email (Ex. 23) at *1; Tebele Dep. (Ex. 21) at 38:25-39:14, 116:8-20; Kane Email (Ex. 24) at *1.  Accordingly, Interworks did not continue to sell Model Cs directly to or through QVC after partnering with Digital Gadgets, did not perform any credit check on Digital Gadgets prior to selling it Model C inventory, and sold inventory to Digital Gadgets pursuant to a consignment arrangement where Digital Gadgets would only pay Interworks for Model Cs as they sold through QVC.  Lu Dep. (Ex. 1) at 81:9-21; 90:19-25;

---

[10] There is a dispute between Interworks and Digital Gadgets as to whether the right to sell Interworks' products to and through QVC was exclusive.  Interworks contends such a term was discussed, but never finalized.  Lu. Dec. (Ex. 2) ¶¶ 29-30; Digital Gadgets contends it was always understood the right would be exclusive so long as Digital Gadgets had inventory from Interworks.  Tebele Dep. (Ex. 21) at 116:8-15.
[11] Charles Tebele is the owner and managing member of Digital Gadgets.  Tebele Dep. (Ex. 21) at 7:17-9:8.

Tebele Dep. (Ex. 21) at 127:3-18.[12]   Interworks and Digital Gadgets also mutually agreed to have Digital Gadgets named as an additional insured on Interworks' liability insurance policy. Lu Dep. (Ex. 1) at 106:1-25.

Interworks' partnership with Digital Gadgets largely operated as a continuation of Interworks' original relationship with QVC except in two regards: (1) QVC assigned the Model Cs sold by Digital Gadgets a different Stock Keeping Unit ("SKU") number due to Digital Gadgets being the entity that was now selling products to and through QVC;[13] and (2) the changes to the product distribution dynamics referenced above.  Kane Dep. (Ex. 22) at 23:5-11, 34:5-35:2. Namely, all three parties involved understood that the product offering would be identical to what it had been before Digital Gadgets' involvement—including Interworks continuing to satisfy any ancillary requirements QVC had previously articulated to Interworks as part of airing the Model C on QVC.  Lu. Dep. (Ex. 1) at 27:14-18, 44:11-16, 55:19-25; Kane Dep. (Ex. 22) at 34:5-35:2; Tebele Dep. (Ex. 21) at 43:3-21, 82:1-14; Lu Dec. (Ex. 2) at ¶ 16. Accordingly, QVC did not require Digital Gadgets to undergo any approval process or submit any of the information Interworks had been required to submit prior to the Model C airings on QVC in December 2016.  Tebele Dep. (Ex. 21) at 82:1-14.  It is also noteworthy that QVC did not set any particular time or quantity limits on the arrangement, it simply endeavored to sell the

---

[12] There is a dispute between Interworks and Digital Gadgets as to whether these goods were sold to Digital Gadgets on consignment.  Compare Lu Dep. (Ex. 1) at 89:2-24, with Tebele Dep. (Ex. 21) at 127:3-18.  However, it is noteworthy in this regard that Interworks own "Picking Sheets" for the December 2016 shipments to Digital Gadgets acknowledge the goods were being delivered on "consignment."  Lu Dep. (Ex. 1) at 89:2-15; Interworks Dec. 2016 Picking Sheets (Ex. 25) at *1-8.

[13] Specifically, the SKU number QVC assigned to the Model Cs purchased from Interworks was T34604 (the "T34604 Model Cs").  Lu Dec. (Ex. 2) ¶ 8.  The SKU number QVC assigned to the Model Cs purchased from Digital Gadgets was T34764 (the "T34764 Model Cs").  Kane Dep. (Ex. 22) at 26:17-27:3.

Model C without interruption until Digital Gadgets' inventory was exhausted.  Kane Dep. (Ex. 22) at 31:7-24.

In December 2016, QVC did at least two additional airings for the Model C and subsequently uploaded recordings of the same to YouTube on December 10, 2016, and December 14, 2016.[14]   QVC YouTube Channel Screenshots (Ex. 20) at *5-6.  The video descriptions for those videos contained a link to redirect the viewer to QVC's website, which contained yet another QVC Model C infomercial.[15]   Id.  QVC sold over 3200 Model Cs in December 2016 alone and continued to sell the product through December 2017—selling approximately 18,000 units in total.  Compare Lu Dep. (Ex. 1) at 16:21-22, with QVC T34764 Model C Spreadsheet (Ex. 29) at *1.

