1  Roger C. Hsu - SBN 170589
2  Joseph M. Liu - SBN 220938
   LAW OFFICES OF ROGER C. HSU
3  175 South Lake Avenue, Suite 210
4  Pasadena, CA 91101
   Telephone: (626) 792-7936
5  Facsimile: (626) 685-2859
6  rchlaw@att.net
   joseph@liu.com
7
8  Attorneys for Plaintiff/Counter Defendant Interworks Unlimited, Inc.

9
              UNITED STATES DISTRICT COURT
10
              CENTRAL DISTRICT OF CALIFORNIA
11

12
13 | Interworks Unlimited, Inc., a California ) **Case No. 2:17-cv-4983 AB TJH KSx)**
   | corporation,                            )
14 |                                         ) **DECLARATION OF ERIC LU IN**
15 |                   Plaintiff,            ) **SUPPORT OF PLAINTIFF'S**
   |        v.                               ) **MOTION FOR SUMMARY**
16 |                                         ) **JUDGMENT, OR IN THE**
17 | Digital Gadgets, LLC., a New Jersey     ) **ALTERNATIVE FOR SUMMARY**
   | limited liability company,              ) **ADJUDICATION OF CLAIMS**
18 |                                         )
19 |                   Defendant.            ) Date:     December 17, 2018
   | _____ ) Time:     UNDER SUBMISSION
20 |                                         ) Courtroom: 9B
21 | Digital Gadgets, LLC., a New Jersey     )
22 | limited liability company,              )
   |                                         )
23 |                   Counterclaimant,      )
24 |        v.                               )
   |                                         )
25 | Interworks Unlimited, Inc., a California )
26 | corporation,                            )
   |                                         )
27 |                   Counter-defendant     )
28 | _____ )

                              - 1

**EXHIBIT 2**

1. I am an authorized representative of Plaintiff Interworks Unlimited, Inc. ("Plaintiff") and am authorized to make this declaration on its behalf. I have personal knowledge of each of the facts set forth in this Declaration, and can testify competently thereto, except as to the matters stated on information and belief, and as to such matters I believe them to be true.

2. I am also a custodian of records of the Plaintiff and am authorized to authenticate the exhibits stated below. These exhibits contain information compiled, prepared or received by qualified personnel of the Plaintiff in the course of regularly conducted business activities, were made at or near the time of the occurrence of the matters set forth by a person with knowledge of those matters, pursuant to a business duty to keep accurate and complete records, are made and kept in the course of the regularly-conducted business activities, and were made and kept by the regularly conducted business activities as a regular practice.

3. Plaintiff is a distributor of electronic goods.

4. It was the exclusive U.S. distributor of hoverboards manufactured by the Chinese company Hangzhou Chic Intelligent Technology CO., Ltd. including the hoverboards entitled "Chic High Roller Self Balancing Hoverboard Model C" ("Model C").

5. In late 2016, Plaintiff started selling Model C's through QVC, Inc. ("QVC").

6. Prior to selling the hoverboards, Plaintiff was required to, and did, submit the hoverboards to QVC for quality testing.

7. The Model C's subsequently passed QVC's quality testing. A true and correct copy of the QVC Quality Assurance report that the Plaintiff received from QVC reflecting this is attached to Plaintiff's Exhibits and Evidence in Support of Motion for Summary Judgment ("PE") as Exhibit 1 and incorporated by reference.

8. QVC assigned the Model C's it purchased from the Plaintiff with a Stock Keeping Unit ("SKU") number of T34604 ("604").

9. The Model C's were designated as a warehouse item. That means, after a consumer purchased the hoverboards, the Plaintiff would deliver the product to QVC, who would deliver the product to the customer.

10. As the holiday season approached, QVC wanted to purchase more Model C's from Plaintiff and was interested in purchasing the hoverboards on a "drop-ship" basis.

11. For a drop ship item, as opposed to a warehouse item, QVC continues to sell a vendor's products; however, the vendor is not required to deliver the products to QVC, and QVC does not deliver to the consumer. Rather, a vendor delivers the products directly to the purchasing customer, cutting down a significant amount of time.

12. Plaintiff, however, did not have the ability to "drop ship" the hoverboards to QVC's customers.

13. Thus, in or about December of 2016, Plaintiff decided to enter into an arrangement with Defendant Digital Gadgets, LLC. ("Defendant"), who said they had the ability to drop ship with QVC.

14. In that arrangement, the Defendant would purchase the Model C's from the Plaintiff. QVC's customer would then purchase the boards from QVC and then the Defendant would ship the boards directly to QVC's customer.

15. The two individuals I spoke to primarily for the Defendant were Chris Mitchell and Charles Tebele.

16. The Plaintiff and Defendant understood that Defendant was purchasing the same exact units that Plaintiff had been selling through QVC.

17. On or about December 9, 2016, Defendant placed an order with the Plaintiff for 4800 Model C's of varying colors at $190/unit, agreeing to pay a total of $912,000.00, payable Net 60 Days.

18. The hoverboards were shipped to the Defendant in 8 separate shipments. A true and correct copy of the 8 invoices prepared by the Plaintiff that reflect these 8

shipments are attached in the PE as Exhibit 2 and incorporated by reference. A true and correct copy of the 8 picking sheets that Plaintiff prepared are attached in the PE as Exhibit 3 and incorporated by reference. And a true and correct copy of the Bills of Lading for each of the 8 shipments are attached in the PE as Exhibit 4 and incorporated by reference.

