Case 3:18-cv-00828-MHL Document 10-21 Filed 03/19/19 Page 1 of 7 PageID# 176
Case 2:17-cv-04983-AB-KS Document 30-21 Filed 12/14/18 Page 6 of 108 Page ID #:907
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC                    Deposition of Charles Tebele

```
 1   UNITED STATES DISTRICT COURT
 2   CENTRAL DISTRICT OF CALIFORNIA
 3   ------------------------------------------x
 4   INTERWORKS UNLIMITED, INC., a
 5   California Corporation,
 6                    Plaintiff,
 7              -against-
 8   DIGITAL GADGETS, LLC; a New Jersey
 9   limited liability company,
10                    Defendant.
11   Case No:   2:17-cv-4983 AB KSx
12   ------------------------------------------x
13                         488 Madison Avenue
14                         New York, New York
15
16                         August 21, 2018
17                         10:01 a.m.
18
19        Examination Before Trial of the
20   Defendant by CHARLES TEBELE, pursuant to
21   Notice, before CINDY A. AFANADOR, a Notary
22   Public of the State of New York.
23
24
25
```

**EXHIBIT 21**

EXHIBIT 10                **H I N E S   R E P O R T E R S**                    123   1 (1)

Case 3:18-cv-00828-MHL   Document 10-21   Filed 03/19/19   Page 2 of 7 PageID# 177
Case 2:17-cv-04983-JHMKS   Document 30-2   Filed 12/14/18   Page 8 of 108   Page ID #:909
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC                   Deposition of Charles Tebele

### Page 6

```
 1  myself or my associate could make comments on
 2  your changes at trial and it would affect your
 3  credibility as a witness.
 4         MR. LAZARUS:  I think you are
 5  going over the line in instructing the
 6  witness, and now you are counseling the
 7  witness on matters that I should be
 8  counseling him on, not you.
 9         If a change needs to be made, the
10  change is going to be made, and the
11  effect is for the judge to instruct the
12  jury, not for you to instruct
13  Mr. Tebele.
14         Thank you.
15         MR. HSU:  I would take it that's
16  your objection, Mr. Lazarus?
17         MR. LAZARUS:  Lazarus.
18         MR. HSU:  Lazarus.
19         THE WITNESS:  He did that
20  yesterday too, to the other two.
21    Q.    Well, any objection from your
22  attorney, Mr. Lazarus, he's doing this to
23  preserve the record, so when there is a need
24  in the future, then he and I will get into
25  some kind of dispute in front of the judge,
```

### Page 7

```
 1  that's why he's doing this.
 2         Did you take any medication in
 3  the last 24 hours that would prevent you from
 4  giving your testimony today?
 5    A.    No.
 6    Q.    Okay.
 7         Other than Charlie Tebele, have
 8  you ever used any other name in the past?
 9    A.    Charles.
10    Q.    Any other names?
11    A.    No.
12    Q.    What's your current occupation?
13    A.    Entrepreneur.
14    Q.    Excuse me, I didn't catch that.
15    A.    Entrepreneur.
16    Q.    Entrepreneur.
17         Do you have an employer?
18    A.    Yes.
19    Q.    Who is that person?
20    A.    It's not a person.
21    Q.    When you say "it's not a person,"
22  what is the employer?  Who's the employer?
23    A.    Digital Gadgets; it's an entity.
24    Q.    Do you know the form of this
25  business entity?
```

### Page 8

```
 1    A.    Yes.
 2    Q.    What is that?
 3    A.    What is the form?
 4    Q.    Correct.
 5    A.    The form is the nature of the
 6  articles of how an organization is formed.
 7    Q.    Was it a corporation?
 8    A.    No.
 9    Q.    Was it an LLC?
10    A.    Yes.
11    Q.    What is your current position at
12  Digital Gadgets?
13    A.    President and CEO.
14    Q.    Do you own this company?
15    A.    Yes.
16    Q.    How long have you worked for your
17  company, Digital Gadgets?
18    A.    About ten years.
19    Q.    Is it accurate to say that
20  Digital Gadgets was established or formed
21  about ten years ago?
22    A.    I'm not sure exactly when it was
23  formed, but it might be a little bit more than
24  ten years ago.
25    Q.    And you don't recall what year?
```

