**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **SHERI WADE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18cv828** |
| | ) | |
| **INTERWORKS UNLIMITED, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM IN SUPPORT OF SECOND MOTION FOR DEFAULT JUDGMENT

Plaintiff Sheri Wade ("Ms. Wade"), by counsel, hereby submits her Memorandum in Support of Second Motion for Default Judgment (the "Motion"). In support of her second request for entry of default judgment against Defendant Interworks Unlimited, Inc. ("Interworks"), Ms. Wade respectfully states as follows:

## LEGAL STANDARD

Prior to entering a default judgment, the Court must ensure that: (1) it possesses personal jurisdiction over the defaulting party; (2) it possesses subject-matter jurisdiction over each of the claims; (3) the action is in the proper venue; and, (4) the defaulting party received proper service of process." Victoria Select Ins. Co. v. R&G Transp., No. 3:16cv624, 2017 U.S. Dist. LEXIS 221531, at *7-8 (E.D. Va. Sep. 7, 2017). Additionally, the Court will consider whether the well-pleaded allegations of the Complaint support the relief sought in the case. Id. at *8. (citations omitted).

**STATEMENT OF FACTS**

I.     **Interworks Becomes the Exclusive Distributor of the Model C and Acquires Ownership of all Related Trademarks**.

Interworks was, at all relevant times to this lawsuit, a California-based company operating as a distributor of games, toys, and electronic goods. Lu Dep. (Ex. 1) at 7:1-5, 7:20-24; Lu Dec. (Ex. 2) ¶ 3. Moreover, at all times relevant to this lawsuit, Interworks owned and used the trademark "EMiO" to sell consumer goods. Interworks EMiO Trademark Application (Ex. 3) at *1, 4.[1] At all times relevant to this lawsuit, Interworks was the exclusive U.S. distributor of hoverboards manufactured by the Chinese company Hangzhou Chic Intelligent Technology CO., Ltd. ("Chic"), including the hoverboards designated as the "Chic High Roller Self Balancing Hoverboard Model C" (the "Model C"). Lu Dep. (Ex. 1) at 9:24-10:1; Lu Dec. (Ex. 2) ¶ 4. Chic had selected Interworks to be its exclusive distributor because Interworks had the ability to sell the Model C to nationwide "retail channels," to include Walmart, Target, Best Buy, and Toys "R" Us. Lu. Dep. (Ex. 1) at 10:10-11:5.

On August 12, 2016, Interworks submitted a trademark application to register a "High Roller" graphic logo with the United States Patent and Trademark Office ("USPTO"). See Interworks Logo Trademark Application (Ex. 4) at *1. As part of that application, Interworks claimed that it owned the logo and was "using the mark in commerce." Id. at *4. Interworks also attached a specimen photo to the application "showing the mark as used in commerce . . . ." Id. at *6. The specimen photo, in turn, reflected an EMiO website screenshot showing the use of the logo in connection with a page soliciting sales of a High Roller hoverboard (the screenshot

---

[1] An asterisk will be used to reference the actual page number of an exhibit where pages in the exhibit are unnumbered or their organic numbering creates confusion.

also noted that shipment was available within the United States and included with the purchase of the product). Id. at *7.

On September 14, 2016, Interworks acquired the entire proprietary interest and good will associated with the trademark "High Roller" pursuant to an assignment agreement from the owner of the same—4WRD USA International LLC. High Roller Trademark Assignment Agreement (Ex. 5) at 1. The assignment authorized Interworks to use the trademark throughout the United States to carry out its distribution agreement with Chic. Id. After acquiring the High Roller trademark, Interworks submitted a Trademark Amendment to Allege Use ("TAAU") to the USPTO on October 8, 2016, which stated that Interworks was using the trademark in commerce and included photos of High Roller hoverboards for sale on the EMiO website as "specimen" photos of such use. TAAU (Ex. 6) at *2-3, *5-6. The specimen photos of the EMiO website that were appended to the TAAU reflected that High Roller hoverboards were eligible for shipment only in the United States and also depicted a shopping cart checkout screen. Id. at *5-7.

## II.  Interworks Markets and Sells the Model C Through QVC.

In approximately April 2016, Interworks' owner, Eric Lu ("Mr. Lu"), contacted Meghan Kane ("Ms. Kane"), a purchaser with a television retailer known as QVC, to propose selling the Model C through QVC. Lu Dep. (Ex. A) at 14:14-19. Interworks contacted QVC because it perceived a "lucrative opportunity" to "capitalize" on the "increasing market" for hoverboards by selling the Model C "through QVC." Interworks' Mem. in Supp. Summ. J. (Ex. 7) at vii, 1-2; see also Lu Dec. (Ex. 2) ¶¶ 5, 16. Accordingly, Interworks pitched the Model C to QVC and, during the June/July 2016 timeframe, QVC agreed to provide Interworks an "airing" for the

Model C in or around November 2016.  Lu Dep. (Ex. 1) at 14:20-16:3.[2]  QVC committed to

selling up to 10,000 Model C units as a "warehouse item."  Id. at 25:1-10; Lu Dec. (Ex. 2) ¶ 9.

In this arrangement, Interworks would be responsible for storing Model C inventory for QVC

throughout QVC's marketing of the product.  Lu Dep. (Ex. 1) at 18:12-16; Lu Dec. (Ex. 2) ¶ 9.

Interworks would deliver the product to a QVC distribution center only after a consumer

purchased a Model C through QVC, and the QVC distribution center would then deliver the

product to the customer.  Id.  In essence, the arrangement was one in which Interworks was

selling its products through QVC.  Lu Dec. (Ex. 2) ¶¶ 5, 16; Interworks' Mem. in Supp. Summ.

J. (Ex. 7) at vii, 1-2; QVC Website Screenshot (Ex. 9) at *1.

Interworks and QVC each shared certain rights of control with respect to their joint effort

to sell the Model C, which were exercised at various points during the QVC product approval

process that occurred from June 2016 – November 2016.  Lu Dep. (Ex. 1) at 15:12-25.  For

example, QVC controlled the timing of any airings for the Model C.  Id.  QVC also set the QA

testing standards for Model Cs sold on QVC.  Lu Dec. (Ex. 2) ¶ 6.  QVC further exercised

control by requiring Interworks to purchase a certain type of general liability insurance which

named QVC as an "additional insured" and covered claims related to the Model C itself and

advertising of the Model C.  QVC QA Rep. (Ex. 10) at *2.  QVC also maintained control over

the distribution methods that would be used to ship Model Cs from its distribution center to end

users.  Lu Dec. (Ex. 2) ¶ 9; QVC 2016 10-K Rep. (Ex. 8) at I-6.

Interworks, on the other hand, set the price of the Model Cs sold on QVC. Lu Dep. (Ex.

1) at 33:2-8.  Interworks also determined the customer service channels that would be used to

---

[2] This involves a national broadcast (including Virginia) through QVC's various networks, and
also includes online marketing by QVC on its website at QVC.com.  QVC 2016 10-K Rep. (Ex.
8) at I-2.

service any QVC customers who purchased Model Cs, including a phone number and website, and determined the content of the User Manual that would be included with the Model C's sold on QVC and posted on QVC's website. QVC QA Rep. (Ex. 10) at *1, 3, 5. As part of the QVC approval process, Interworks also determined the product "claims" QVC would make regarding the Model C during its marketing and advertising of the product. Id. at *2.[3] Finally, Interworks (as the trademark owner of the High Roller brand name and logo associated with Model C) maintained the right to control QVC's use of the relevant brand names and logos associated with the Model C. Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 107 (4th Cir. 1991); Crinkley v. Holiday Inns, Inc., 844 F.2d 156, 166 (4th Cir. 1988).

QVC aired the Model C on at least four separate occasions nationwide (including Virginia) from October 2016 to the end of November 2016.[4] Additionally, QVC uploaded these airings to its YouTube channel, with each video description also containing a link to direct viewers back to QVC's website to purchase the Model C.[5] QVC YouTube Channel Screenshots (Ex. 16) at *1-4. Ultimately, Interworks sold approximately 10,000 units through QVC in November 2016. Lu Dep. (Ex. 1) at 14:1-10, 16:21-22; Lu Dec. (Ex. 2) ¶ 16.

---

[3] In this context, "claims" are "statement[s] about a product that relates to its benefits, performance, efficacy, safety, price, or other characteristic that is used to incentivize a customer to purchase it." QVC Claims Informational Pamphlet (Ex. 11) at *2.

[4] The airings of the Model C that occurred during this period of time are being filed under separate cover as Exhibits 12 - 15.

[5] The videos are still active on QVC's YouTube channel and can be viewed at:
https://www.youtube.com/watch?v=4aDfdohG_58&t=2s
https://www.youtube.com/watch?v=UwwvCUx_uVY
https://www.youtube.com/watch?v=SBQxJSkksXQ
https://www.youtube.com/watch?v=FwBWy49IT2I

## III. Interworks and QVC and Digital Gadgets Enter Into a Joint Venture to Continue Selling the Model C Through QVC.

Given the number of Model Cs sold in November 2016, Interworks and QVC wanted to continue selling the Model C through the holiday season. Lu. Dep. (Ex. 1) at 23:8-18; Lu Dec. (Ex. 2) ¶ 10. To do so, however, they needed a vendor who could distribute the Model Cs directly to customers (as opposed to first sending the product to a QVC distribution center for shipment to the end user) to ensure purchases would be delivered to QVC customers in time for Christmas. Lu Dep. (Ex. 1) at 20:14-21:3; Lu Dec. (Ex. 2) ¶¶ 10-11. QVC referred to such vendors as "drop ship vendors" or "drop ship partners." Lu Dep. (Ex. 1) at 86:7-13; Lu. Dec. (Ex. 2) ¶¶ 10-11; QVC 2016 10-K Rep. (Ex. 8) at I-6. Interworks, although able to obtain additional Model C inventory, was not able to drop ship as it was not a certified QVC drop ship vendor. Lu Dep. (Ex. 1) at 85:24-86:17; Lu Dec. (Ex. 2) ¶ 12; Kane Dep. (Ex. 17) at 79:17-80:2.