On or before December 12, 2016, Ms. Wade watched one of the Model C infomercials broadcasted on the QVC network (the same infomercial that QVC uploaded to YouTube on December 10, 2016).  Wade Dec. (Ex. 30) ¶ 1.  She watched the infomercial through her cable provider, Verizon Fios, on channel 650.  Id. ¶ 2.  At the time she watched the infomercial, she was at her home in North Chesterfield, Virginia.  Id. ¶ 3.  After watching the infomercial, she visited the QVC website and ordered a T34764 Model C.  Id. ¶ 4.  She placed the order on December 12, 2016, from either her work office or her home (both of which are in Virginia).  Id. ¶¶ 4-5.  Digital Gadgets shipped the Model C via UPS to the address designated by Ms. Wade, located in Richmond, Virginia.  Id. ¶¶ 4, 6; Wade Dec. Ex. A at 1.  The Model C that Ms. Wade

---

[14] The airings of the Model C that occurred during this time are being filed under separate cover as Exhibits 26-27.  The videos are still active on QVC's YouTube channel and can be viewed at: https://www.youtube.com/watch?v=R44HLe-z0qY
https://www.youtube.com/watch?v=xl_-f_5PCzY

[15] Specifically, the video descriptions contain a link to http://qvc.co/2hglMh0, which is the QVC page for the T34764 Model C.  QVC Model C Website Screenshot (Ex. 28) at *1.  That page remained active until just recently, but has now seemingly been deleted.

ordered contained the User Manual docketed in this case as ECF No. 1-1 (i.e., the same document appended hereto as Exhibit 31).  Wade Dec. (Ex. 30) ¶ 8.[16]

## ARGUMENT

For the reasons specifically stated below, Ms. Wade is able to prove each of the prerequisites to an entry of default judgment against Interworks in this case.[17]

### I.    Interworks is Subject to Personal Jurisdiction in Virginia.

#### a.   The Standards Governing the Exercise of Personal Jurisdiction.

When a federal court sits in diversity, it "has personal jurisdiction over a non-resident defendant if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process."  Nichols v. G.D. Searle & Co., 991 F.2d 1195, 1199 (4th Cir. 1993).  Where, as here, the state's long-arm statute is coextensive with constitutionally permissible limits, the inquiries merge and the sole issue to be resolved is the due process inquiry. Young v. New Haven Advocate, 315 F.3d 256, 261 (4th Cir. 2002).

"A court may exercise general or specific personal jurisdiction."  Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 188 (4th Cir. 2016).[18]  "For a court to have specific personal jurisdiction over a defendant, the defendant must have 'purposefully established minimum contacts in the forum State' such 'that [it] should reasonably anticipate being haled into court there.'"  Id. at 189 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)).  The Fourth Circuit applies a three-part test for assessing whether the exercise of specific jurisdiction comports with due process requirements: "(1) [whether] the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of

---

[16] The User Manual remains available on the QVC website and is available at
https://www.qvc.com/footers/fth/pdf/T34604_UM-Manual.pdf

[17] There has already been an entry of default against Interworks (ECF No. 7).

[18] Ms. Wade does not contend Interworks is subject to general jurisdiction in this case.

those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Id. (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (internal quotation marks omitted). Even so, a personal jurisdiction analysis is not mechanical in nature. Id. (quoting Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 561 (4th Cir. 2014)). Rather, it takes into account the totality of the facts involved in each case. Id.

With respect to the due process analysis, it is well-settled that the unilateral activity of third parties claiming some relationship with the defendant cannot be imputed to the defendant for jurisdictional purposes. Hanson v. Denckla, 357 U.S. 235, 253 (1958). That being said, the Supreme Court has plainly stated that a nonresident defendant need not have a physical presence in the forum to have purposefully availed itself of the privilege of conducting activities in the same. Burger King Corp., 471 U.S. at 476. Moreover, a nonresident defendant may avail itself of the privilege of conducting activities in a forum through the acts of an intermediary or an agent who it has directed to take action there. Daimler AG v. Bauman, 571 U.S. 117, 135 n.13 (2014) ("[A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there.").

Indeed, the Fourth Circuit has previously found on multiple occasions that nonresident entities selling goods into a forum "through" other entities were subject to personal jurisdiction in the forum where the goods were sold. In Hardy, a manufacturer of parachutes ("Pioneer"), who was incorporated in Delaware and operated out of Connecticut, was found to be subject to personal jurisdiction in South Carolina in an action brought by a resident of South Carolina alleging that a parachute manufactured by Pioneer was defective and had injured her. Hardy v.

13

Pioneer Parachute Co., 531 F.2d 193, 195 (4th Cir. 1976).  The Fourth Circuit summarized the

relevant jurisdictional facts as follows:

> Pioneer is a Delaware corporation whose principal place of business is in Manchester, Connecticut. It owns no property in South Carolina, has no agents, employees or office in the state, and pays no taxes there. Although Pioneer occasionally makes direct sales to customers in South Carolina, **it primarily sells through its exclusive distributor**, Parachutes. Pioneer does no direct advertising but contributes to Parachutes' advertising budget.
>
> Parachutes, a New York corporation with its home office in Orange, Massachusetts, distributes and markets sports parachutes made by Pioneer. Parachutes owns no property in South Carolina, maintains no office or place of business there, and has no agents, employees, salesmen, distributors, or franchisees in the state. It advertises Pioneer's products in two nationally circulated magazines which reach subscribers in South Carolina. Since 1966, Parachutes has made at least 42 direct sales to customers in South Carolina. In March 1967, it sold the Pioneer parachute, whose safety is at issue in this case, for $361.00 to a resident of South Carolina in response to a telephone order from that state.