19. Per Defendant's instructions, the Plaintiff shipped the hoverboards to Phoenix Warehouse in the City of Santa Fe Springs.

20. Subsequently, and at Defendant's behest, after the hoverboards were shipped, Plaintiff gave Defendant a discount of $30 on 1,613 of those 4800 hoverboards for a total discount of $48,390.00. A true and correct copy of the credit memo that Plaintiff prepared reflecting this discount is attached in the PE as Exhibit 5 and incorporated by reference.

21. Thus, for the first order, the Defendant purchased $863,610.00 worth of Model C's.

22. On or about December 23, 2016, Defendant again ordered another 6000 Model C's hoverboards of varying colors, this time agreeing to pay $215.00 each, Net 60 Days, for a total of $1,290,000. A true and correct copy of the purchase order sent by the Defendant and received by the Plaintiff that reflects this purchase is attached in the PE as Exhibit 6 and incorporated by reference. A true and correct copy of the 5 invoices prepared by the Plaintiff that reflects the original purchase price are attached in the PE as Exhibit 7 and incorporated by reference.

23. After placing the second order, again, at Defendant's behest, Plaintiff provided Defendant with a discount on the second order of $55.00 per hoverboard. A true and correct copy of the 5 invoices prepared by the Plaintiff reflecting the discounted price are attached in the PE as Exhibit 8 and incorporated by reference.

24. The hoverboards were also shipped to Phoenix warehouse in 5 separate shipments. A true and correct copy of the 5 picking sheets prepared by the

Plaintiff that reflect the 5 separate shipments are attached in the PE as Exhibit 9 and incorporated by reference. And a true and correct copy of the Bills of Lading for each of the 5 shipments are attached in the PE as Exhibit 10 and incorporated by reference.

25. Of the 6000 hoverboards ordered, the Plaintiff delivered a total of 5808 hoverboards, for a total bill of $929,280.00.

26. Thus, together with the first order, the Defendant ordered a total of $1,792,890.00 worth of Model C's from the Plaintiff.

27. As of today, the Defendant has only made three payments for these two purchases. On or about December 23, 2016, the Plaintiff received a payment of $570,000.00. On or about March 1, 2017, the Plaintiff received another payment of $99,460.00, and, on or about March 13, 2017, the Plaintiff received another payment of $95,850.00.

28. Since then, there have been no other payments received for these two purchases, nor has there been any additional discounts provided. Defendant, thus, has an outstanding balance owing of $1,027,580.00.

29. During the course of our initial conversations, Plaintiff and Defendant discussed the possibility of Defendant being the exclusive vendor of the Model C's for QVC. I responded that we can have such an agreement but wanted to first meet to discuss our partnership further. A true and correct of an email reflecting such a discussion is attached in the PE as Exhibit 11 and incorporated by reference.

30. However, the conversation did not continue, and the two sides never agreed to an exclusivity agreement or execute any sort of written exclusivity agreement.

31. On or about April 16, 2017, with a balance owing of $1,027,580.00, the Defendant proposed, in part, on keeping all the boards, pay 50% by May 1, 2017, and pay the remaining 50% by June 5, 2017. As part of the proposal, the Defendant approached the exclusivity issue again and asked for "an exclusive contract drafted per our conversation." A true and correct copy of the proposal

that I received by email is attached in the PE as Exhibit 12 and incorporated by reference.

32. The Plaintiff never agreed this proposal.

33. On or about June 5, 2017, I requested by email that Defendant either pay the outstanding balance or to return the Model C's. A true and correct copy of that request is attached in the PE as Exhibit 13 and incorporated by reference.

34. On or about June 6, 2017, the Defendant responded by ignoring the outstanding balance issue but instead alleged that the hoverboards that the Plaintiff sold it had "a litany of QA issues." A true and correct copy of that email reflecting this response is attached in the PE as Exhibit 14 and incorporated by reference.

35. I responded the same day requesting that Defendant return the alleged defective hoverboards and asked that Defendant share a copy of the alleged QVC's QA report ("QVC's QA Report"). A true and correct copy of the email reflecting the foregoing response is also attached in the PE as Exhibit 14 and incorporated by reference. A true and correct copy of the QVC QA Report that I received from the Defendant is attached in the PE as Exhibit 15 and incorporated by reference.

36. The Defendant continued to refuse to pay and refused to return the products.

37. On or about June 23, 2017, I sent Defendant an email accompanied by a Return Merchandise Authorization Number ("RMA") of 1420 for the return of 5808 Model C's, and asking Defendant to make arrangement for its pick-up. A true and correct copy of this email reflecting the foregoing is attached in the PE as Exhibit 16 and incorporated by reference.

38. Defendant did not respond to this email.

39. Plaintiff sent another email on June 27, 2017 to reiterate its request to pick-up the boards. A true and correct copy of the email reflecting the foregoing is also attached in the PE as Exhibit 16 and incorporated by reference. Again, Defendant did not respond.

40. Plaintiff sent a third email on June 27, 2017 to request an update. Defendant finally responded, telling Plaintiff that the hoverboards were "currently on HOLD pending legal review." A true and correct copy of the emails reflecting the foregoing conversation are also attached in the PE as Exhibit 16 and incorporated by reference.

41. As of today, the Plaintiff has not received any returned hoverboards from the Defendant.

42. If the boards were returned today, the Plaintiff would not be able to sell them.

43. As of today, the Defendant has not notified the Plaintiff of any claim or suit related to the hoverboards Plaintiff sold to the Defendant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on 11-8-18
(date)

Eric Lu
Declarant