### Page 9

```
 1    A.    I don't recall what year.
 2    Q.    Okay.
 3         Other than officer and owner of
 4  Digital Gadgets, are you a director?
 5         Strike that.
 6         Are you the sole managing member
 7  of Digital Gadgets?
 8    A.    I am the managing member.
 9    Q.    Are you familiar with a company
10  called Techpoint, LLC, one word,
11  T-E-C-H-P-O-I-N-T?
12    A.    Yes.
13    Q.    And do you know any business
14  affiliation between Techpoint, LLC and Digital
15  Gadgets?
16    A.    Yes.
17    Q.    And what is that business
18  affiliation?
19    A.    Techpoint, LLC sources certain
20  products for Digital Gadgets and serves as an
21  agency for sourcing products.
22    Q.    When you say "sourcing products,"
23  can you explain to me what "sourcing" means?
24    A.    Means finding sources that have
25  products that may be applicable for sale by
```

EXHIBIT 10           H I N E S   R E P O R T E R S           123 (6 - 9)

Case 3:18-cv-00828-MHL Document 10-21 Filed 03/19/19 Page 3 of 7 PageID# 178
Case 2:17-cv-04983-MHL-KS Document 50-2 Filed 12/14/18 Page 10 of 109 PageID #:917
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC    Deposition of Charles Tebele

|  |  |
|---|---|
| 1    (Tebele Exhibit 3, Document<br>2    bearing Bates stamp Interworks 7, marked<br>3    for identification.)<br>4    Q.    This letter apparently was<br>5 written by Thomas Carulli, supposedly a lawyer<br>6 working for this firm.  I'm looking at the<br>7 letterhead; Kaplan, Massamillo & Andrews.<br>8 Have you ever seen this document?<br>9    A.    Yes.<br>10    Q.    Did you hire this law firm to<br>11 write this letter to Interworks?<br>12    A.    Yes.<br>13    Q.    And let's look at the first<br>14 paragraph.<br>15        Says "Dear Mr. Lu, we represent<br>16 Digital Gadgets, LLC.  This is to place you on<br>17 notice that Interworks has violated the<br>18 exclusive right granted DG," that's Digital<br>19 Gadgets, "to sell Interworks products to and<br>20 through QVC, moreover, at a price less than<br>21 offered by Digital Gadgets, resulting in<br>22 significant and irreparable harm to Digital<br>23 Gadgets."<br>24    A.    Yes, it was terrible.<br>25    Q.    There are two issues raised by<br>Page 38 | 1 multiple occasions, I spoke to QVC.  I mean<br>2 this was a heavy issue, this wasn't a light<br>3 issue and we would never, as our company<br>4 policy, sell something that someone else<br>5 makes, to then have that company go and<br>6 compete with us on the same thing.<br>7    Q.    Well, that's fair.<br>8        So Chris Mitchell reported this<br>9 to you; what did he tell you, if anything,<br>10 that you recall pertaining to this exclusive<br>11 right?<br>12    A.    Look, I had many conversations<br>13 with Chris Mitchell and with Eric, but what I<br>14 will say is Interworks was in a jam, we helped<br>15 them, and explicit in the help was this<br>16 exclusive, which was being honored for a time,<br>17 but then at some point, Interworks decided to<br>18 go rogue and go behind our backs, so it was<br>19 not just implied, it was the tone of the<br>20 entire relationship.  And, moreover, we were<br>21 discussing further exclusive and further<br>22 accounts, so it wasn't that it was this one<br>23 little thing, it was beyond that.<br>24        At some point, Interworks just<br>25 decided that they were gonna not honor it.<br>Page 40 |
| 1 this paragraph.  One, the first one was the<br>2 exclusive right.  You don't recall seeing any<br>3 written documents or written agreements signed<br>4 by Interworks and Digital Gadgets pertaining<br>5 to this exclusive right?<br>6    A.    **I don't know about a written<br>7 agreement, however there is a certain<br>8 agreement without question between Interworks<br>9 and Digital Gadgets that when Digital Gadgets<br>10 was selling those goods to QVC, which<br>11 Interworks was stuck with and QVC canceled<br>12 their orders with, that Digital Gadgets would<br>13 fill Interworks' shoes as the exclusive<br>14 partner, there's no doubt about that.**<br>15    Q.    When you say "there's no doubt<br>16 about that," you know, what proof do you<br>17 recall?<br>18        MR. LAZARUS:  Objection to the<br>19    form of the question.<br>20    Q.    Let me ask you this:  When you<br>21 say there's no doubt about this exclusive<br>22 right, have you ever seen any e-mails sent by<br>23 Eric Lu?<br>24    A.    I've seen e-mails, I was on<br>25 conversations, I spoke to Chris Mitchell on<br>Page 39 | 1    Q.    Okay.<br>2        To your knowledge, is --<br>3    A.    **Which caused us a tremendous<br>4 amount of lost work and time and reputation.**<br>5    Q.    Do you know if Interworks is<br>6 currently selling hoverboards to QVC?<br>7    A.    I don't understand the question.<br>8    Q.    To your personal knowledge, is<br>9 Interworks selling hoverboards to QVC now?<br>10    A.    At this moment, I don't know.<br>11 Are they in business?<br>12    Q.    Which party is in business?<br>13    A.    Is Interworks still in business?<br>14    Q.    That's why I'm here.<br>15    A.    I don't understand.<br>16    Q.    Well, you know, maybe your<br>17 attorney can ask my client that question two<br>18 weeks from now.<br>19    A.    Okay.  I don't know if they are<br>20 selling it.  I don't even know if they are in<br>21 business.  I'm hearing all kinds of things in<br>22 the trade about deceptive things that they are<br>23 doing, so I don't know if they are there, they<br>24 are not there, they are selling, they are not<br>25 selling, I don't know.<br>Page 41 |