Accordingly, Interworks and QVC decided to involve another party to serve as a drop ship vendor. Lu Dep. (Ex. 1) at 23:8-21. QVC identified a number of potential drop ship vendors for Interworks, but Interworks retained the right to ultimately decide which vendor would be used. Id. at 85:5-24. Interworks ultimately selected Digital Gadgets, LLC ("Digital Gadgets") to "fill Interworks' shoes as the exclusive [QVC] partner" so that QVC could continue to sell the Model C through the holiday season. [6] Lu Dep. (Ex. 1) at 23:15-21, 85:5-24; Kane Dep. (Ex. 17) at 79:17-80:2; Tebele Dep. (Ex. 18) at 38:25-39:14. [7] Under this arrangement,

---

[6] There is a dispute between Interworks and Digital Gadgets as to whether the right to sell Interworks' products to and through QVC was exclusive. Interworks contends such a term was discussed, but never finalized. Lu. Dec. (Ex. 2) ¶¶ 29-30; Digital Gadgets contends it was always understood the right would be exclusive so long as Digital Gadgets had inventory from Interworks. Tebele Dep. (Ex. 18) at 116:8-15.

[7] Charles Tebele is the owner and managing member of Digital Gadgets. Tebele Dep. (Ex. 18) at 7:17-9:8; see also Tebele Dec. (Ex. 19) ¶¶ 1-2. He and Chris Mitchell were the two individuals

Interworks "sold" Model C inventory to Digital Gadgets to be stored in Digital Gadgets' warehouse for the specific and sole purpose of "servicing" QVC orders as a drop ship vendor and granted it the right to "sell Interworks['] products to and through QVC." Lu Dep. (Ex. 1) at 18:24-19:3, 22:3-11, 23:8-21, 83:5-10, 85:5-24; Kane Dep. (Ex. 17) at 79:17-80:2; Tebele Dep. (Ex. 18) at 38:10-20; 127:3-18. Notably, Interworks sold the Model Cs to Digital Gadgets on consignment, meaning Digital Gadgets would only pay Interworks for Model Cs as they sold through QVC. Lu Dep. (Ex. 1) at 81:9-21; Tebele Dep. (Ex. 18) at 127:3-18.[8] Similarly, it appears (although admittedly is not entirely clear) that QVC would only pay Digital Gadgets for Model Cs after they actually sold them to QVC customers. Tebele Dec. (Ex. 19) ¶¶ 42-43; Mitchell Email (Ex. 22) at *1. QVC retained a right of return vis-à-vis Digital Gadgets, and Digital Gadgets maintained a right of return vis-à-vis Interworks. Lu Dep. (Ex. 1) at 54:24-55:6; Tebele Dep. (Ex. 18) at 79:4-8; Mitchell Email (Ex. 23) at *1.

Additionally, each entity possessed certain rights of control in the joint venture. For example, Interworks decided which drop ship vendor would handle distribution of the Model C on behalf of QVC. Lu Dep. (Ex. 1) at 85:5-24. Moreover, Interworks owned the various High Roller trademarks associated with the Model C and therefore retained a right to control Digital Gadget's and QVC's use of the same. Shell, 928 F.2d at 107; Crinkley, 844 F.2d at 166. Digital Gadgets controlled the amount of inventory available to QVC and maintained control over the

---

associated with Digital Gadgets who Mr. Lu primarily communicated with regarding the business relationship between Interworks and Digital Gadgets. Lu Dec. (Ex. 2) ¶ 15.

[8] There is a dispute between Interworks and Digital Gadgets as to whether these goods were sold to Digital Gadgets on consignment. Compare Lu Dep. (Ex. 1) at 89:2-24, with Tebele Dep. (Ex. 18) at 127:3-18. However, it is noteworthy in this regard that Interworks' "Picking Sheets" for the December 2016 shipments to Digital Gadgets acknowledge the goods were being delivered on "consignment." Lu Dep. (Ex. 1) at 89:2-15; Interworks Dec. 2016 Picking Sheets (Ex. 20) at *1-8. An email between the parties further suggests such an arrangement existed. Asamoah Email (Ex. 21) at *1.

details of storing the Model C inventory prior to sale and distributing Model Cs to QVC customers after sales had been consummated by QVC. Lu. Dec. (Ex. 2) ¶ 14; Tebele Dep. (Ex. 18) at 90:4-24. QVC controlled the QA standards for Model Cs sold on QVC, the timing and content of the additional airings of the Model C, and the timing and content of any online marketing for the Model C. Lu Dep. (Ex. 1) at 15:12-25; QVC 2016 10-K Rep. (Ex. 8) at I-1; id. at I-18 (identifying QVC's programming and website as part of its intellectual property).

The nature of the arrangement between the three entities also demonstrated a joint intent on their part to share in the profits and losses of their joint venture. For example, Digital Gadgets described the venture as one in which it was selling Model Cs to QVC's customers. Tebele Dec. (Ex. 19) ¶ 20. Moreover, Interworks and Digital Gadgets actually regarded each other as partners in selling Model Cs through QVC, a perspective also held by QVC. Lu Dec. (Ex. 2) ¶ 29; Tebele Dep. (Ex. 18) at 38:25-39:14, 116:8-20; Lu Email (Ex. 24) at *1; Kane Email (Ex. 25) at *1. Interworks did not continue to sell Model Cs directly to or through QVC after partnering with Digital Gadgets, did not perform any credit check on Digital Gadgets prior to "selling" it Model C inventory, and sold Digital Gadgets Model C inventory on consignment. Lu Dep. (Ex. 1) at 21:22-22:1-6, 90:19-91:2; Tebele Dep. (Ex. 18) at 127:6-18. Moreover, Interworks shouldered the costs associated with procuring inventory from Chic and the costs of including both QVC and Digital Gadgets as additional insureds on its liability insurance policy. Lu Dep. (Ex. A) at 8:21-25; 9:1-3; 16:1-15; 26:14-17; 105:12-25; 106:1-21; 107:8-23. Digital Gadgets shouldered the costs associated with storing and distributing the Model Cs while QVC attempted to market and sell the Model C inventory. Lu Dep. (Ex. A) at 19:15-25; 20:1-12. QVC shouldered the costs associated with marketing the Model C through online and broadcast media. QVC 2016 10-K Rep. (Ex. 8) at I-13. Most notably, it seems that payment would only

change hands between each entity once an actual sale to a QVC customer occurred, demonstrating that the true source of each entity's profit from the endeavor was QVC's sale of a Model C to an end user, rather than any independent transactions between them. Tebele Dep. (Ex. 18) at 127:6-18; Tebele Dec. (Ex. 19) ¶¶ 42-43. It is also noteworthy in this regard that QVC did not set any particular time or quantity limits on the arrangement, it simply continued to sell the Model C without interruption until Digital Gadgets' inventory was exhausted. Kane Dep. (Ex. 17) at 31:7-24.

That the three entities intended to operate as a joint venture is further made evident by the fact that QVC largely treated Digital Gadgets' involvement as a de facto continuation of Interworks' original relationship with QVC except in two regards: (1) QVC assigned the Model Cs sold by Digital Gadgets a different Stock Keeping Unit ("SKU") number due to Digital Gadgets being the vendor that was selling products to and through QVC;[9] and (2) the changes to the product distribution referenced above. Kane Dep. (Ex. 17) at 23:5-10, 34:5-35:2. Other than those differences, all three parties involved understood that the product offering would be identical in all respects to what it had been prior to Digital Gadgets' involvement—including Interworks continuing to satisfy any ancillary requirements QVC had previously articulated to Interworks as part of airing the Model C on QVC. Lu. Dep. (Ex. 1) at 27:14-18, 44:11-16, 55:19-25; Lu Dec. (Ex. 2) at ¶ 16; Kane Dep. (Ex. 17) at 34:5-35:2; Tebele Dep. (Ex. 18) at 43:3-21, 82:1-12; Tebele Dec. (Ex. 19) ¶ 18. Accordingly, QVC did not require Digital Gadgets to undergo any separate product approval process or submit any of the information Interworks

---

[9] Specifically, the SKU number QVC assigned to the Model Cs purchased from Interworks was T34604 (the "T34604 Model Cs"). Lu Dec. (Ex. 2) ¶ 8. The SKU number QVC assigned to the Model Cs purchased from Digital Gadgets was T34764 (the "T34764 Model Cs"). Kane Dep. (Ex. 17) at 26:17-27:3.

had been required to submit prior to the Model C airings on QVC in December 2016. Tebele Dep. (Ex. 18) at 82:1-12; Tebele Dec. (Ex. 19) ¶ 18.[10]

In December 2016, QVC did at least two additional airings for the Model C and subsequently uploaded recordings of the same to YouTube on December 10, 2016, and December 14, 2016.[11] QVC YouTube Channel Screenshots (Ex. 16) at *5-6. The video descriptions for those videos contained a link to redirect the viewer to QVC's website, which contained yet another QVC Model C infomercial.[12] Id. QVC sold over 3,200 Model Cs in December 2016 alone and continued to sell the product through December 2017—selling approximately 18,000 units in total. Compare Lu Dep. (Ex. 1) at 16:21-22, with QVC T34764 Model C Spreadsheet (Ex. 29) at *1.