Id. at 195.  Notably, despite recognizing that Pioneer did not directly sell or advertise the product

at issue in South Carolina, the Fourth Circuit nonetheless deemed it to have done so through its

exclusive distributor:

> No unconstitutional burden is imposed on a foreign corporation by requiring it to defend a suit in a forum located in a state where it has advertised and sold a product whose use gave rise to the cause of action. We conclude, therefore, that the due process clause does not preclude entry of a judgment against Pioneer and Parachutes because they did not have more extensive contacts with South Carolina.

Id.

Another decision reaching a similar result is Anita's N.M. Style Mexican Food,

Inc. v. Anita's Mexican Foods Corp., 201 F.3d 314 (4th Cir. 2000).[19]  In that case, a

Virginia corporation known as "Anita's Virginia" brought suit against a California

---

[19] This case will be referred to herein after as "Anita's" for shorthand purposes and in short form citations.

corporation known as "Anita's California" regarding an alleged violation of a stipulated judgment the parties had previously reached (in California) during a trademark dispute regarding parties' use of the "ANITA'S" trademark.  Id. at 316.  Specifically, the terms of the stipulated judgment prohibited Anita's California from selling Mexican food products under the trademark "ANITA'S" outside of California.  Id.  Additionally, Anita's California agreed that it would ensure the compliance of its licensee, Queen International Foods, Inc. ("Queen International"), with the terms of the stipulated judgment.  Id.  The stipulated judgment contained a provision that Anita's California "controls the nature and quality of the goods and services sold in association with any trade name, trademark, or service mark comprising ANITA'S, by Queen International Foods, Inc."  Id.  Nonetheless, Queen International did sell food under the trademark ANITA'S outside of California and, specifically, in Virginia.  Anita's Virginia brought suit in Virginia alleging that Anita's California and Queen International were in violation of the stipulated judgment.  Id.

Anita's California contended that it was not subject to personal jurisdiction in Virginia because it had no office and no sales representatives in Virginia, and did not ship products in Virginia.  Id. at 318.  The Fourth Circuit observed, nonetheless, that "Anita's California . . . sold Mexican food products in Virginia through its licensee Queen International . . . ."  Id. (emphasis added).  The Court further reasoned that "[t]hese sales were purposeful and availed Anita's California of the benefit of doing business in Virginia under Virginia law."  Id. at 319.  Consequently, Anita's California could reasonably anticipate being haled into court in Virginia and was subject to personal jurisdiction there.  Id.

Abel v. Montgomery Ward Co. presents another decision which obtained the same result after analyzing facts mirroring the present case.  In that case, the Court found the foreign manufacturer of a bicycle to have taken action purposefully directed to Virginia where the manufacturer sold its bicycles to a domestic retailer who then marketed and resold the manufacturer's products in retail outlets in Virginia and other states.[20]  Abel v. Montgomery Ward Co., 798 F. Supp. 322, 327 (E.D. Va. 1992).[21]  The Court held that the manufacturer could fairly anticipate being haled into court in states where the retailer sold its product given it had contractually agreed to indemnify and defend the retailer against defective product claims, extend additional warranties that may flow through to consumers, purchase liability insurance for defective product claims, and provide instruction booklets to be distributed with the products.  Id.  The Court also found the manufacturer subject to personal jurisdiction in Virginia because the instruction booklet distributed with the product created "continuing obligations" between the manufacturer and consumer.  Id.  Accordingly, the manufacturer could not claim that its only connection between itself and the forum was the "unilateral activity" of the retailer.  Id.

The decisions of Hardy, Anita's, and Abel are not anomalies by any stretch of the imagination.  Other decisions have reached similar outcomes when analyzing similar facts. Selke v. Germanwings GmbH, 261 F. Supp. 3d 645, 655 (E.D. Va. 2017) (finding foreign airline had purposefully availed itself of the privilege of doing business in Virginia where it

---

[20] The manufacturer was a Taiwanese corporation not qualified to do business in Virginia and having no office or employee in Virginia.  Abel v. Montgomery Ward Co., 798 F. Supp. 322, 325 (E.D. Va. 1992).  The retailer's purchase of bicycles from the manufacturer occurred in Taiwan, and the retailer had then shipped the bicycles to Los Angeles, California.  Id.

[21] Notably, the Court found purposeful activity directed at Virginia on part of the manufacturer despite the lack of a technical manufacturer-distributor relationship with the forum retailer.  Id. at 327.  Moreover, the Court found purposeful activity directed at Virginia despite the manufacturer's argument that it did not create, control, or employ the distribution system that brought the product to Virginia.  Id.

16

contractually permitted a domestic airline to sell tickets to Virginia residents on its behalf); Jones v. Boto Co., 498 F. Supp. 2d 822, 829 (E.D. Va. 2007) (foreign defendant found to have purposefully directed activity at Virginia by selling its products to national retailers such as Walmart and Target while also maintaining a website available throughout the United States that offered product information and service to American consumers).

b.   Interworks Purposefully Directed Activities at Virginia Through QVC.