EXHIBIT 10    H I N E S  R E P O R T E R S    11 (38 - 41)

Case 3:18-cv-00828-MHL Document 10-21 Filed 03/19/19 Page 4 of 7 PageID# 179
Case 2:17-cv-04983-MHL-KS Document 56-12 Filed 12/14/18 Page 17 of 108 PageID #:918
Interworks Unlimited, Inc. vs. Digital Gadgets, LL                    Deposition of Charles Tebele

**Page 42**

1 Q. You heard something about
2 Interworks going out of business?
3 A. I'm speculating. I'm wondering.
4 I'm asking you.
5 Q. Unfortunately, I can't give you
6 that answer.
7 But your attorney can ask my
8 client a couple weeks from now, two, three
9 weeks from now.
10 A. Okay. I just don't wanna -- you
11 are asking me if they are selling something, I
12 don't even know if they are in business, so
13 I'm trying to --
14 Q. All I'm trying to get --
15 A. How would I know what they are
16 doing?
17 Q. Did you hear from QVC that they
18 are still selling to QVC?
19 A. It's not something that I
20 discussed with QVC on a daily basis.
21 Q. Okay. That's a good answer.
22 The -- if you look at the second
23 paragraph, a reference of insurance coverage
24 was mentioned. Do you know why lack of
25 insurance coverage was an important issue at

**Page 43**

1 the time when this letter was written?
2 A. Why insurance is important?
3 Q. Why lack of insurance coverage
4 was an important issue?
5 A. It's a requirement of doing
6 business, and part of the product -- when QVC
7 approves a product for sale, there are certain
8 requirements. If insurance on that product is
9 part of the approval, it becomes part of
10 the -- you can't separate the insurance from
11 the product. If QVC approves the product that
12 has this cup with this holder with this lid,
13 and you take off the lid, it's no longer the
14 cup.
15 You follow what I'm saying?
16 Q. Yes, I follow.
17 A. So if the board doesn't have the
18 insurance and it was approved with the
19 insurance, then the lack of the insurance
20 makes the product not what it was represented
21 to be.
22 Q. Okay.
23 The -- at the time, did you, I
24 mean Digital Gadgets, have serious concern on
25 lack of insurance coverage with respect to