On or before December 12, 2016, Ms. Wade watched one of the Model C infomercials broadcasted on the QVC network (the same infomercial that QVC uploaded to YouTube on December 10, 2016). Wade Dec. (Ex. 30) ¶ 1. She watched the infomercial through her cable provider, Verizon Fios, on channel 650. Id. ¶ 2. At the time she watched the infomercial, she was at her home in North Chesterfield, Virginia. Id. ¶ 3. After watching the infomercial, she visited the QVC's website and ordered a T34764 Model C. Id. ¶ 4. She placed the order on

---

[10] Further telling of the joint nature between the three entities is that when QA product issues began to arise later in the joint venture (i.e., when Digital Gadgets was the entity technically selling the Model C to QVC), QVC reached out to Interworks rather than Digital Gadgets to try and get them resolved. Kane Email (Ex. 25) at *1. When it could not get the information requested from Interworks, QVC described itself as "stuck in the middle" between Interworks and Digital Gadgets and urged the Digital Gadgets representative to contact his "partners" at Interworks to try and get the issue resolved. Id.

[11] The airings of the Model C that occurred during this time are being filed under separate cover as Exhibits 26-27. The videos are still active on QVC's YouTube channel and can be viewed at: https://www.youtube.com/watch?v=R44HLe-z0qY
https://www.youtube.com/watch?v=xl_-f_5PCzY

[12] Specifically, the video descriptions contain a link to http://qvc.co/2hglMh0, which is the QVC page for the T34764 Model C. QVC Model C Website Screenshot (Ex. 28) at *1.

December 12, 2016, from either her work office or her home (both of which are in Virginia).  Id. ¶¶ 4-5.  Digital Gadgets shipped the Model C via UPS to the address designated by Ms. Wade, located in Richmond, Virginia.  Id. ¶¶ 4, 6; Wade Dec. Ex. A at 1-2.  The Model C that Ms. Wade ordered contained the User Manual docketed in this case as ECF No. 1-1 (i.e., the same document appended hereto as Exhibit 31).  Wade Dec. (Ex. 30) ¶ 8.[13]

## ARGUMENT

For the reasons specifically stated below, Ms. Wade is able to prove each of the prerequisites to an entry of default judgment against Interworks in this case.

### I.  Interworks is Subject to Personal Jurisdiction in Virginia.

#### a.  The Three-Part Test Governing the Exercise of Specific Personal Jurisdiction.

When a federal court sits in diversity, it "has personal jurisdiction over a non-resident defendant if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process."  Nichols v. G.D. Searle & Co., 991 F.2d 1195, 1199 (4th Cir. 1993).  Where, as here, the state's long-arm statute is coextensive with constitutionally permissible limits, the two inquiries merge and the sole issue to be resolved is whether the exercise of personal jurisdiction comports with due process.  Young v. New Haven Advocate, 315 F.3d 256, 261 (4th Cir. 2002) (noting that Virginia's long-arm statute is coextensive with limitations on personal jurisdiction set by the Due Process Clause).

"A court may exercise general or specific personal jurisdiction."  Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 188 (4th Cir. 2016).[14]  The Fourth Circuit applies a three-part test for assessing whether an exercise of specific jurisdiction comports with due process requirements:

---

[13] The User Manual remains available on the QVC website and is available at https://www.qvc.com/footers/fth/pdf/T34604_UM-Manual.pdf

[14] Ms. Wade does not contend that Interworks is subject to general jurisdiction in this case.

"(1) [whether] the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Id. (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (internal quotation marks omitted).

     b.   The First Prong of the Jurisdictional Test is Satisfied in this Case.

       *i.  Standards Governing the First Prong of the Specific Jurisdiction Test in Stream of Commerce Cases.*

In World-Wide Volkswagen Corp. v. Woodson, the Court laid the foundation for what would later come to be known in subsequent decisions as a "stream of commerce" theory of jurisdiction. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980). In that case, a couple had purchased an automobile from a dealer in New York. Id. at 288. While in transit to their new residence in Arizona, the couple suffered an accident in Oklahoma that caused severe injuries to several of the vehicle's occupants. Id. The couple brought a products liability suit in Oklahoma against the New York dealer and the New York distributor, claiming that design defects in the automobile contributed to the accident. Id. The plaintiffs acknowledged that the two New York corporations only did business in New York. Id. Nevertheless, they argued that Oklahoma's exercise of jurisdiction over the New York corporations was appropriate because it would have been foreseeable to the New York corporations that the vehicle would cause injury in Oklahoma. Id. at 295. The Supreme Court, however, rejected the argument and explained that:

> [The New York corporations did not] avail themselves of . . . the privileges and benefits of Oklahoma law. They solicit no business there either through salespersons or through advertising reasonably calculated to reach the State. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or

> residents or that they indirectly, through others, serve or seek to
> serve the Oklahoma market.

Id. at 295.  The Court then contrasted the facts before it with scenarios in which an out-of-state

defendant delivered its products into the stream of commerce with an expectation that the

product would be sold in the forum state.  Id. at 297-98.  As to such scenarios, the Court

remarked:

> The forum State does not exceed its powers under the Due Process
> Clause if it asserts personal jurisdiction over a corporation that
> delivers its products into the stream of commerce with the
> expectation that they will be purchased by consumers in the forum
> State.

Id.

Considerable division and disagreement subsequently ensued among the federal courts

regarding the meaning and contours of the "stream of commerce" language articulated in World-

Wide Volkswagen.  The Supreme Court subsequently accepted two cases which furnished

opportunities to clarify the standard for determining whether a non-resident defendant's

transmission of a product into the stream of commerce would amount to "purposeful availment"

of the forum state.  However, both cases failed to generate a majority opinion on the issue,

instead producing only plurality opinions which have been met with varying degrees of

acceptance.

The first of these decisions was Asahi.  See generally Asahi Metal Industry Co. v.

Superior Court of California, 480 U.S. 102 (1987).  That case involved a suit brought by a

California resident who was injured when the rear tire tube on his motorcycle exploded.  Id. at

106.  The plaintiff brought suit against the Taiwanese manufacturer of the tire tube.  Id.  The

Taiwanese manufacturer, in turn, impleaded Asahi—a Japanese company responsible for

manufacturing the tube's valve assembly.  Id.  Asahi acknowledged that it was aware that its

valve assemblies would eventually be sold on motorcycles throughout the United States, but claimed that it never expected to be subject to suit in California given all of its sales flowed from Japan to Taiwan.  Id. at 106-07.

With respect to the first prong of the International Shoe test—i.e., issue of "purposeful availment"[15]—Justice O'Connor (joined by Chief Justice Rehnquist and Justices Powell and Scalia) penned a plurality opinion which acknowledged that the language of World-Wide Volkswagen could be read to allow an exercise of personal jurisdiction over any manufacturer who was aware that its product may be sold in the forum state.  Id. at 110.  She disagreed with this construction of the law, however, reasoning that:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.  Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.  But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

---

[15] Relying on the second prong of International Shoe, the Court unanimously concluded that California's assertion of jurisdiction over Asahi would be unconstitutional—i.e., the Court held that the assertion of personal jurisdiction would "offend traditional notions of fair play and substantial justice," taking into account the burden on Asahi to defend an American suit and California's minor interest in deciding whether Asahi would have to indemnify the Taiwanese manufacturer.  Asahi, 480 U.S. at 114. The Court also noted that the "unique burdens placed upon one who must defend oneself in a foreign legal system" counseled strongly in favor of finding no jurisdiction.  Id.

Id. at 112.[16]  Thus, according to Justice O'Connor, even though Asahi may have been aware that its products would be sold in California, its lack of conduct directed specifically at California made jurisdiction in California improper under a "minimum contacts" analysis.  Id. at 113.

Following Asahi, the Supreme Court again attempted to clarify what type of conduct by a nonresident defendant would amount to "purposeful availment" in stream of commerce cases See generally J. McIntyre Machinery, Ltd. v. Nicastro, 564 U.S. 873 (2011).  In that case, the Court reviewed whether the Supreme Court of New Jersey had correctly held that New Jersey courts could exercise personal jurisdiction over a foreign manufacturer ("J. McIntyre").[17]  Id. at 877-78.  In accounting for the relevant jurisdictional facts, the Court observed that J. McIntyre had only directly sold its product in the United States to its distributor, who was not under J. McIntyre's control.  Id. at 878.  Moreover, although the manufacturer had attended conferences in the United States to advertise its products with its distributor, none of those conferences had occurred in New Jersey.  Id.  Indeed, only four of the manufacturer's machines (one of which had caused the injury at issue in the case) had actually ended up in New Jersey.  Id.  Finally, the Court noted that the manufacturer held both United States and European patents on its technology and "the U.S. distributor structured its advertising and sales efforts in accordance

---

[16] Justice Brennan and Justice Stevens also wrote opinions addressing the issue of purposeful availment and disagreeing with Justice O'Connor's reasoning.  Id. at 116.  Given that the Fourth Circuit has repeatedly cited Justice O'Connor's plurality opinion, however, those opinions will not be addressed herein.  See infra at 17.