Interworks purposefully directed its activities at Virginia in such a manner that it is subject to personal jurisdiction here.  There can be no doubt that QVC advertised the Model C in Virginia and sold the Model C to Ms. Wade in Virginia.[22]   The issue to be resolved is whether Interworks may be treated as having advertised and sold the Model C in Virginia through QVC, thereby rendering it subject to personal jurisdiction here.  Anita's, 201 F.3d at 318; Hardy, 531 F.2d at 195.  Phrased alternatively, if QVC's advertising and selling of the Model C in Virginia amounts to mere unilateral conduct by a third party, those contacts are not chargeable to Interworks for jurisdictional purposes.  Hanson, 357 U.S. at 253.  Even though it is unknown how many Model Cs were sold in Virginia, if Interworks sold Ms. Wade the Model C at issue in this case through QVC, that single transaction alone would be sufficient to render Interworks subject to personal jurisdiction in Virginia.  Hardy, 531 F.2d at 195 ("A single transaction is a sufficient contact to satisfy [the minimum contacts] standard if it gives rise to the liability asserted in the suit.") (citations omitted).

In this case, it is clear that Interworks was selling its products through QVC and therefore purposefully availed itself of the privilege of conducting business in Virginia.  Certainly as to the Model Cs sold on QVC throughout November 2016, no guesswork is needed on the issue.

---

[22] Generally speaking, an online sale is deemed to occur where the goods are delivered.  South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2092 (2018) (citations omitted).

Interworks repeatedly characterized the nature of its relationship with QVC as one in which it was selling the Model C "through" QVC—both in the declaration of its owner and a related court filing.  Lu Dec. (Ex. 2) ¶¶ 5, 16; Interworks' Mem. in Supp. Summ. J. (Ex. 5) at vii, 1-2.  Even if that admission were not present, there is abundant evidence to support this conclusion.  From its very inception, the relationship between Interworks and QVC could not be said to resemble a traditional vendor-vendee relationship.  Such a relationship typically contemplates the sale of goods by the vendor to the vendee, with delivery marking the point in time in which the parties operate independently of each other.  Rock-Ola Mfg. Corp. Wertz, 249 F.2d 813, 817 (4th Cir. 1957).  Here, however, QVC advertised and marketed the Model Cs while the goods remained in Interworks' possession.  Lu Dec. (Ex. 2) ¶ 9.  Interworks would only send Model Cs to QVC as sales were occurring.  Id.  This arrangement necessitated ongoing contacts between Interworks and QVC such that neither one was ever actually operating independently of the other.  Indeed, QVC itself describes its role in marketing and advertising products as one that differentiates it from traditional retailers and enables vendors to build relationships with millions of QVC customers.  QVC Vendor Website Screenshot (Ex. 7) at *1.  The intent that QVC operate as an intermediary for Interworks to indirectly sell its products to QVC's customers is further borne out by the fact that Interworks itself provided customer service for the Model Cs sold on QVC and set the cost of the product.  Lu Dep. (Ex. 1) at 33:2-8; QVC QA Rep. (Ex. 15) at *1; User Manual (Ex. 31) at *2-3, 5.

Other nuances of the relationship between Interworks and QVC further dispel any inference that it could fairly be characterized as an independent vendor-vendee relationship.  For example, prior to QVC initiating its advertising and marketing of the Model C, Interworks submitted product "claims" to QVC to use in advertising and marketing the Model C.  QVC QA

Rep. (Ex. 15) at *2.  QVC also encouraged Interworks to submit additional product materials that could be used during customer contacts to increase the likelihood of sales, a statement which itself reveals Interworks' continuing stake in QVC's handling of its product.  Id. at *4.[23] Although Interworks did not directly contribute funds to a QVC marketing or advertising "budget" for the Model C like the manufacturer in Pioneer, it nonetheless shared in QVC's related advertising and operational costs.  Namely, Interworks purchased an insurance policy on behalf of QVC which specifically guarded QVC against the risk of product-related litigation and advertisement-related litigation.  Id. at *2.  Moreover, Interworks absorbed all pre-sale storage costs for Model C inventory earmarked for QVC as well as the risk of any intervening damage to the Model C inventory.  Lu Dec. (Ex. 2) ¶ 9.  Thus, Interworks not only shouldered part of QVC's advertising and operational costs, it also adjusted QVC's liability risks to be far more consistent with that of an agent (who maintained a substantial physical, broadcast, and online presence in Virginia) instead of an independent vendee. See Rock-Ola Mfg. Corp. Wertz, 249 F.2d at 817 (noting vendee's personal guaranty to vendor militated against a finding of agency as it increased the vendee's risk beyond what would be expected for an agent).

Additionally, Interworks unquestionably retained a right of control in its relationship with QVC.  As the trademark owner of the "High Roller" brand and logo, Interworks had the right to control QVC's use of its trademarks as well as the quality of goods sold under those trademarks. Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 107 (4th Cir. 1991); Crinkley v. Holiday Inns, Inc., 844 F.2d 156, 166 (4th Cir. 1988).  This level of control alone is both telling of an agency relationship and sufficient to treat Interworks as selling its products through QVC. Anita's, 201 F.3d at 317-18.  Indeed, the only dynamic present between Interworks and QVC

---

[23] It is also noteworthy that such consumer contacts were relatively likely to be handled in Virginia given one of QVC's two domestic call centers is located in Virginia.

which tends to suggest an actual vendor-vendee relationship is the fact that QVC would purchase units for resale instead of receiving a sales commission.  However, the Fourth Circuit has made clear that where a nonresident defendant is selling its products into the forum through an intermediary, merely selling goods to the intermediary for resale as opposed to paying the intermediary a sales commission will not defeat the exercise of personal jurisdiction.  Kahn v. Maico Co., 216 F.2d 233, 235 (4th Cir. 1954).