**Page 44**

1 these hoverboards supplied by Interworks?
2 A. Doesn't the letter state that?
3 Q. Yes, it does say that. I mean,
4 I'm asking you -- well, let me try to ask
5 another question.
6 When you had this letter written
7 to Interworks, did Interworks promptly show
8 you sufficient insurance coverage to alleviate
9 your such concern?
10 A. Are you saying -- are you asking
11 me if we had insurance I would still go and
12 pay money to hire a lawyer and write a letter
13 that we didn't have insurance?
14 Q. No. The question is, after you
15 sent this letter, after, did you or anybody
16 else at Digital Gadgets receive satisfactory
17 explanations from Interworks?
18 A. I know that there was attempt to
19 resolve the insurance issue by Interworks. I
20 don't know if it was quote/unquote
21 satisfactory, but I do know that there was
22 certain actions taken as a result of this
23 letter to mitigate what -- maybe what
24 Interworks felt it needed to provide.
25 Q. Subsequent to sending this

**Page 45**

1 letter, did you realize that it was actually a
2 non-issue?
3 A. No.
4 Q. Are you aware Digital Gadgets had
5 to purchase insurance subsequent to sending
6 this letter to Interworks?
7 A. Am I aware that Digital Gadgets
8 had to purchase -- if Interworks didn't solve
9 the problem, then Digital Gadgets would have
10 had to purchase insurance. I don't know the
11 dates and times, but if we had to do something
12 to mitigate damages, we would have done that
13 based on our relationship with QVC.
14 Q. Right, QVC would have required
15 you, meaning your company, to provide that
16 coverage, if Interworks failed to provide one,
17 right?
18 A. If it was provideable (sic) by
19 us. It's not like you could just go out and
20 like buying a pack of gum in the store, not
21 like saying, okay, you don't have it, I'll do
22 it, it's an intricate piece of equipment that
23 many insurance companies will not insure.
24 Q. Do you personally involve in
25 obtaining or procuring such insurance coverage

EXHIBIT 10          H I N E S   R E P O R T E R S          12 (42 - 45)
                                                                    134

Case 3:18-cv-00828-MHL Document 10-21 Filed 03/19/19 Page 5 of 7 PageID# 180
Case 2:17-cv-04983-MHL-KS Document 56-2 Filed 12/14/18 Page 27 of 108 Page ID #:928
Interworks Unlimited, Inc. vs. Digital Gadgets, LL                                Deposition of Charles Tebele