[17] The New Jersey Supreme Court had held that New Jersey's courts could exercise personal jurisdiction over the foreign manufacturer "so long as the manufacturer 'knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states.'"  J. McIntyre, 564 U.S. at 877 (quoting Nicastro v. McIntyre Mach. Am., Ltd., 201 N.J. 48, 76-77, 987 A.2d 575, 591-92 (N.J. 2010)).  With this jurisdictional test in mind, the New Jersey Supreme Court "concluded that a British manufacturer of scrap metal machines was subject to jurisdiction in New Jersey, even though at no time had it advertised in, sent goods to, or in any relevant sense targeted the State."  Id.

with [the manufacturer's] direction and guidance whenever possible, and [] at least some of the machines were sold on consignment to the distributor." Id. (internal citations and quotation marks omitted).

After taking inventory of these facts, the Court reversed the decision of the Supreme Court of New Jersey regarding the exercise of personal jurisdiction over the foreign manufacturer. Id. at 887 (reversing the decision of the Supreme Court of New Jersey); id. at 893 (concurring opinion joining in the judgment of the plurality opinion but not its reasoning). Justice Kennedy delivered the plurality opinion with three Justices joining. Id. at 877. Justice Breyer delivered an opinion, joined by Justice Alito, concurring in the judgment of the plurality opinion, but not its reasoning. Id. at 893. Justice Ginsburg delivered a dissenting opinion, joined by two Justices. Id.[18]

Justice Kennedy's plurality opinion concluded that a "defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted its goods will reach the forum State." Id. at 882.[19] Given that "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis," id. at 884, Justice Kennedy reasoned that only J.

_____

[18] Justice Ginsburg's dissent is not addressed herein given Justice Kennedy's plurality opinion is the only opinion from J. McIntyre that appears to have been favorably cited by the Fourth Circuit.

[19] Unfortunately, Justice Kennedy's plurality opinion provides no direct insight or guidance as to what type of conduct by an out-of-state defendant would amount to a "targeting" of the forum state. One might potentially extrapolate some guidance to this effect from the manner in which Justice Kennedy took note of factors not present in the case in finding an absence of purposeful availment (i.e., possibly suggesting that if they had been present, it would have changed his reasoning), but it is unclear as to what degree the opinion was intended to be understood in this way or how the reasoning would be applied to reach a contrary result in a factually dissimilar case. Thus, J. McIntyre contributes virtually nothing of substantive import to the stream of commerce discussion beyond the reasoning contained in Justice O'Connor's plurality opinion in Asahi.

McIntyre's purposeful contacts specific to New Jersey, rather than the United States generally, were relevant to the question of whether New Jersey's exercise of personal jurisdiction over it would comport with due process.  Id. at 886.  In this regard, he concluded that the nature of J. McIntyre's operations possibly "reveal[ed] an intent to serve the U.S. market, but they do not show that J. McIntyre purposefully availed itself of the New Jersey market," specifically taking note that J. McIntyre "had no office in New Jersey; it neither paid taxes nor owned property there; and it neither advertised in, nor sent any employees to, the State."  Id.

As the above analysis demonstrates, neither the reasoning in Asahi nor J. McIntyre regarding the issue of "purposeful availment" in stream of commerce cases qualifies as controlling precedent if viewed in isolation.  Nonetheless, decisional law within the Fourth Circuit has expressed a clear preference for Justice O'Connor's reasoning in Asahi and, to a significantly lesser degree, Justice Kennedy's reasoning in J. McIntyre.  Namely, the Fourth Circuit has categorically rejected the notion that a defendant's mere placement of a product into the stream of commerce with the expectation that the product would be sold in the forum state is, standing alone, sufficient to satisfy the first prong of the due process analysis.  Lesnick v. Hollingsworth & Vose Co., 35 F.3d 939, 945 (4th Cir. 1994).  Rather, in evaluating whether the first prong of the specific jurisdiction test is met in a stream of commerce case, the Fourth Circuit has repeatedly cited the reasoning of Justice O'Connor's plurality opinion in Asahi as being authoritative.  Universal Leather, LLC v. Koro Ar, S.A., 773 F.3d 553, 562 (4th Cir. 2014); Foster v. Arletty 3 S.A.R.L., 278 F.3d 409, 415 (4th Cir. 2002); Lesnick v. Hollingsworth & Vose Co., 35 F.3d 939, 947 (4th Cir. 1994); Ellicott Mach. Corp. v. John Holland Party, Ltd., 995 F.2d 474, 478 (4th Cir. 1993); Fed. Ins. Co. v. Lake Shore, Inc., 886 F.2d 654, 659-60 (4th Cir. 1989).  The Fourth Circuit has also cited Justice Kennedy's plurality opinion in J. McIntyre,

albeit in cursory fashion, for the proposition that sufficient contacts will exist to exercise jurisdiction over an out-of-state defendant if the defendant targeted the forum with its goods. ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 392 (4th Cir. 2012). In summary, the law in the Fourth Circuit with respect to the first prong of the specific jurisdiction test in stream of commerce cases is that an out-of-state defendant who sends a product into the stream of commerce with the expectation that a product will be sold in the forum state will only be subject to personal jurisdiction in the forum state if the defendant has also engaged in conduct that evinces an intent or purpose to serve the forum state. Conduct satisfying this standard could be of the kind mentioned in Justice O'Connor's plurality opinion in Asahi or by other conduct showing that the out-of-state defendant "targeted" the forum with its goods. Fed. Ins. Co., 886 F.2d at 659-60 (citing Asahi, 480 U.S. at 112).

> ii. *Standards Governing the Attribution of Jurisdictional Contacts by a Third Party to an Out-of-State Defendant.*

An out-of-state defendant need not have a physical presence in a state to have purposefully availed itself of that forum. Walden v. Fiore, 571 U.S. 277, 285 (2014). Much to the contrary, the Supreme Court has consistently recognized over the last 40 years that an out-of-state manufacturer or distributor may avail itself of a particular forum indirectly—i.e., through contacts by agents and/or other parties with the forum that were either on behalf of the out-of-state defendant or at the direction of the out-of-state defendant (this concept will be referred to in this filing as "indirect purposeful availment" and/or the "doctrine of attribution"). For example, before Asahi and J. McIntyre, the Supreme Court observed that the commercial conduct of one party on behalf of another party can be imputed to the latter party for purposes of satisfying the "purposeful availment" requirement of due process. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 n. 22 (1985) ("We have previously noted that when commercial activities are 'carried

on in behalf of' an out-of-state party those activities may sometimes be ascribed to the party . . . , at least where he is a 'primary [participant]' in the enterprise and has acted purposefully in directing those activities . . . ." (internal citations omitted)); World-Wide Volkswagen, 444 U.S. at 287 (holding that purposeful availment exists where the sale of a product in the forum "arises from the efforts of the manufacturer or distributor to serve, **directly or indirectly**, the market for its product in other States" (emphasis added)); International Shoe, 326 U. S. at 318 (noting that "the commission of some single or occasional acts of the corporate agent in a state" may sometimes "be deemed sufficient to render the corporation liable to suit" on related claims); Justice O'Conner's plurality opinion in Asahi continued to recognize the principle that an out-of-state defendant can indirectly avail itself of a particular forum through commercial conduct taken on its behalf therein by a distributor/sales agent in the forum. Asahi, 480 U. S. at 112 (opinion of O'Connor, J.) (noting that specific jurisdiction may lie over a foreign defendant that places a product into the "stream of commerce" while also "**marketing the product through a distributor who has agreed to serve as the sales agent in the forum State**") (emphasis added). Following Asahi and J. McIntyre, the Supreme Court again acknowledged the principle in Daimler AG. Daimler AG v. Bauman, 571 U.S. 117, 135 n.13 (2014) ("[A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there."); see also Walden, 571 U.S. at 286 ("To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties.").