The case for exercising personal jurisdiction over Interworks becomes even stronger when examining the nature of its relationship with QVC in December 2016 (i.e., the period of time when Ms. Wade watched the QVC infomercial and ordered the Model C at issue in this case).  In addition to the foregoing points, Interworks acquired even greater control over QVC in that Interworks gained control over the customer distribution process itself, having the right to decide which entity would be used to send Model Cs to QVC customers.  Lu Dep. (Ex. 1) at 85:5-24.  Moreover, as the exclusive distributor of the Model Cs, Interworks essentially had the ability to control the duration of QVC's sale of Model Cs, which could only continue so long as Interworks was willing to provide Digital Gadgets inventory.  Kane Dep. (Ex. 22) at 31:7-24.

Interworks also shipped the Model C at issue into Virginia "through" its partner, Digital Gadgets.  Lu Dep. (Ex. 1) at 18:24-19:14, 23:8-12. Although Digital Gadgets technically functioned as an intermediate vendor between QVC and Interworks, it is clear that the arrangement was really a de facto continuation of Interworks' original relationship with QVC. This reality is borne out by the express characterizations of Interworks and Digital Gadgets as to the nature of their relationship—i.e., a partnership in which Digital Gadgets was merely meant to "fill Interworks' shoes" vis-à-vis QVC.  Lu Dec. (Ex. 2) ¶ 29; Lu Email (Ex. 23) at *1; Tebele

20

Dep. (Ex. 21) at 38:25-39:14, 116:8-20.[24]  It is also demonstrated by several facts: (a) Digital Gadgets was simply able to stand on QVC's prior approval of the Model C (submitted by Interworks) and was not required to go through any separate product approval process prior to QVC airing and selling the Model C in December 2016; (b) Interworks, as opposed to Digital Gadgets, remained responsible for insuring QVC and ensuring all Model Cs sold to Digital Gadgets complied with QVC standards; (c) Interworks did not run any credit check for Digital Gadgets and stopped selling Model Cs to QVC after partnering with Digital Gadgets; (d) Interworks purchased insurance for Digital Gadgets—thereby absorbing part of Digital Gadgets' operating/advertising costs and altering Digital Gadgets' liability risks to be commensurate with those of an agent; and (e) Interworks sold the Model Cs to Digital Gadgets on consignment, meaning Digital Gadgets would only pay for them as they sold on QVC.  Lu. Dep. (Ex. 1) at 27:14-18, 44:11-16, 55:19-25, 81:9-21; 90:19-25, 106:1-25; Kane Dep. (Ex. 22) at 34:5-35:2; Tebele Dep. (Ex. 21) at 43:3-21, 82:1-14, 127:3-18

Moreover, even if there were any question about whether Interworks could be considered to have been advertising and selling the Model Cs through QVC, it is beyond dispute that Interworks was a <u>direct participant in the sales made by QVC for a different reason</u>.  <u>Kahn</u>, 216 F.2d at 235.  Namely, Interworks made a number of express warranties regarding the Model C directly to QVC's customers in the User Manual.[25]  <u>Abel</u>, 798 F. Supp. at 327; <u>see also</u> <u>King v.</u>

---

[24] Whether their relationship technically amounted to a joint venture or partnership does not change the outcome because, under either arrangement, Interworks and Digital Gadgets would be considered agents of each other.  <u>Burruss v. Green Auction & Realty Co.</u>, 228 Va. 6, 10, 319 S.E.2d 725, 727 (1984) ("Joint venturers, like partners, have the dual status of principals for themselves and agents for all other joint venturers, within the scope of the enterprise.").

[25] Moreover, Interworks' statements of fact regarding the safety features of High Roller hoverboards as broadcasted in its YouTube video could also further give rise to such continuing contacts and obligations because those representations constitute actionable express warranties to consumers.

Blackpowder Prods., No. 7:15-CV-00212, 2016 U.S. Dist. LEXIS 95660, at *8-10 (W.D. Va. July 22, 2016) (citations omitted).  Interworks designated itself in the User Manual as the point of contact for customer service and/or customer requests for permission to modify the Model C without voiding any warranty on the same.  User Manual (Ex. 31) at *2-5.  Interworks subtly employed the content of the User Manual to further advertise High Roller products and solicit additional business by prominently displaying the High Roller logo on a page which also referred QVC customers to the EMiO website Interworks used to sell High Roller products.  Id. at *5[26] Thus, at an absolute minimum, Interworks actually participated in the QVC sales (regardless of whether QVC would be considered a sales agent for Interworks) and QVC and Digital Gadgets acted as Interworks' agents for communicating these various warranties, instructions, and advertisements to QVC customers.  Kahn, 216 F.2d at 235; see also Abel, 798 F. Supp. at 327. Accordingly, Interworks' contacts with Virginia were not in any way the result of mere "unilateral activity" by third parties—but, in fact, Interworks' own activities.[27]  Abel, 798 F. Supp. at 327.