| | |
|---|---|
| 1  Q.   The question, very simple:  Did<br>2 you know Digital Gadgets had to submit samples<br>3 to QVC for testing and approval before you<br>4 started selling them?<br>5  A.   That's not true.<br>6  Q.   Not true?<br>7  A.   No.  In this case, because<br>8 **Interworks purported to sell us the unit that**<br>9 **was already approved by QVC, QVC allowed us to**<br>10 **sell it based on our reputation and vouching**<br>11 **for the fact that it was the same model, so we**<br>12 **began to sell it without submitting a sample.**<br>13 **And only after five months later when we**<br>14 **needed to submit a sample for a new program**<br>15 **and new orders did we then submit them a**<br>16 **sample, and then determined that what we were**<br>17 **selling them all along was fraudulent.**<br>18  Q.   You are 100 percent sure about<br>19 that?<br>20  A.   I'm sure of what I just said.<br>21  Q.   Okay.<br>22       That's very good answer.  I'm<br>23 just --<br>24  A.   That doesn't mean that's 100<br>25 percent of what occurred.<br><div align="right">Page 82</div> | 1  A.   That's what it says.<br>2  Q.   Okay.<br>3       Does it say that the -- by the<br>4 way, what is the products described on this<br>5 report?<br>6  A.   (No response.)<br>7  Q.   Description on top, you see Chic<br>8 High Roller Self Balancing Hoverboard W?  I<br>9 don't know what that "W" means.  Do you know,<br>10 W slash --<br>11  A.   What are you asking me?<br>12  Q.   I'm asking if you know what that<br>13 means?  I have no idea what that means.  What<br>14 the W at the end and slash, what does that<br>15 mean?<br>16  A.   Probably is truncated that<br>17 **there's some words after that, but it doesn't**<br>18 **pick up on the form.**<br>19  Q.   The reason I was asking you,<br>20 because I don't know what that means.<br>21       If you go through this report, it<br>22 seems like the samples submitted by Interworks<br>23 to QVC passed the testing?<br>24  A.   Yes.<br>25  Q.   Is there anything -- you see the<br><div align="right">Page 84</div> |
| 1  Q.   Well, that's based on your<br>2 recollection that's what happened, right?<br>3  A.   Yes.<br>4  Q.   Okay.<br>5       MR. HSU:  Let's mark this as 8.<br>6       (Tebele Exhibit 8, Document<br>7       bearing Bates stamps Interworks 212<br>8       through Interworks 221, marked for<br>9       identification.)<br>10  Q.   Exhibit 8 is a computer generated<br>11 form on top of the first page says QVC, QA<br>12 sample, evaluation report?<br>13  A.   Correct.<br>14  Q.   And have you ever seen this<br>15 entire report?<br>16  A.   **I have seen this form.  I don't**<br>17 **know if I've seen this report before, but I'm**<br>18 **familiar with the form.**<br>19  Q.   And if you look at those days,<br>20 probably the seventh or eighth line from the<br>21 top, indicates that the sample evaluation due<br>22 date, pick due date, requested due date, look<br>23 at those days, do those tell you that the<br>24 samples were submitted to QVC by Interworks in<br>25 early October?<br><div align="right">Page 83</div> | 1 second page of this exhibit, the Bates number<br>2 Interworks 213 in the midsection of the page<br>3 where it says battery identification, four<br>4 battery packaging, four general electrical<br>5 requirement test, Interworks passed all of<br>6 those things, right?<br>7  A.   **I don't know what -- I mean you**<br>8 **are making a statement, I guess, yeah.**<br>9  Q.   So you were saying that<br>10 Interworks -- I'm trying to understand what<br>11 your claim is.  One of your claims is that<br>12 Interworks fraudulently --<br>13  A.   **Interworks had got this board**<br>14 **approved.**<br>15  Q.   Right.<br>16       MR. LAZARUS:  Referring to?<br>17  A.   Interworks 212.<br>18  Q.   This is 8.<br>19  A.   **The item on this Exhibit Number 8**<br>20 **was approved for sale by QVC.**<br>21  Q.   And QVC --<br>22  A.   **And you want me to continue to**<br>23 **answer, make it easier?**<br>24  Q.   Sure.<br>25  A.   **Interworks sold us this board,**<br><div align="right">Page 85</div> |

EXHIBIT 10                H I N E S   R E P O R T E R S                22 (82 - 85)
                                                                                144