Consistent with the foregoing authorities, the Fourth Circuit's decisions also recognize circumstances of indirect purposeful availment and are instructive in this case as to the doctrine

of attribution, even if pre-dating Asahi and/or J. McIntyre.[20]  Stover v. O'Connell Assocs., 84

F.3d 132, 136 (4th Cir. 1996) (noting that "that a person's activity in a state, conducted directly

or through agents, may serve as an analog for his physical presence" for purposes of personal

jurisdiction).   In Hardy, for example, a manufacturer of parachutes ("Pioneer"), who was

incorporated in Delaware and operated out of Connecticut, was found to be subject to personal

jurisdiction in South Carolina in an action brought by a resident of South Carolina alleging that a

parachute manufactured by Pioneer was defective and had injured her.   Hardy v. Pioneer

Parachute Co., 531 F.2d 193, 195 (4th Cir. 1976).  The Fourth Circuit summarized the relevant

jurisdictional facts as follows:

> Pioneer is a Delaware corporation whose principal place of
> business is in Manchester, Connecticut. It owns no property in
> South Carolina, has no agents, employees or office in the state, and
> pays no taxes there. Although Pioneer occasionally makes direct
> sales to customers in South Carolina, **it primarily sells through
> its exclusive distributor**, Parachutes. **Pioneer does no direct
> advertising but contributes to Parachutes' advertising budget**.
>
> Parachutes, a New York corporation with its home office in
> Orange, Massachusetts, distributes and markets sports parachutes
> made by Pioneer. Parachutes owns no property in South Carolina,
> maintains no office or place of business there, and has no agents,
> employees, salesmen, distributors, or franchisees in the state. It
> advertises Pioneer's products in two nationally circulated
> magazines which reach subscribers in South Carolina. Since 1966,
> Parachutes has made at least 42 direct sales to customers in South
> Carolina. In March 1967, it sold the Pioneer parachute, whose

---

[20] This conclusion follows because neither Asahi nor J. McIntyre displaced the long-recognized
principle of indirect purposeful availment.  Much to the contrary, Daimler (an actual majority
opinion that post-dates J. McIntyre) cites Asahi and International Shoe as supportive authority
for that very proposition, demonstrating the doctrine's continuity throughout those decisions and
to the present day.  Daimler, 571 U.S. at 135 n.13.  In other words, this doctrine of attribution
remains the same in the present state of the law as it did before Asahi or J. McIntyre and, for that
reason, decisions applying the doctrine of attribution to a particular kind of relationship carry
precedential value as to the type of relationship that will activate the doctrine, even if no longer
precedential authority as to the quantum of minimum contacts that are necessary to amount to
purposeful availment by the out-of-state defendant.

> safety is at issue in this case, for $361.00 to a resident of South
> Carolina in response to a telephone order from that state.

Id. (emphasis added). Notably, despite recognizing that Pioneer did not <u>directly</u> sell or advertise the product at issue in South Carolina, the Fourth Circuit nonetheless deemed it to have done so through the conduct of its exclusive distributor:

> No unconstitutional burden is imposed on a foreign corporation by requiring it to defend a suit in a forum located in a state where it has advertised and sold a product whose use gave rise to the cause of action. We conclude, therefore, that the due process clause does not preclude entry of a judgment against Pioneer and Parachutes because they did not have more extensive contacts with South Carolina.

Id.

To be sure, Pioneer was decided before <u>Asahi</u> and <u>J. McIntyre</u>. For this reason, it <u>may</u> be of questionable precedential value in analyzing the legal issue of what degree of indirect activity by an out-of-state defendant would satisfy the due process requirement of "purposeful availment" in stream of commerce cases.[21] <u>Yet it nonetheless remains good law as to illuminating the type of relationship that can exist between two entities that will allow for the contacts of one entity with the forum to be attributed to the other entity (i.e., the uncontroversial proposition that an out-of-state defendant may avail itself of a particular forum indirectly through the conduct of its distributor)</u>.

---

[21] Ms. Wade contends that <u>Hardy</u> actually would be good law on the issue of purposeful availment as well given its analysis was driven by the finding that Pioneer had advertised and sold the product in the forum state through its distributor, which is exactly the type of conduct that <u>Asahi</u> recognizes as being probative of an intent by an out-of-state defendant to serve the forum. <u>Asahi</u>, 480 U.S. at 112.

Moreover, the Fourth Circuit reached a similar result <u>thirteen years</u> after <u>Asahi</u> in <u>Anita's</u> <u>N.M. Style Mexican Food, Inc. v. Anita's Mexican Foods Corp.</u>, 201 F.3d 314 (4th Cir. 2000).[22] In that case, a Virginia corporation known as "Anita's Virginia" brought suit against a California corporation known as "Anita's California" regarding an alleged violation of a stipulated judgment the parties had previously reached (in California) during a trademark dispute regarding the parties' use of the "ANITA'S" trademark. <u>Id.</u> at 316. Specifically, the terms of the stipulated judgment prohibited Anita's California from selling Mexican food products under the trademark "ANITA'S" outside of California. <u>Id.</u> Additionally, Anita's California agreed that it would ensure the compliance of its licensee, Queen International Foods, Inc. ("Queen International"), with the terms of the stipulated judgment. <u>Id.</u> The stipulated judgment contained a provision that Anita's California "controls the nature and quality of the goods and services sold in association with any trade name, trademark, or service mark comprising ANITA'S, by Queen International Foods, Inc." <u>Id.</u> Nonetheless, Queen International did sell food under the trademark ANITA'S outside of California and, specifically, in Virginia. Anita's Virginia brought suit in Virginia alleging that Anita's California and Queen International were in violation of the stipulated judgment. <u>Id.</u>

---

[22] While <u>Anita's</u> was decided after <u>Asahi</u>, it was decided before <u>J. McIntyre</u>. Yet, there is no reason to believe that the Fourth Circuit would have reached different result had the case been decided after <u>J. McIntyre</u>. As noted above, Justice Kennedy's plurality opinion in <u>J. McIntyre</u> did not really contribute anything new to the stream of commerce line of cases substantively, at least as far as illuminating the specific types of conduct by an out-of-state defendant that would amount to purposeful availment of a given forum in stream of commerce cases. Indeed, <u>J. McIntyre's</u> lack of impact within the operative body of decisional law is borne out by the fact that its analysis regarding "purposeful availment" has not received any significant treatment by the Fourth Circuit or meaningfully guided the Fourth Circuit's ruling in any case in the eight years since the case was been decided. Rather, the Fourth Circuit has briefly cited the case one time for its stream of commerce reasoning. <u>ESAB</u>, 685 F.3d at 392.

Anita's California contended that it was not subject to personal jurisdiction in Virginia because it had no office and no sales representatives in Virginia, and did not ship products in Virginia.  Id. at 318.  The Fourth Circuit observed, nonetheless, that "Anita's California . . . sold Mexican food products in Virginia <u>through</u> its licensee Queen International . . . ."  Id. (emphasis added).  The Court further reasoned that "[t]hese sales were purposeful and availed Anita's California of the benefit of doing business in Virginia under Virginia law."  Id. at 319.  Consequently, Anita's California could reasonably anticipate being haled into court in Virginia and was subject to personal jurisdiction there.  Id.

In this case, the question brought center stage is what type of relationship between the entities involved must be demonstrated by the evidence to animate the principle of indirect purposeful availment.  Although it appears such a relationship need not be one amounting to a technical principal-agent relationship, <u>see</u> <u>Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan</u>, 259 F.3d 209, 217 n.8 (4th Cir. 2001), the Fourth Circuit has previously held that merely demonstrating cooperation between two otherwise independent entities in a business endeavor was insufficient to invoke the doctrine of attribution given there was no contention that a joint venture existed between the two entities.  <u>Compare</u> <u>Lesnick</u>, 35 F.3d at 946 n.2, <u>with</u> <u>Tire Eng'g & Distribution, Ltd. Liab. Co. v. Shandong Linglong Rubber Co.</u>, 682 F.3d 292, 303 n.7 (4th Cir. 2012); <u>Bonney v. Roelle</u>, No. 96-1664, 1997 U.S. App. LEXIS 18179, at *21 (4th Cir. July 21, 1997) (observing that it is well-settled law within the Fourth Circuit that the doctrine of attribution does apply when the parties are engaged in a joint venture).  In an unpublished decision, the Fourth Circuit indicated that the doctrine would be activated by: (a) a showing of agency status; (b) a demonstration that the out-of-state defendant exercised a greater degree of control over the third party than would be expected in their

relationship; or (c) the out-of-state defendant and third party were separate entities in name alone. Gray v. Riso Kagaku Corp., No. 95-1741, 1996 U.S. App. LEXIS 8406, at *10 (4th Cir. Apr. 17, 1996). This framing of the doctrine is consistent with the guidance provided by the Supreme Court as discussed supra at 18-19. In short, while the exact contours of the doctrine of attribution remained unfixed at present in terms of what types of relationships other than an agency will activate it, the controlling authorities are uniform in their recognition that the doctrine is activated where an agency relationship is shown between the out-of-state defendant and the third party who engaged in various contacts with the forum.

### iii. Interworks Purposefully Directed Activities at Virginia Through QVC and Digital Gadgets.

QVC plainly maintained a substantial physical presence in Virginia for the purpose of soliciting customer sales,[23] advertised and marketed the Model C in Virginia,[24] sold the Model C to Ms. Wade in Virginia.[25] The issue to be resolved is whether Interworks may be charged with QVC's jurisdictional contacts under the doctrine of attribution. If so, Interworks would be subject to personal jurisdiction in Virginia by virtue of QVC's contacts. Anita's, 201 F.3d at 318; Hardy, 531 F.2d at 195. In this case, QVC's contacts with Virginia may be attributed to Interworks because the evidence in the record establishes that QVC, Interworks, and Digital Gadgets were engaged in a joint venture and, accordingly, agents of each of other for jurisdictional purposes. Burruss v. Green Auction & Realty Co., 228 Va. 6, 10, 319 S.E.2d 725,

---

[23] Namely, one of QVC's two domestic call centers for receiving customer orders related to its programming was in Virginia. QVC 2016 10-K Rep. (Ex. 8) at I-23.

[24] There is no doubt that each of the six known QVC airings regarding the Model C had a substantial broadcast presence in Virginia. QVC distributes its live programming to 96% of U.S. households subscribing to services offered by major television distributors, and nearly 83% of all U.S. households. Compare id. at I-2, with Table HH-1 (Ex. 32) at *1.