### c.   Ms. Wade's Claim Arose out of Interworks' Activities with Virginia.

With respect to the second prong of the jurisdictional analysis—i.e., whether Ms. Wade's claims arose out of Interworks' activities with Virginia—this requirement is clearly met.  A claim arises out of a defendant's activities with the forum if those activities "precipitated" or were the "genesis" of the plaintiff's claim.  Selke, 261 F. Supp. 3d at 657.  In the instant case,

---

[26] The Fourth Circuit has recognized that a trademark serves as an advertising device.  Arrow Distilleries, Inc. v. Globe Brewing Co., 117 F.2d 347, 351 (4th Cir. 1941).

[27] Admittedly, the degree of Interworks' direct involvement in drafting the content of the User Manual is not known.  However, the User Manual bears Interworks' various trademarks (i.e, the "EMiO" language, the "High Roller" language, and the "High Roller" graphic logo) in such a manner that its content may be fairly ascribed to Interworks.  United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 98 (1918) (noting that a trademark functions as a "commercial signature" on merchandise and the package in which it is sold).

Ms. Wade purchased a Model C through QVC as a result of Interworks' dealings with QVC and is bringing the instant action alleging that the User Manual included with that purchase (i.e., the one supplied to QVC by Interworks) contained false statements of fact regarding the Model C's safety features in violation of Virginia law.  As a result of those false statements, Ms. Wade was injured in her attempt to operate the Model C that she purchased through QVC.

          d.   <u>The Exercise of Personal Jurisdiction over Interworks is Reasonable.</u>

Turning to the third prong of the jurisdictional analysis, the exercise of personal jurisdiction over Interworks is constitutionally reasonable.  <u>Perdue Foods LLC</u>, 814 F.3d at 189. In making this determination, the Court must take account of factors such as the following: "(a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering fundamental substantive social policies." <u>Lesnick</u>, 35 F.3d at 946 (citations omitted).

Ms. Wade has a clear interest in litigating this matter in her home state and Virginia has a strong interest in providing a means of redress for its citizens who have been injured by products that malfunctioned, as well as ensuring products being sold into the Commonwealth meet its safety standards. <u>First American First, Inc. v. National Asso. of Bank Women</u>, 802 F.2d 1511, 1518 (4th Cir. 1986); <u>Jones</u>, 498 F. Supp. 2d at 830; <u>Abel</u>, 798 F. Supp. at 329.    While Interworks may have faced some burden by having to litigate in Virginia, the burden would have been mitigated by the fact that Interworks had purchased liability insurance for the very purpose of defending such claims.  Moreover, any burden that exists is certainly less than foreign entities that have been required to do so in similar circumstances in the face of similar competing interests held by the plaintiff and the Commonwealth.  <u>Selke</u>, 261 F. Supp. 3d at 658; <u>Jones</u>, 498

23

F. Supp. 2d at 831; <u>Abel</u>, 798 F. Supp. at 329.  Accordingly, the Court should find the exercise of specific personal jurisdiction over Interworks to be constitutionally reasonable in this case.[28]

## II.   **The Court is Vested with Subject Matter Jurisdiction to Adjudicate this Dispute.**

The Court is vested with diversity jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.  Specifically, Interworks resides in California and Ms. Wade resides in Virginia.  Lu Dep. (Ex. 1) at 7:20-24; Wade Dec. (Ex. 30) ¶ 3.  Moreover, the amount of Ms. Wade's medical bills related to the injuries claimed in this lawsuit alone exceed the requisite jurisdictional amount.  Wade Dec. (Ex. 30) ¶ 19.

## III.   **Venue is Properly Laid in this Court.**

Venue is properly laid in this Court as a substantial part of the acts and omissions that gave rise to this lawsuit occurred within this judicial district and division.  28 U.S.C. § 1391(b)(2); LR 3(B)(4), (C).  Specifically, the following material events giving rise to Ms. Wade's claim against Interworks occurred in this district and division: (1) Ms. Wade watched the QVC Model C broadcast which enticed her to purchase the Model C; (2) Ms. Wade ordered the Model C that did not function as represented from QVC's website; (3) Digital Gadgets delivered the Model C to an address in Richmond, Virginia; (4) Ms. Wade read and relied upon the allegedly inaccurate statements made by Interworks in the User Manual; and (5) Ms. Wade suffered the injuries for which she is seeking relief.  Wade Dec. (Ex. 30) ¶¶ 1-19; Wade Dec. Ex. A at 1.

---

[28]  Ms. Wade is not aware of any authority to suggest that "the efficient resolution of controversies as between states" or "the shared interests of the several states in furthering fundamental substantive social policies" would either favor or disfavor the exercise of personal jurisdiction in this case.