Case 3:18-cv-00828-MHL Document 10-21 Filed 03/19/19 Page 6 of 7 PageID# 181
Case 2:17-cv-04983-MHL-KS Document 156-2 Filed 12/14/18 Page 39 of 108 Page ID #:936
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC       Deposition of Charles Tebele

```
 1          (Tebele Exhibit 16, Document           1       Q.   And discuss our partnership
 2     bearing Bates stamp Digital gadgets 35,     2  further?
 3     marked for identification.)                 3       A.   Yep.
 4     Q.     16, there is a short e-mail on       4       Q.   So you did discuss, meaning your
 5  top from Eric Lu to Chris Mitchell in          5  company, did discuss this exclusive agreement
 6  December, specifically on December 21, 2016.   6  with Eric Lu?
 7          It says "Chris, see my comments        7       A.   Yes.
 8  below in red.  I'll give you a call shortly."  8       Q.   At the trade show, and what was
 9          In response to Chris Mitchell's        9  your recollection on Eric Lu's response or
10  e-mail to Eric Lu dated the same day earlier  10  anything that he said in Las Vegas -- when you
11  than that, well, yes, a little earlier than   11  met Eric Lu, did he agree to give that
12  3:04 a.m., was 9:26 a.m. in the morning, here 12  exclusive deal to you guys?
13  by the way, have you received this e-mail from 13      A.   There was no doubt that he agreed
14  Chris Mitchell?                                14  that as long as we had inventory in place that
15     A.     Did I receive this e-mail from       15  we remained the exclusive partner.  We would
16  Chris Mitchell?                                16  never buy somebody else's goods for them to go
17     Q.     Right.                               17  sell them to the same customer behind our
18          Did he subsequently forward it to      18  back.  The discussion further was we were
19  you?                                           19  discussing other accounts to extend the
20     A.     I don't remember.                    20  exclusive to.
21     Q.     And says -- Chris Mitchell says      21      Q.   Did you also at Las Vegas discuss
22  here "Eric" starting from the second paragraph 22  the payment terms such as consignment?
23  "current order QVC isn't going to be able to   23      A.   It's possible.
24  resolve the lithium battery reissue until next 24      Q.   But you don't remember sitting
25  month."                                        25  here?
                                       Page 114                                         Page 116

 1          Are you aware of such issue            1       A.   Again, there was a sequence of
 2  existing in December of 2016?                  2  events and a lot of conversations.  I don't
 3     A.     That's a different issue.  That's    3  know what conversation was at CES versus on
 4  a different lithium battery issue than what we 4  the phone, but it was a fluid situation.
 5  are talking about with the QA.                 5          (Tebele Exhibit 17, Document
 6     Q.     Right.                               6     bearing Bates stamp Digital Gadgets 80,
 7          And you say is a different issue?      7     marked for identification.)
 8     A.     It has nothing to do with the QA.    8       Q.   Next one is 17.  Have you ever
 9     Q.     Okay.                                9  seen this certificate of liability insurance?
10          And was this around the time when    10       A.   Possibly.
11  Chris Mitchell was negotiating with Eric on   11       Q.   You see towards the bottom left
12  the price terms along with the other terms for 12 underneath two words certificate, Digital
13  the sale of the hoverboards?                  13  Gadgets, LLC and that's your company, right?
14     A.     It appears to be.                   14       A.   Yes.
15     Q.     And when Chris Mitchell             15       Q.   On top -- well, it's not very
16  mentioned -- you see down below like one, two, 16 top, it's like ninth or tenth or twelfth line
17  three, four, fourth bullet point, if you look 17  from the top, you see under the insured
18  at the second one?                            18  Interworks Unlimited, Inc.?
19     A.     Yep.                                19       A.   Yes.
20     Q.     Received exclusive agreement to     20       Q.   Was printed there, so the insured
21  supply chip listen board to QVC for 2017 and  21  of this policy was Interworks?
22  then Eric's comment is yes, we can put this   22       A.   Yes.
23  agreement to you, but let's have our meetings 23       Q.   And your company was made as an
24  and see it and that's the trade show, right?  24  additional insured?
25     A.     Yes.                                25       A.   Yes.
                                       Page 115                                         Page 117
```

EXHIBIT 10        HINES REPORTERS              30 (114 - 117)
152

Case 3:18-cv-00828-MHL Document 10-21 Filed 03/19/19 Page 7 of 7 PageID# 182
Case 2:17-cv-04983-MHL-KS Document 1-56-2 Filed 12/14/18 Page 35 of 108 PageID
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC #:939                                  Deposition of Charles Tebele