[25] Generally speaking, an online sale is deemed to occur where the goods are delivered. South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2092 (2018) (citations omitted).

727 (1984) ("Joint venturers, like partners, have the dual status of principals for themselves and agents for all other joint venturers, within the scope of the enterprise.").[26]

Under Virginia law, "[a] joint venture exists where two or more parties enter into a special combination for the purpose of a specific business undertaking, jointly seeking a profit, gain, or other benefit, without any actual partnership or corporate designation." Roark v. Hicks, 234 Va. 470, 475 (1987) (citations omitted). "[T]he relationships and duties of joint venturers and partners, toward one another, are essentially the same." Burruss v. Green Auction Co., 228 Va. 6, 10 (1984). Whether a joint venture exists is determined by the facts and circumstances of a particular case. Smith v. Grenadier, 203 Va. 740, 744 (1962). Notably, a joint venture can exist even in the absence of a formal agreement establishing one between the parties involved. Id. The relationship is characterized as one in which there is "a joint business enterprise for [each party's] mutual benefit, with an express or implied understanding or agreement that they are to share in the profits or losses of the enterprise, and that each is to have a voice in its control and management." PGI, Inc. v. Rathe Prods., Inc., 265 Va. 334, 340 (2003) (citations omitted).

In Smith, the Court found sufficient evidence to support the existence of a joint venture between a subcontractor ("Rainwater") and the owner of certain equipment used by him on a project ("Grenadier"). Id. at 745-46. Rainwater used Grenadier's equipment on the condition that Rainwater would pay Grenadier monthly deferred payments. Id. at 743. Because Rainwater

---

[26] It is clear that Virginia law governing the formation of joint ventures would govern the question of whether Interworks, Digital Gadgets, and QVC were engaged in a joint venture. A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits. Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418-19 (4th Cir. 2004). In this regard, Virginia clearly applies the substantive law of place of the wrong to all legal questions that are not procedural in nature. Morrissey v. William Morrow & Co., 739 F.2d 962, 968 (4th Cir. 1984); Jones v. R. S. Jones & Assocs., 246 Va. 3, 5, 431 S.E.2d 33, 34 (1993). Here, the sale of the product at issue occurred in Virginia and Ms. Wade was injured by the product in Virginia. Accordingly, whether Interworks, Digital Gadgets, and QVC are to be treated as joint venturers is a question to be resolved by Virginia law.

was unable to secure a payment bond, Grenadier executed a contract with the general contractor to create the impression that Grenadier—and not Rainwater—was the actual subcontractor for the project. Id. The court held that because both Grenadier and Rainwater had contracted with the general contractor, the jury "could conclude that Grenadier and Rainwater were doing the work jointly and each had a right to the control and management of the project, and that a community of interest in the object and purpose of the undertaking existed between them." Id. at 745. With respect to the sharing of profits, the court found that Rainwater's monthly payments to Grenadier on the equipment constituted a profit to Grenadier, while Rainwater's ability to keep the equipment after his payments constituted "profit" to him. Id.

Here, as detailed above in the Statement of Facts, there is more than adequate evidence that Interworks, Digital Gadgets, and QVC were engaged "[a] joint business enterprise for their mutual benefit, with an express or implied understanding or agreement that they [were] to share in the profits or losses of the enterprise, and that each is to have a voice in its control and management." Roark, 234 Va. at 475. As noted above, the common commercial goal between the three entities was to capitalize on the holiday demand for hoverboards, with each entity playing its respective and necessary role to achieve that objective. To that end, Interworks certainly possessed an identifiable voice in management and degree of control over its joint effort with Digital Gadgets and QVC to sell the Model C hoverboard to QVC customers. Interworks participated in forming the claims to be used about the Model C during QVC's marketing and advertising of the same, and set the price for the Model C. Interworks also exerted control over the customer distribution process itself, having the right to decide which entity would be used as the drop ship vendor to send Model Cs to QVC customers. Moreover, as the trademark owner of the "High Roller" brand and logo, Interworks had the right to control

QVC's use of its trademarks as well as the quality of goods sold under those trademarks.  Shell, 928 F.2d at 107; Crinkley, 844 F.2d at 166.  Digital Gadgets controlled the amount of inventory available to QVC (and, accordingly, the duration of QVC's sales of the Model C given QVC intended the duration of its operations to continue so long as Digital Gadgets' had inventory available), as well as managing the details of storing the Model C inventory prior to sale and distributing the Model C inventory to QVCs customers after sales had been consummated by QVC.  QVC controlled/managed the QA standards for Model Cs sold on QVC, the timing and content of the airings of the Model C, and the content of any online marketing for the Model C.

The nature of the arrangement between the three entities also demonstrated a joint intent on their part to share in the profits or losses of their joint venture.  Interworks shouldered the costs associated with procuring inventory from Chic and the costs of including both QVC and Digital Gadgets as additional insureds on its liability insurance policy.  Digital Gadgets shouldered the costs associated with storing and distributing the Model Cs while QVC attempted to market and sell the Model C inventory.  QVC shouldered the costs associated with marketing the Model C through online and broadcast media.  In this regard, each entity was simultaneously sharing in the cost/risk of the joint venture while enjoying the "profit" of the other entities' operational contributions.  For example, Interworks received the profit of having QVC's nationwide marketing and advertising of its High Roller trademark to an established customer base.  Digital Gadgets also profited by being a financial beneficiary of each sale achieved through QVC's marketing and advertising of the Model C, while not having to front the costs associated with procuring inventory until sales had already occurred.  QVC also profited by being able to sell an in-demand product it could not have otherwise obtained given Interworks was the exclusive distributor of the Model C (without having to expend any resources on

procuring or storing Model C inventory, or distributing Model C orders). It also seems (but is admittedly not certain) that payment would only change hands between each entity once an actual sale to a QVC customer occurred, demonstrating that the true source of each entity's profit from the endeavor was QVC's actual sale of a Model C to an end user, rather than any independent transactions between them.

Had Interworks bothered to appear in this matter, it would almost certainly dispute that its relationship with Digital Gadgets and QVC amounted to a joint venture. Rather, it would label each relationship as simply being an independent vendor-vendee relationship which would be insufficient to animate the doctrine of attribution. To be sure, the requirement that joint venturers share in a profit cannot be met just by showing that each entity made profit from an independent chain of sales. <u>Wells v. Whitaker</u>, 207 Va. 616, 626 (1966). Rather, if the profit being "shared" between the entities is profits from sales, the profits must be joint (not several). <u>Id.</u> However, several points must be made in this regard. First, there is evidence in the record that the payment arrangement between the three entities was such that all profits derived solely from QVC's sale of Model C's to end users, not independent transactions between the three entities. Given as much, there would be reason to conclude that the profits were in fact joint in nature, not several. <u>Id.</u> Second, even if the evidence in the record is in sufficient on this point, joint venturers may share in profit by virtue of any material benefit they receive from the enterprise—not only joint sales profits. <u>See, e.g.</u>, <u>Smith</u>, 203 Va. at 745. In this regard, each entity shared in the profits of their joint enterprise through the meaningful (and, indeed, necessary) operational contributions of each other as described above (i.e., Interworks profited by receiving widespread marketing, advertising, and distribution of its trademark and product without any incurring any direct costs for those services, while both Digital Gadgets and QVC

profited by being able to financially benefit from the sale of an in-demand product without incurring the costs of procuring product inventory beforehand).

Moreover, the vendor-vendee relationship typically contemplates the sale of goods by the vendor to the vendee, with delivery marking the point in time at which the parties operate independently of each other.  Rock-Ola Mfg. Corp. Wertz, 249 F.2d 813, 817 (4th Cir. 1957).  Here, however, QVC marketed the Model Cs while the goods remained in either Interworks' or Digital Gadgets' possession, with each party in the chain of supply only paying its respective supplier once an actual sale occurred and each party maintaining a right of return vis-à-vis its supplier.  Such a structure is far more indicative of an agency relationship than an independent sale.  United States v. General Electric Co., 272 U.S. 476, 484 (1926) (holding a consignee to be a del credere agent because the consignor retained the legal title, and the consignee maintained a right of return and was not required to pay until goods were sold).  This conclusion is further borne out by the fact that QVC actively markets itself as a conduit between the product vendor and the end user for the vendor to build relationships with millions of QVC customers:

> At QVC, we don't just display items on shelves or in online galleries. We create a multiplatform experience that brings products and brands to life through people and stories. Does your product solve a problem, fill a void, or make day-to-day life a bit easier? Does your brand have a compelling narrative that will resonate with consumers? With our unique utilization of multiple platforms—broadcast, online, mobile, and social channels—we offer vendors and entrepreneurs the tools to begin and build relationships with our engaged community of millions of shoppers worldwide. So… what's your story?

QVC Vendor Website Screenshot (Ex. 9) at *1 (emphasis added).