IV.    **Interworks Received Service of Process.**

Interworks received service of process.  Rule 4 permits, <u>inter alia</u>, a plaintiff to serve process upon a corporation in any manner permitted by state law of the forum in which the district court is situated. Fed. R. Civ. P. 4(b)(1)(A). Virginia law, in turn, authorizes service on a foreign corporation by service of process on the Secretary of the Commonwealth in accordance with Section 8.01-329.  Va. Code Ann. § 8.01-301(3).  The Certificate of Compliance by the Service of Process Clerk for the Secretary of the Commonwealth (docketed at the second page of ECF No. 4 in this case) confirms Interworks was served in accordance with the provisions of Section 8.01-329.

V.    **Ms. Wade's Complaint States Plausible Claims for Relief Against Interworks.**

Ms. Wade's Complaint asserts two claims against Interworks.  The first claim is based upon Interworks' alleged violations of the Virginia Consumer Protection Act ("VCPA")—specifically, Section 59.1-200(14).  <u>See</u> Compl. ¶¶ 15-21, ECF No. 1, Nov. 30, 2018.  The second claim is based upon Interworks' various breaches of express warranties made in the User Manual.  Compl. ¶¶ 22-29.  The well-pleaded factual allegations in Ms. Wade's complaint plausibly state a claim for relief under both theories for the reasons set forth below.

a.    <u>Ms. Wade's Complaint Alleges a Plausible VCPA Claim Against Interworks</u>.

To state a claim for relief under the VCPA, a plaintiff must allege facts which plausibly establish that a "supplier" engaged in conduct prohibited by Section 59.1-200 in connection with a "consumer transaction."  Va. Code Ann. § 59.1-200.  It is important to address that decisional law historically interpreted the VCPA as requiring an intent to defraud or deceive on part of the supplier for the supplier's conduct to be actionable.  <u>See, e.g.</u>, <u>Padin v. Oyster Point Dodge</u>, 397 F. Supp. 2d 712, 722 (E.D. Va. 2005).  However, the Supreme Court of Virginia has clarified

that the reach of VCPA is significantly broader than that of common law fraud and, accordingly, "[t]he VCPA clearly does not require the consumer to prove in every case that misrepresentations were made knowingly or with the intent to deceive." Ballagh v. Fauber Enters. Inc., 290 Va. 120, 773 S.E.2d 366, 368-70 (2015). Accordingly, a complaint sufficiently alleges a VCPA claim by alleging a misrepresentation by a supplier in connection with a consumer transaction, provided it also alleges that the consumer relied on the representation and suffered damages as a result. In re Lumber Liquidators Chinese-Manufactured Flooring Durability Mktg. & Sales Practice Litig., No. 1:16md2743, 2017 U.S. Dist. LEXIS 105335, at *42 (E.D. Va. July 7, 2017) (citing Ballagh, 290 Va. at 370).[29]

Ms. Wade has alleged all of the essential elements of a VCPA claim in her complaint. A "supplier" under the VCPA includes a "distributor . . . who . . . sells . . . goods . . . to be resold . . . by other persons in consumer transactions." Va. Code § 59.1-198. Ms. Wade has alleged that Interworks is the distributor of the Model C at issue in this case. See Compl. ¶ 8 (attaching the Model C User Manual as Exhibit A to the pleading); Compl. Ex. A at *2 (identifying Interworks as the distributor of the Model C).[30] The VCPA definition of "consumer transactions" includes "the . . . sale . . . of goods . . . to be used primarily for personal, family or household purposes." Va. Code Ann. § 59.1-198. Accordingly, Ms. Wade has alleged that Interworks' wrongful conduct occurred in connection with a "consumer transaction" because she alleges that it arises out of her purchase of the Model C hoverboard as a Christmas present for her son. Compl. ¶ 6.

Finally, Ms. Wade alleges that Interworks violated the VCPA by specifically identifying a number of false promises or misrepresentations made by Interworks in the User Manual with

---

[29] This case will be abbreviated as "In re Lumber Liquidators" in subsequent citations.
[30] Ms. Wade may rely on the User Manual's identification of Interworks as a distributor because an exhibit appended to a complaint becomes a part of the complaint for all purposes. Fed. R. Civ. P. 10(c).

respect to the Model C hoverboard.  Va. Code Ann. 59.1-200(14) (prohibiting a supplier from, inter alia, making any other false promise or misrepresentation in connection with a consumer transaction).  Specifically, Ms. Wade's pleading identified the particular statements from the User Manual allegedly violative of the VCPA, included the actual User Manual containing the false and/or misrepresentative statements as an exhibit to the Complaint, and alleged the statements were substantively false and/or misrepresentative by asserting: (a) the Model C's self-balancing technology would allow for secure forward movement; (b) an alarm and indicator light on the Model C would warn users if they were not at a sufficiently self-balanced state to enable safe movement on the same; and (c) wrist guards were not part of the safety gear needed to safely operate the "High Roller" hoverboard.  See Compl. ¶¶ 10-11, 20.