| | |
|---|---|
| 1  submitted this certificate to QVC around the<br>2  time Digital Gadgets received this from<br>3  Interworks?<br>4     A.   What's the question again?<br>5     Q.   Do you know if Digital Gadgets<br>6  ever submitted this certificate of liability<br>7  insurance to QVC ever?<br>8     A.   I don't know.<br>9         (Tebele Exhibit 20, Document<br>10     bearing Bates stamps Digital Gadgets 244<br>11     through Digital Gadgets 247, marked for<br>12     identification.)<br>13     Q.   20 has a number of pages.<br>14         These documents were produced by<br>15  Digital Gadgets.<br>16         If you see the second e-mail from<br>17  the top on Digital Gadgets 244, this e-mail<br>18  was sent by Chris Mitchell to Eric, presumably<br>19  Eric Lu, and you were cc'd on it.  Do you see<br>20  that?<br>21     A.   Yep.<br>22     Q.   And Chris Mitchell first said<br>23  "Eric understood about wanting the boards<br>24  back.  We were honoring the consignment backup<br>25  agreement per our conversation.  But if that's<br>Page 126 | 1  approved from my factor."<br>2     Did Eric Lu write all of these<br>3  responses in bold printed form?<br>4     A.   I don't know, looks like it.<br>5     Q.   And here he was complaining to<br>6  you guys that if you had been approved by my<br>7  vendor, I would have given this consignment<br>8  backup agreement to you guys at the time this<br>9  e-mail was sent to them, to Eric Lu, to your<br>10  recollection, Interworks' factor never<br>11  approved your company on this credit line of<br>12  $1 million, right?<br>13     A.   **I have no idea.  It looks to be**<br>14  **he shipped it, bought approval from his factor**<br>15  **and maybe he was in trouble or something.  I**<br>16  **don't know what -- I don't know what -- I**<br>17  **don't know what the inner workings between him**<br>18  **and his factor are, but we don't have any**<br>19  **obligation as Digital Gadgets to satisfy his**<br>20  **factor.  His factor relationship is between**<br>21  **him and his factor.**<br>22     Q.   If you look down below,<br>23  there's -- it seems like there is a<br>24  spreadsheet prepared by Chris Mitchell to<br>25  Eric Lu.  If you can help me go over the<br>Page 128 |
| 1  no longer an option for you, we can send back<br>2  the remaining boards."<br>3         What is the consignment backup<br>4  agreement Chris Mitchell was talking about<br>5  here, if you know?<br>6     A.   **Basically, that there were,**<br>7  **throughout the negotiations, like I said, it**<br>8  **was fluid and what they agreed to was rather**<br>9  **than shipping the boards back and forth**<br>10  **between Interworks and Digital Gadgets and**<br>11  **having them sit in one warehouse or another,**<br>12  **since they were only for QVC that we would pay**<br>13  **them based on when they were sold.  So that's,**<br>14  **I mean, call it a consignment agreement, but**<br>15  **it's not a very technical term.  Consignment**<br>16  **agreement would basically mean to me we would**<br>17  **pay for the goods per specific agreement as**<br>18  **they were sold.**<br>19     Q.   Okay.<br>20         And then the -- see there's some<br>21  bold printed lines or words starting from an<br>22  arrow pointing to the left, "I have honored<br>23  everything" that -- "everything I've said.  I<br>24  told you guys I would give you<br>25  terms/consignment if you guys would get<br>Page 127 | 1  second page of the document, where you can see<br>2  not this page, can you just briefly go to a<br>3  second page?<br>4     A.   Yes.<br>5     Q.   Second page on top to the right,<br>6  you see the total received number is 10,608<br>7  units?<br>8     A.   Yes.<br>9     Q.   Is that consistent with your<br>10  recollection of how many units of<br>11  hoverboards --<br>12     A.   **I previously answered I'm not**<br>13  **sure how many hoverboards were received, but**<br>14  **if this e-mail states -- the e-mail stands on**<br>15  **its own.  The statement is what it is.**<br>16     Q.   Okay.<br>17         But you mention about computer<br>18  data and software.  If you have to retrieve<br>19  this information or spreadsheet from your<br>20  computer you would be able to do that, right?<br>21     A.   Yes.<br>22     Q.   After you received these e-mails<br>23  from Chris Mitchell and Eric Lu, did you<br>24  remember -- did you remember you had a meeting<br>25  or a couple of meetings with Chris Mitchell?<br>Page 129 |

EXHIBIT 10                    H I N E S   R E P O R T E R S                        33 (126 - 129)
                                                                                         135