It is also noteworthy that Virginia law looks to Restatement (Second), Agency, § 14J for guidance in distinguishing whether a given mode of operation indicates an independent sale or an agency relationship.  Wells, 207 Va. at 626 (citing Restatement [Second], Agency, § 14J).  That

section of the Restatement identifies seven factors informative of whether the parties to a transaction are engaged in a sale or an agency. Those factors include: "(1) That the consignee gets legal title and possession of the goods"; "(2) That the consignee becomes responsible for an agreed price, either at once or when the goods are sold"; "(3) That the consignee can fix the price at which he sells without accounting to the transferor for the difference between what he obtains and the price he pays"; "(4) That the goods are incomplete or unfinished and it is understood that the transferee is to make additions to them or to complete the process of manufacture"; "(5) That the risk of loss by accident is upon the transferee"; "(6) That the transferee deals, or has a right to deal, with the goods of persons other than the transferor"; and "(7) That the transferee deals in his own name and does not disclose that the goods are those of another."

Here, the vast majority of these factors indicate that the transactions between Interworks, Digital Gadgets, and QVC were occurring in the context of an agency relationship.[27] As to the first factor, QVC never took possession of the Model C inventory once Digital Gadgets became its drop ship vendor. Tebele Dep. (Ex. 18) at 90:4-10, 126:22-127:18. Although Digital Gadgets stored the Model Cs while QVC attempted to sell the Model C, legal title to the inventory remained with Interworks given the Model Cs were sold on consignment. Id. at 127:6-18, 132:8-15. As to the third factor, it was Interworks who set the price of the Model Cs being sold on QVC during the relevant time, not Digital Gadgets or QVC. Lu Dep. (Ex. 1) at 33:2-9. As to the fourth factor, neither Digital Gadgets nor QVC were required to do anything to complete the

_____

[27] The evidence in the record is insufficient to know how the sixth factor would impact the analysis. Only the second factor would potentially counsel in favor of a finding the transactions between Interworks, Digital Gadgets, and QVC to be sales rather than part of an agency relationship. However, the Restatement counsels that this factor is not determinative, particularly if there is a right to return unsold goods. Restatement [Second], Agency, § 14J. Here, both QVC and Digital Gadgets maintained such a right of return, therefore this factor should be treated as neutral to the outcome or even as favorable to Ms. Wade.

manufacture of the Model Cs. Id. at 27:14-18, 40:8-11, 44:11-16. As to the fifth factor, the risk of loss by accident was completely upon Interworks. As a practical matter, QVC had no such risk given it had no responsibility for storing or distributing the Model Cs and could return Model Cs to Digital Gadgets for any reason without explanation. Tebele Dep. (Ex. 18) at 55:16-25, 79:4-8, 90:4-24. Moreover, Digital Gadgets only paid Interworks for Model Cs that actually sold to QVC customers and could return any damaged or defective Model Cs to Interworks. Lu Dep. (Ex. 1) at 54:24-55:4; Tebele Dep. (Ex. 18) at 126:22-127:18. As to the seventh factor, QVC in fact marketed the good as being High Roller products (i.e., Interworks' trademark), frequently referencing the High Roller name throughout their broadcasts and prominently displaying the High Roller name and logo almost without any interruption during their December infomercials for the product and repeatedly attesting to its high quality (the references by the QVC sales reps to the High Roller brand in the two December airings are summarized in the spreadsheet appended hereto as Exhibit 33).

Accordingly, for the reasons stated above, this Court should hold that the transactions occurring between Interworks, Digital Gadgets, and QVC were actually occurring in the context of a joint venture or, alternatively, a del credere agency. For that reason, the Court should also hold that QVC's physical presence (i.e., its Virginia call center) and widespread marketing and advertising of the Model C in Virginia is attributable to Interworks (as well as Digital Gadgets shipment of the Model C at issue into Virginia). Having an agent physically present in Virginia, as well as advertising and marketing the Model C in Virginia through an agent, is exactly the type of conduct that both Asahi and the Fourth Circuit have recognized as manifesting an intent by an out-of-state defendant to purposefully avail itself of a particular forum. Asahi, 480 U.S. at 112; Fed. Ins. Co., 886 F.2d at 660; see also Selke v. Germanwings GmbH, 261 F. Supp. 3d 645,

655 (E.D. Va. 2017) (finding foreign airline had purposefully availed itself of the privilege of doing business in Virginia where it contractually permitted a domestic airline to sell tickets to Virginia residents on its behalf).

### c. The Second Prong of the Jurisdictional Test is Satisfied in this Case.

With respect to the second prong of the jurisdictional analysis—i.e., whether Ms. Wade's claims arose out of Interworks' activities with Virginia—this requirement is clearly met. A claim arises out of a defendant's activities with the forum if those activities "precipitated" or were the "genesis" of the plaintiff's claim. Selke, 261 F. Supp. 3d at 657. In the instant case, Ms. Wade purchased a Model C through QVC as a result of Interworks' marketing and advertising of the Model C in Virginia and is bringing the instant action alleging that the User Manual included with that purchase (i.e., the one supplied to QVC by Interworks, approved by QVC, and still present on QVC's website) contained false statements of fact regarding the Model C's safety features in violation of Virginia law.[28] As a result of those false statements, Ms. Wade was injured in her attempt to operate the Model C that she purchased through QVC.

### d. The Third Prong of the Jurisdictional Test is Satisfied in this Case.

Turning to the third prong of the jurisdictional analysis, the exercise of personal jurisdiction over Interworks is constitutionally reasonable. Perdue Foods LLC, 814 F.3d at 189. In making this determination, the Court must take account of factors such as the following: "(a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared

---

[28] The QVC QA sheet for the Model C reflects in approved the User Manual for the same. QVC QA Rep. (Ex. 10) at *3. The User Manual remains available on QVC's website at https://www.qvc.com/footers/fth/pdf/T34604_UM-Manual.pdf.

interests of the several states in furthering fundamental substantive social policies." Lesnick, 35 F.3d at 946 (citations omitted).

Ms. Wade has a clear interest in litigating this matter in her home state and Virginia has a strong interest in providing a means of redress for its citizens who have been injured by products that malfunctioned, as well as ensuring products being sold into the Commonwealth meet its safety standards. First American First, Inc. v. National Asso. of Bank Women, 802 F.2d 1511, 1518 (4th Cir. 1986); Abel v. Montgomery Ward Co., 798 F. Supp. 322, 329 (E.D. Va. 1992). While Interworks may have faced some burden by having to litigate in Virginia, the burden would have been mitigated by the fact that Interworks had purchased liability insurance for the very purpose of defending such claims. Moreover, any burden that exists is certainly less than foreign entities that have been required to do so in similar circumstances in the face of similar competing interests held by the plaintiff and the Commonwealth. Selke, 261 F. Supp. 3d at 658; Abel, 798 F. Supp. at 329. Accordingly, the Court should find the exercise of specific personal jurisdiction over Interworks to be constitutionally reasonable in this case.[29]

## II. The Court is Vested with Subject Matter Jurisdiction to Adjudicate this Dispute.

The Court is vested with diversity jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00. Specifically, Interworks resides in California and Ms. Wade resides in Virginia. Lu Dep. (Ex. 1) at 7:20-24; Wade Dec. (Ex. 30) ¶ 3. Moreover, the amount

---

[29] Ms. Wade is not aware of any authority to suggest that "the efficient resolution of controversies as between states" or "the shared interests of the several states in furthering fundamental substantive social policies" would either favor or disfavor the exercise of personal jurisdiction in this case.

of Ms. Wade's medical bills related to the injuries claimed in this lawsuit alone exceed the requisite jurisdictional amount. Wade Dec. (Ex. 30) ¶ 19.

### III.     <u>Venue is Properly Laid in this Court.</u>

Venue is properly laid in this Court as a substantial part of the acts and omissions that gave rise to this lawsuit occurred within this judicial district and division. 28 U.S.C. § 1391(b)(2); LR 3(B)(4), (C). Specifically, the following material events giving rise to Ms. Wade's claim against Interworks occurred in this district and division: (1) Ms. Wade watched the QVC Model C broadcast which enticed her to purchase the Model C; (2) Ms. Wade ordered the Model C that did not function as represented from QVC's website; (3) Digital Gadgets delivered the Model C to an address in Richmond, Virginia; (4) Ms. Wade read and relied upon the allegedly inaccurate statements made by Interworks in the User Manual; and (5) Ms. Wade suffered the injuries for which she is seeking relief. Wade Dec. (Ex. 30) ¶¶ 1-19; Wade Dec. Ex. A at 1.

### IV.     <u>Interworks Received Service of Process.</u>

Interworks received service of process. Rule 4 permits, <u>inter alia</u>, a plaintiff to serve process upon a corporation in any manner permitted by state law of the forum in which the district court is situated. Fed. R. Civ. P. 4(b)(1)(A). Virginia law, in turn, authorizes service on a foreign corporation by service of process on the Secretary of the Commonwealth in accordance with Section 8.01-329. Va. Code Ann. § 8.01-301(3). The Certificate of Compliance by the Service of Process Clerk for the Secretary of the Commonwealth (docketed at the second page of ECF No. 4 in this case) confirms Interworks was served in accordance with the provisions of Section 8.01-329.

V.     **Ms. Wade's Complaint States Plausible Claims for Relief Against Interworks.**

Ms. Wade's Complaint asserts two claims against Interworks.  The first claim is based upon Interworks' alleged violations of the Virginia Consumer Protection Act ("VCPA")—specifically, Section 59.1-200(14).  See Compl. ¶¶ 15-21, ECF No. 1, Nov. 30, 2018.  The second claim is based upon Interworks' various breaches of express warranties made in the User Manual.  Compl. ¶¶ 22-29.  The well-pleaded factual allegations in Ms. Wade's complaint plausibly state a claim for relief under both theories for the reasons set forth below.

a.     Ms. Wade's Complaint Alleges a Plausible VCPA Claim Against Interworks.