Finally, Ms. Wade has alleged that she read the User Manual and relied on the allegedly false and/or misrepresentative statements in the User Manual in selecting the safety equipment she wore (which excluded wrist guards) and attempting to maneuver the Model C forward (i.e., she did so given the User Manual's representation that the Model C was equipped with self-balancing technology and would sound an alarm and activate a warning light if the Model C were not sufficiently self-balanced to allow safe movement).  Id. ¶¶ 8-12.  Hearing no alarm and seeing no warning light, Ms. Wade attempted to move forward and, when she did, the Model C lurched backwards in an unexpected and unpredictable manner that caused Ms. Wade to fall forward and suffer severe fractures in her left arm and wrist.  Id. ¶¶ 12-13.  These injuries, in turn, gave rise to significant economic and noneconomic damages.  Id. ¶¶ 14, 21.

Accordingly, Ms. Wade has alleged a plausible claim for relief against Interworks under the VCPA.  In re Lumber Liquidators, 2017 U.S. Dist. LEXIS 105335, at *42.

   b.  Ms. Wade's Complaint Alleges a Plausible Breach of Express Warranty
       Claim Against Interworks.

Ms. Wade has plausibly alleged a claim for breach of express warranty against Interworks. Stating a plausible claim for breach of express warranty relief requires only that the plaintiff allege some statement or affirmation by the defendant that could plausibly create an express warranty as well as facts plausibly demonstrating the goods at issue did not conform with the warranty. See, e.g., Barber v. Sam's Club E., Inc., No. 6:17-CV-00035, 2017 U.S. Dist. LEXIS 166453, at *8 (W.D. Va. Oct. 7, 2017); Fields v. Jobar Int'l, Inc., No. 3:14CV50, 2014 U.S. Dist. LEXIS 52855, at *16 (E.D. Va. Apr. 16, 2014).

Section 8.2-313(b) provides that "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Va. Code Ann. § 8.2-313(1)(b). A "seller" under Section 8.2-313 is simply "a person who sells or contracts to sell goods." Va. Code Ann. § 8.2-103. Accordingly, it is not necessary to allege that the defendant sold the goods at issue specifically to the plaintiff to plausibly state a claim for breach of express warranty against the defendant. Fields, 2014 U.S. Dist. LEXIS 52855, at *16 (citations omitted). Nor is it necessary to allege "any reliance on" or "actual knowledge of the warranty-triggering language" by the plaintiff. Id.; see also Benedict v. Hankook Tire Co., 295 F. Supp. 3d 632, 653 (E.D. Va. 2018) (citations omitted). Section 8.2-313 also clarifies that "[i]t is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty." Va. Code Ann. § 8.2-313(2). The sole inquiry is simply whether the statement may fairly be treated as a "basis of the bargain." Benedict, 295 F. Supp. 2d at 653 (citations omitted). In this regard, "all of the statements of the seller [are part of the basis of the bargain] unless good reason is shown to the contrary." Id. (internal quotations and citations omitted) (alterations in original).

Here, by alleging that Interworks is the distributor of the Model C, Ms. Wade has alleged that Interworks is a "seller" of the Model C. <u>See</u> Compl. ¶ 8 (attaching the Model C User Manual as Exhibit A to the pleading); Compl. Ex. A at *2 (identifying Interworks as the distributor of the Model C).  Ms. Wade also alleged that Interworks made a number of descriptive statements in the User Manual regarding the Model C that became a basis of the bargain, including: (a) the Model C's self-balancing technology would allow for secure forward movement on the same; (b) an alarm and indicator light on the Model C would warn users if they were not at a sufficiently self-balanced state to enable safe movement on the same; and (c) wrist guards were not part of the safety gear needed to safely operate the Model C.  <u>See</u> <u>id.</u> ¶¶ 10-11, 24-25; <u>see also</u> <u>See</u> <u>King</u> <u>v. Blackpowder Prods.</u>, 2016 U.S. Dist. LEXIS 95660, at *5-10 (holding rifle distributor's statements in product manual regarding rifle firing capabilities created an actionable express warranty against distributor even though plaintiff had purchased the rifle from a retailer). Lastly, Ms. Wade alleged that the Model C did not conform to these descriptions, and that such nonconformity caused her injuries in this case.  <u>See</u> Compl. ¶¶ 26-30.  These allegations are sufficient to have plausibly stated a claim for breach of express warranty against Interworks.

## <u>CONCLUSION</u>

Accordingly, having proven that all prerequisites to an entry of default judgment against Interworks are met in this case, Ms. Wade respectfully requests that the Court enter default judgment in her favor in an amount to be established after hearing evidence by Ms. Wade on the quantum of her damages.

Respectfully submitted,

SHERI WADE


By: _____/s/_____
                        Counsel

Jonathan E. Halperin, Esq. (VSB No. 32698)
Andrew Lucchetti, Esq. (VSB No. 86631)
Isaac A. McBeth, Esq. (VSB No. 82400)
Halperin Law Center, LLC
5225 Hickory Park Drive, Suite B
Glen Allen, VA 23059
Phone: (804) 527-0100
Facsimile: (804) 597-0209
jonathan@hlc.law
andrew@hlc.law
isaac@hlc.law

and

Brody Reid, Esq. (VSB No.75343)
Reid Goodwin, PLC
4116 Fitzhugh Avenue
Richmond, Virginia 23230
Phone: (804) 415-7800
Facsimile: (804) 415-7560
breid@reidgoodwin.com
*Counsel for Plaintiff*