To state a claim for relief under the VCPA, a plaintiff must allege facts which plausibly establish that a "supplier" engaged in conduct prohibited by Section 59.1-200 in connection with a "consumer transaction."  Va. Code Ann. § 59.1-200.  It is important to address that decisional law historically interpreted the VCPA as requiring an intent to defraud or deceive on part of the supplier for the supplier's conduct to be actionable.  See, e.g., Padin v. Oyster Point Dodge, 397 F. Supp. 2d 712, 722 (E.D. Va. 2005).  However, the Supreme Court of Virginia has clarified that the reach of VCPA is significantly broader than that of common law fraud and, accordingly, "[t]he VCPA clearly does not require the consumer to prove in every case that misrepresentations were made knowingly or with the intent to deceive."  Ballagh v. Fauber Enters. Inc., 290 Va. 120, 773 S.E.2d 366, 368-70 (2015).  Accordingly, a complaint sufficiently alleges a VCPA claim by alleging a misrepresentation by a supplier in connection with a consumer transaction, provided it also alleges that the consumer relied on the representation and suffered damages as a result.  In re Lumber Liquidators Chinese-Manufactured Flooring

<u>Durability Mktg. & Sales Practice Litig.</u>, No. 1:16md2743, 2017 U.S. Dist. LEXIS 105335, at
*42 (E.D. Va. July 7, 2017) (citing <u>Ballagh</u>, 290 Va. at 370).[30]

Ms. Wade has alleged all of the essential elements of a VCPA claim in her complaint. A
"supplier" under the VCPA includes a "distributor . . . who . . . sells . . . goods . . . to be resold . .
. by other persons in consumer transactions." Va. Code § 59.1-198. Ms. Wade has alleged that
Interworks is the distributor of the Model C at issue in this case. <u>See</u> Compl. ¶ 8 (attaching the
Model C User Manual as Exhibit A to the pleading); Compl. Ex. A at *2 (identifying Interworks
as the distributor of the Model C).[31] The VCPA definition of "consumer transactions" includes
"the . . . sale . . . of goods . . . to be used primarily for personal, family or household purposes."
Va. Code Ann. § 59.1-198. Accordingly, Ms. Wade has alleged that Interworks' wrongful
conduct occurred in connection with a "consumer transaction" because she alleges that it arises
out of her purchase of the Model C hoverboard as a Christmas present for her son. Compl. ¶ 6.

Finally, Ms. Wade alleges that Interworks violated the VCPA by specifically identifying
a number of false promises or misrepresentations made by Interworks in the User Manual with
respect to the Model C hoverboard. Va. Code Ann. 59.1-200(14) (prohibiting a supplier from,
<u>inter alia</u>, making any other false promise or misrepresentation in connection with a consumer
transaction). Specifically, Ms. Wade's pleading identified the particular statements from the
User Manual allegedly violative of the VCPA, included the actual User Manual containing the
false and/or misrepresentative statements as an exhibit to the Complaint, and alleged the
statements were substantively false and/or misrepresentative by asserting: (a) the Model C's self-
balancing technology would allow for secure forward movement; (b) an alarm and indicator light

---

[30] This case will be abbreviated as "<u>In re Lumber Liquidators</u>" in subsequent citations.
[31] Ms. Wade may rely on the User Manual's identification of Interworks as a distributor because
an exhibit appended to a complaint becomes a part of the complaint for all purposes. Fed. R.
Civ. P. 10(c).

on the Model C would warn users if they were not at a sufficiently self-balanced state to enable safe movement on the same; and (c) wrist guards were not part of the safety gear needed to safely operate the "High Roller" hoverboard. See Compl. ¶¶ 10-11, 20.

Finally, Ms. Wade has alleged that she read the User Manual and relied on the allegedly false and/or misrepresentative statements in the User Manual in selecting the safety equipment she wore (which excluded wrist guards) and attempting to maneuver the Model C forward (i.e., she did so given the User Manual's representation that the Model C was equipped with self-balancing technology and would sound an alarm and activate a warning light if the Model C were not sufficiently self-balanced to allow safe movement). Id. ¶¶ 8-12. Hearing no alarm and seeing no warning light, Ms. Wade attempted to move forward and, when she did, the Model C lurched backwards in an unexpected and unpredictable manner that caused Ms. Wade to fall forward and suffer severe fractures in her left arm and wrist. Id. ¶¶ 12-13. These injuries, in turn, gave rise to significant economic and noneconomic damages. Id. ¶¶ 14, 21.

Accordingly, Ms. Wade has alleged a plausible claim for relief against Interworks under the VCPA. In re Lumber Liquidators, 2017 U.S. Dist. LEXIS 105335, at *42.

   b.  <u>Ms. Wade's Complaint Alleges a Plausible Breach of Express Warranty Claim Against Interworks.</u>

Ms. Wade has plausibly alleged a claim for breach of express warranty against Interworks. Stating a plausible claim for breach of express warranty relief requires only that the plaintiff allege some statement or affirmation by the defendant that could plausibly create an express warranty as well as facts plausibly demonstrating the goods at issue did not conform with the warranty. See, e.g., Barber v. Sam's Club E., Inc., No. 6:17-CV-00035, 2017 U.S. Dist. LEXIS 166453, at *8 (W.D. Va. Oct. 7, 2017); Fields v. Jobar Int'l, Inc., No. 3:14CV50, 2014 U.S. Dist. LEXIS 52855, at *16 (E.D. Va. Apr. 16, 2014).

Section 8.2-313(b) provides that "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Va. Code Ann. § 8.2-313(1)(b). A "seller" under Section 8.2-313 is simply "a person who sells or contracts to sell goods." Va. Code Ann. § 8.2-103. Accordingly, it is not necessary to allege that the defendant sold the goods at issue <u>specifically to the plaintiff</u> to plausibly state a claim for breach of express warranty against the defendant. <u>Fields</u>, 2014 U.S. Dist. LEXIS 52855, at *16 (citations omitted). Nor is it necessary to allege "any reliance on" or "actual knowledge of the warranty-triggering language" by the plaintiff. <u>Id.</u>; <u>see also</u> <u>Benedict v. Hankook Tire Co.</u>, 295 F. Supp. 3d 632, 653 (E.D. Va. 2018) (citations omitted). Section 8.2-313 also clarifies that "[i]t is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty." Va. Code Ann. § 8.2-313(2). The sole inquiry is simply whether the statement may fairly be treated as a "basis of the bargain." <u>Benedict</u>, 295 F. Supp. 2d at 653 (citations omitted). In this regard, "all of the statements of the seller [are part of the basis of the bargain] unless good reason is shown to the contrary." <u>Id.</u> (internal quotations and citations omitted) (alterations in original).

Here, by alleging that Interworks is the distributor of the Model C, Ms. Wade has alleged that Interworks is a "seller" of the Model C. <u>See</u> Compl. ¶ 8 (attaching the Model C User Manual as Exhibit A to the pleading); Compl. Ex. A at *2 (identifying Interworks as the distributor of the Model C). Ms. Wade also alleged that Interworks made a number of descriptive statements in the User Manual regarding the Model C that became a basis of the bargain, including: (a) the Model C's self-balancing technology would allow for secure forward movement on the same; (b) an alarm and indicator light on the Model C would warn users if they were not at a sufficiently

self-balanced state to enable safe movement on the same; and (c) wrist guards were not part of the safety gear needed to safely operate the Model C.  See id. ¶¶ 10-11, 24-25; see also King, 2016 U.S. Dist. LEXIS 95660, at *5-10 (holding rifle distributor's statements in product manual regarding rifle firing capabilities created an actionable express warranty against distributor even though plaintiff had purchased the rifle from a retailer).  Lastly, Ms. Wade alleged that the Model C did not conform to these descriptions, and that such nonconformity caused her injuries in this case.  See Compl. ¶¶ 26-30.  These allegations are sufficient to have plausibly stated a claim for breach of express warranty against Interworks.

## CONCLUSION

Accordingly, having proven that all prerequisites to an entry of default judgment against Interworks are met in this case, Ms. Wade respectfully requests that the Court enter default judgment in her favor in an amount to be established after hearing evidence by Ms. Wade on the quantum of her damages.

DATE: September 6, 2019                    Respectfully submitted,

                                           SHERI WADE


                                           By: _____/s/_____
                                                            Counsel

                                           Jonathan E. Halperin, Esq. (VSB No. 32698)
                                           Andrew Lucchetti, Esq. (VSB No. 86631)
                                           Isaac A. McBeth, Esq. (VSB No. 82400)
                                           Halperin Law Center, LLC
                                           5225 Hickory Park Drive, Suite B
                                           Glen Allen, VA 23059
                                           Phone: (804) 527-0100
                                           Facsimile: (804) 597-0209
                                           jonathan@hlc.law
                                           andrew@hlc.law
                                           isaac@hlc.law

                                           and

                                           Brody Reid, Esq. (VSB No.75343)
                                           Reid Goodwin, PLC
                                           4116 Fitzhugh Avenue
                                           Richmond, Virginia 23230
                                           Phone: (804) 415-7800
                                           Facsimile: (804) 415-7560
                                           breid@reidgoodwin.com
                                           *Counsel for Plaintiff*