UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERWORKS UNLIMITED, INC., )<br>a California Corporation, )<br>)<br>Plaintiff, )<br>)<br>VS. )<br>)<br>DIGITAL GADGETS, LLC; )<br>a New Jersey limited )<br>liability company, )<br>)<br>Defendants. )<br>_____)<br>)<br>AND RELATED CROSS-ACTION. )<br>_____) | CASE NO.<br>2:17-cv-4983 AB KSx |

DEPOSITION OF
ERIC LU

Thursday, September 13, 2018

9:58 A.M.

21650 Oxnard Street
Suite 500
Woodland Hills, California 91367

**EXHIBIT 1**

EXHIBIT 7                                                                 81

Page 6

1  A. Plaintiff.
2  Q. Okay. I'm going to ask you questions during
3  the course of the day. To the best of your ability,
4  please answer my questions. To the best of your
5  ability, when I'm asking a question, please wait for me
6  to finish the question before you answer it, and I will
7  do my best to not interrupt you when you're answering.
8  A. Okay.
9  Q. You have to answer verbally so that the court
10 reporter can take it down. If, during the course of the
11 examination, you wish to confer with counsel, that's
12 fine, except I would ask you that you answer a pending
13 question before you confer with counsel. So if we're in
14 the middle of a question, before you speak to counsel,
15 you should try your best to answer the question.
16     Of course, if you don't understand the
17 question, you can ask me to rephrase it. And, lastly,
18 if during the course of the morning, you wish to take a
19 break -- during the course of the day, I should say --
20 just let me know, and we'll take a break.
21 A. Okay.
22 Q. By whom are you currently employed?
23 A. Interworks Unlimited.
24 Q. And what is your position?
25 A. President.

Page 7

1  Q. What is the business of Interworks?
2  A. Distribution.
3  Q. Distribution of what?
4  A. Distribution of gaming, consumer electronics,
5  and toys.
6  Q. And are you the owner of Interworks?
7  A. Yes.
8  Q. Are there any other owners?
9  A. No.
10 Q. How many employees does Interworks have?
11 A. Nine.
12 Q. Is Tony Tu one of your employees?
13 A. Yes.
14 Q. What's his position?
15 A. He's the accounts executive.
16 Q. And what are his duties and responsibilities?
17 A. His duties are to assist me to process -- to
18 communicate with our clients, customers, and our
19 vendors.
20 Q. How long has Interworks been in business?
21 A. Almost ten years.
22 Q. Where is Interworks located?
23 A. Interworks is located at 2418 Peck Road,
24 City of Industry, California 90601.
25 Q. Has it been at that location for the ten

Page 8

1  years --
2  A. Yes.
3  Q. -- of its existence?
4     And are your offices there?
5  A. Yes.
6  Q. Do you know a company, Digital Gadgets, LLC?
7  A. Yes.
8  Q. And how do you know them?
9  A. They were introduced to me by a sales -- a VP
10 of sales at Chic.
11 Q. And who is the VP of sales?
12 A. Her name is Janet, last name is Lu, L-u. Not
13 related.
14 Q. And who is Chic?
15 A. Chic is the manufacturer of the hoverboard.
16 Q. When did this introduction take place?
17 A. To my recollection, it's sometime in September
18 or October of 2016.
19 Q. And do you recall the reason for the
20 introduction?
21 A. Yes. Digital Gadgets -- Chris Mitchell, who
22 was trying to solicit Chic for distribution in the
23 U.S. -- we -- Interworks has the exclusive distribution.
24 And an introduction was made between Janet and Chris, to
25 me, for the reason that they want to sell Chic products

Page 9

1  in the United States. And that's the reason for the
2  introduction, is they can buy directly from us because
3  we're the distributor -- the exclusive distributor.
4  Q. So Mr. Mitchell had made inquiry of Chic to
5  acquire product from them --
6  A. Correct.
7  Q. -- and Ms. Lu advised Mr. Mitchell that
8  Interworks was the exclusive distributor, and therefore
9  put the two of you together?
10 A. Correct.
11 Q. Now, at the time of this introduction, what was
12 the business relationship between Chic and Interworks?
13    What were you the exclusive distributors of?
14 A. Exclusive distributors for their hoverboards.
15 Q. Do they make a product besides hoverboards?
16 A. Solely hoverboards.
17 Q. And was the exclusivity that you had, was that
18 in a writing?
19 A. Yes.
20 Q. Has that writing been produced in this lawsuit?
21 A. I'm not sure.
22    MR. LAZARUS: I'd call for the production of
23 the exclusivity agreement.
24 Q. When did Interworks and Chic enter into the
25 exclusivity agreement?

|  | Page 10 |  | Page 12 |
|---|---|---|---|
| 1 | A. Sometime in 2015. | 1 | (Whereupon, the record was read back |
| 2 | Q. Prior to the exclusivity arrangement, were you | 2 | by the Court Reporter as follows: |
| 3 | doing business with Chic? | 3 | "Q. Prior to the exclusivity |
| 4 | A. Yes, we were. | 4 | arrangement, had you made sales of |
| 5 | Q. And the prior business consisted of purchasing | 5 | hoverboards to QVC?") |
| 6 | hoverboards? | 6 | THE WITNESS: No. |
| 7 | A. Correct. | 7 | BY MR. LAZARUS: |
| 8 | Q. And how long had that prior business gone on? | 8 | Q. To whom had you made sales? |
| 9 | A. Probably for about a year. | 9 | A. Again, that's a trade secret. I -- |
| 10 | Q. Tell me, please, how it came to pass that the | 10 | Q. What's secret about it? |
| 11 | arrangement became an exclusive. | 11 | A. Because Digital Gadgets is a competitor, and |
| 12 | A. Well, for a business relationship, you know, we | 12 | they have all rights to get the information from who I'm |
| 13 | sold their product. They needed a distributor for the | 13 | selling to so they can attempt to solicit my accounts. |
| 14 | U.S. channel. And we had the retail channels; so, you | 14 | So for that reason, I don't think that I should disclose |
| 15 | know, that's kind of how it came about. | 15 | any of the retail accounts. I mean, if you can figure |
| 16 | Q. They had no other distributor in the U.S.? | 16 | what the retail accounts are, you know, it's what is out |
| 17 | A. At that time, no. | 17 | there. It's retailers. |
| 18 | Q. Did they propose the exclusive arrangement, or | 18 | Q. Okay. So exactly why it's not confidential or |
| 19 | did you? | 19 | secret. |
| 20 | A. I think it was mutual. | 20 | So which retailers was it? |
| 21 | Q. In your earlier answer, you used the | 21 | A. It's secret in who is selling hoverboards. I |
| 22 | expression, "we had the retail channels." | 22 | don't want to disclose that. |
| 23 | What does that mean? | 23 | Q. Okay. So on your counsel's instruction, you're |
| 24 | A. Retail channels is your retail stores in the | 24 | refusing to disclose your customer base for hoverboards; |
| 25 | United States. You know, big-bucks stores. Your -- you | 25 | is that correct? |
|  | Page 11 |  | Page 13 |
| 1 | know, your Wal-Mart, Target, your Best Buy, Toys "R" Us. | 1 | A. That's correct. |
| 2 | You know, big-bucks retailers. | 2 | MR. HSU: I reiterate my objection and |
| 3 | Q. When you say "We had the retail channels," what | 3 | instruction. Thank you. |
| 4 | do you mean? | 4 | MR. LAZARUS: And your objection is it's a |
| 5 | A. That means we sell to the retail channels. | 5 | secret? |
| 6 | Q. Okay. Did you have any exclusivity arrangement | 6 | MR. HSU: Trade secret. Without a protective |
| 7 | with any retailer? | 7 | order, you're not going to get it. And I offered you. |
| 8 | A. No. | 8 | THE REPORTER: I'm sorry? |
| 9 | Q. Prior to the exclusivity arrangement, had you | 9 | MR. HSU: "And I offered you." |
| 10 | sold hoverboards to the retail channel? | 10 | MR. LAZARUS: Don't try to justify your |
| 11 | A. Yes. | 11 | misconduct. |
| 12 | Q. To whom did you make those sales? | 12 | MR. HSU: You can say whatever you want. |
| 13 | MR. HSU: Hold on. | 13 | MR. LAZARUS: I will say whatever I want. |
| 14 | Objection. Trade secrets. Not reasonably | 14 | Thank you. |
| 15 | calculated to lead to any admissible evidence. | 15 | MR. HSU: It's your deposition. |
| 16 | Where are we going? | 16 | MR. LAZARUS: It is my deposition. |
| 17 | BY MR. LAZARUS: | 17 | Q. For what period of time prior to the |
| 18 | Q. Okay. Just answer the question. | 18 | exclusivity arrangement had you sold hoverboards to QVC? |
| 19 | MR. HSU: I instruct the witness not to answer. | 19 | A. Did you say "prior to the exclusivity"? |
| 20 | MR. LAZARUS: Okay. Mark that, and I will seek | 20 | Q. Yes, sir, that's what I said. |
| 21 | sanctions. | 21 | A. I did not sell hoverboards to QVC. |
| 22 | Q. Prior to the exclusivity arrangement, had you | 22 | Q. Okay. So after -- the first sales by |
| 23 | made sales of hoverboards to QVC? | 23 | Interworks, to QVC, of hoverboards came after you |
| 24 | A. Can you repeat that question? | 24 | entered into the exclusivity arrangement? |
| 25 | MR. LAZARUS: Could you read the question back. | 25 | A. Correct. |

Page 14

1 Q. Okay. And how many units did you sell?
2 A. Roughly, off my head (verbatim), about 10,000.
3 Q. Over what period of time?
4 A. Of a one-month period.
5 Q. What month?
6 A. The month of November.
7 Q. What year?
8 A. 2016.
9 Q. And what model hoverboard did you sell?
10 A. It's the High Roller Model C.
11 Q. Prior to selling hoverboards to QVC, had you --
12 Interworks made sales of products to QVC?
13 A. No.
14 Q. Who introduced you to QVC?
15 A. I contacted QVC.
16 Q. And when did you do that?
17 A. Around April of 2016.
18 Q. And who did you contact?
19 A. The buyer, Meghan Kane.
20 Q. And between April of 2016 and November of 2016,
21 how did it develop that you were able to sell
22 10,000 units to QVC?
23 A. Well, we made our sales pitch. We presented
24 our product. And Chic has the patent for the
25 hoverboard; so at that point, QVC decided to bring it on

Page 15

1 board.
2 Q. At what point?
3 A. What's that?
4 Q. At what point did they decide to bring in your
5 board?
6 A. I would say somewhere around June -- June, July
7 time frame.
8 Q. And from June to November, what happened?
9 A. Can you rephrase that?
10    "What happened"? What do you mean, "what
11 happened"? I'm not understanding the question.
12 Q. Well, if they decided to bring them in in June,
13 and the first sales were in November, what happened in
14 the period between June and November relative to those
15 sales?
16 A. Well, between the time between June and
17 November, when they needed the goods, they -- as a
18 buyer, they have to plan when they're going to air it
19 because, as you know, QVC is not a -- QVC is not a
20 retail store. So they have to book an airing time. And
21 during that process, they're setting up for the
22 holidays. So they're going to -- you know, we discuss
23 the product, then they gave us airing time when they
24 needed to deliver the goods and when they're going to do
25 the airing. So...

Page 16

1 Q. And they told you that the airing would be
2 approximately November of 2016?
3 A. Right.
4 Q. Okay. When did you take in the -- withdrawn.
5    Did you physically receive the hoverboards from
6 Chic?
7 A. Well, the goods came in late October, beginning
8 of November. And products came in in sequence. It's
9 coming in containers. It's a large volume; so it's many
10 containers that come in. So around that period of time,
11 products are flowing in.
12 Q. In the fall of 2016, sometime in October?
13 A. Right.
14 Q. And where did they come into?
15 A. The Long Beach port and then to my warehouse.
16 Q. Okay. Where is your warehouse?
17 A. 2418 Peck Road.
18 Q. And did you take in 10,000 pieces from Chic,
19 approximately?
20 A. Yes.
21 Q. And were all 10,000 of those sold to QVC?
22 A. Yes.
23 Q. Other than -- other than those 10,000 pieces,
24 and in the period of calendar year 2016, had you taken
25 in any other hoverboards for any other customer?

Page 17

1 A. Yes.
2 Q. Okay. And how many pieces did you sell?
3 A. Probably in the range of another, give or take,
4 10,000.
5 Q. And was that before or after you took in the
6 pieces for QVC?
7 A. Before.
8 Q. And after you took in the 10,000 pieces to --
9 for QVC, did you ever again take in hoverboards for sale
10 to QVC -- for Interworks sale to QVC?
11 A. Yes.
12 Q. When?
13 A. Like I said, products were coming in from --
14 you know, coming in for the holidays. So there needs to
15 be replenishment. So there were goods coming in
16 through -- every month, there's goods coming in.
17    (Interruption in proceedings due to cell
18 phone.)
19    MR. LAZARUS: Excuse me.
20    Yeah? I am. You're --
21    THE WITNESS: You have to type that. He didn't
22 say "Off the record."
23    THE REPORTER: I can do my job, thank you.
24 BY MR. LAZARUS:
25 Q. I'm sorry.

Page 18

1  After the 10,000 pieces were taken in, were
2 they delivered to QVC?
3  A.  Which 10,000? Before or the after?
4  I told you, there's before QVC and after --
5 after I shipped 10,000 QVC items. So -- so before or
6 after?
7  Q.  Okay. You said you took in 10,000 pieces for
8 QVC in October.
9  A.  Right. Right.
10  Then, after, there's a continuation of products
11 coming in.
12  Q.  Okay. Were all 10,000 pieces shipped to QVC?
13  A.  Yes.
14  Q.  Were they shipped, or were they called out by
15 QVC customers --
16  A.  They were shipped to QVC.
17  Q.  Okay. The subsequent pieces, over what period
18 of time would you make those shipments?
19  A.  Well, the remaining -- the flow of products
20 that's coming in, those are for our other customers, for
21 reorders and for the holidays. So, you know, there's
22 always a flow of products coming in. It's not 10,000
23 for QVC and you stop. There's a flow of products.
24  Q.  Okay. But I asked you about QVC.
25  When did you next ship goods to QVC after the

Page 19

1 10,000 pieces?
2  A.  After we shipped the 10,000 pieces to QVC, the
3 next shipment, we actually went through Digital Gadgets.
4  Q.  What does that mean, "we went through
5 Digital Gadgets"?
6  A.  So Interworks sells directly to QVC, to their
7 direct DC vendor. Digital Gadgets is a drop-ship
8 vendor. And due to the timing and the holidays, QVC
9 needed more products and the timing for us to ship to
10 the DC for the airing out to the customers, and the
11 timing didn't work out. So that's where Digital Gadgets
12 came in and asked to work together to do the online side
13 or the drop-ship side. So we sold Digital Gadgets goods
14 so that they can be the drop-ship vendor for QVC.
15  Q.  The goods -- the 10,000 pieces that Interworks
16 sold to QVC were delivered to the QVC distribution
17 center?
18  A.  Correct.
19  Q.  And they were billed to QVC by Interworks?
20  A.  Correct.
21  Q.  The drop-ship goods that you're referring to
22 were delivered -- withdrawn.
23  Were the drop-ship goods that you referred to
24 delivered to the DC?
25  A.  No.

Page 20

1  Q.  Where were they delivered?
2  A.  They were delivered to the Phoenix distribution
3 in Santa Fe, which is Digital Gadgets's third-party
4 warehouse logistics company.
5  Q.  And if you know, after delivery to Phoenix,
6 where did those goods next go?
7  A.  Those goods, to my understanding, should be for
8 QVC's customers.
9  Q.  Do you mean to say that they were shipped out
10 of the Phoenix warehouse, to your understanding, direct
11 to the QVC customer?
12  A.  Correct.
13  Q.  Now, in what manner -- withdrawn.
14  What is the reason that that was an expedited
15 manner of doing business?
16  How did you save time?
17  A.  Well, saving time is -- the transit time from
18 our warehouse to -- to QVC's DC takes about seven days.
19 Okay? And for QVC to receive the goods and prepare the
20 goods to ship, I don't know how long that's going to
21 take. Okay? So with the drop-ship, they can
22 immediately ship directly to the consumer versus going
23 to the DC -- to the distribution center and the
24 distribution center out to that consumer.
25  And, again, the reason that we did the

Page 21

1 drop-ship is because it's a timing and it's
2 Christmastime, and so people want their gifts before
3 Christmas.
4  Q.  You will recall that you answered, a minute or
5 two ago, when I was asking you about the shipments --
6 after the 10,000 units, when your next shipments were to
7 QVC, and your answer was that the next shipment was
8 actually through Digital Gadgets.
9  Do you recall that?
10  A.  Mm-hmm.
11  Q.  Okay. So was there an agreement, between you
12 and Digital Gadgets, pertaining to the sale and delivery
13 of hoverboard units, by Digital, to QVC, at the time
14 that you made the sale to Digital Gadgets?
15  A.  When you refer to "agreement," do you -- are
16 you referring to a contract, or are you referring to a
17 PO? What are you referring to, "agreement"?
18  Q.  Do you know what an agreement is?
19  A.  I do know what an agreement is, but there's
20 many forms of "agreement."
21  Q.  Thank you.
22  Was there an agreement between you and
23 Digital Gadgets whereby you and Digital Gadgets
24 understood that these hoverboards would go to QVC?
25  A.  The agreement is they're PO'd to us.

Page 22

1   Q. The Digital Gadgets PO?
2   A. Correct. Digital Gadgets's PO.
3   Q. Okay. However, again, referring to your
4   earlier answer, you stated that your next shipment to
5   QVC went through Digital Gadgets --
6   A. Correct.
7   Q. Do you recall that?
8      -- so when Digital Gadgets purchased those
9   goods from Interworks, was it your understanding that
10  Digital Gadgets would deliver those units to QVC?
11  A. That's correct.
12  Q. And how many units were -- were subject of this
13  agreement?
14  A. 4,800 pieces for the first order.
15  Q. First quarter of what year?
16  A. No. First order.
17  Q. I'm sorry. First order. Okay.
18     And what model was that?
19  A. Model C.
20  Q. Now --
21  A. And a second order of 5,800 pieces.
22  Q. And timing-wise, when was the 4,800-piece order
23  placed?
24  A. 4,800-piece order was placed roughly around
25  beginning of December.

Page 23

1   Q. And the 5,800-piece order?
2   A. 5,800 pieces was around early January.
3   Q. Now, prior to the placement of those orders --
4   and, by the way, I want to be clear.
5      Those were Digital Gadgets orders to
6   Interworks; correct?
7   A. Correct.
8   Q. Okay. Prior to the placement of those orders,
9   by Digital Gadgets, with Interworks, had you spoken to
10  QVC concerning the routing of these goods through
11  Digital Gadgets?
12  A. Yes.
13  Q. With whom did you speak?
14  A. Again with Meghan Kane.
15  Q. Tell me what those conversations were.
16  A. The conversations were, "How can we expedite
17  more products?" "How can we sell and push more units
18  for the holidays?"
19     And the solution was to use a drop-ship vendor.
20  Q. And that was Digital Gadgets?
21  A. So -- Digital Gadgets. Correct.
22  Q. And that's the earlier story you told me about
23  the introduction? That's the reason for the
24  introduction?
25  A. Correct.

Page 24

1   Q. Now, the units for the first order, when --
2   when that order was placed by Digital Gadgets, did
3   Interworks have those units in inventory?
4   A. Yes.
5   Q. How about when the second order came?
6   A. Yes.
7   Q. And when -- when did you acquire those units?
8   A. Again, it's between November through December.
9   The whole -- products come on a container load. And
10  there's 2,400 per container; so they come on a weekly
11  basis.
12  Q. Were they -- did they arrive at the same time
13  as the 10,000 pieces that you shipped to the QVC drop
14  center?
15  A. No. They come two or three containers per
16  week. So in sequence, they come, you know, on the -- on
17  a week-to-week basis. Not in one shot, the 10,000, but,
18  you know, little by little they trickle in.
19  Q. Am I correct that the 10,000 pieces that you
20  sold to QVC arrived contemporaneous with the
21  4,800 pieces that ultimately went through
22  Digital Gadgets?
23  A. Can you repeat that question?
24  Q. Let me try again. Did you --
25  A. Yeah.

Page 25

1   Q. Did these -- did you buy 10,000 pieces for drop
2   for your shipment to the QVC DC, and then buy
3   4,800 pieces for Digital Gadgets to drop-ship?
4   (Verbatim.)
5   A. No. We bought -- we bought 20,000 units --
6   Q. Okay.
7   A. -- from the factory. And the units that come
8   in, we allocate 10,000 to QVC, which they committed to;
9   and then whatever that QVC wanted additionally for the
10  drop-ship, that's what Digital Gadgets ordered.
11  Q. Okay. And is there a piece of paper from
12  Interworks, to Chic, that is an order for 20,000 units
13  of hoverboards -- these 20,000?
14  A. You mean like a PO?
15  Q. Yes, sir.
16  A. Of course.
17  Q. Okay. And do you, Interworks, maintain a copy
18  of that PO?
19  A. Of course.
20     MR. LAZARUS: I call for the production of that
21  purchase order, which I don't think has been produced.
22     THE WITNESS: But again, Roger, with this is
23  this is a trade secret, also, because that's my factory.
24  And this document -- I mean, this document has all the
25  information -- costs and -- you know, the factory

Page 26

1 information. And I don't want this disclosed because --
2 BY MR. LAZARUS:
3 Q. I'm not interested in -- I understand what
4 you're saying. I don't need the explanation. You don't
5 want to produce it. I will take it up with the court
6 down the road. I don't need the explanation.
7 MR. HSU: Yeah. When the request is being
8 made, we can respond to it.
9 MR. LAZARUS: The request is being made now,
10 and I will put it in writing when I get the transcript.
11 But I do want to go on record. I want the PO -- or POs
12 from Interworks, to Chic, for these -- for these
13 hoverboards.
14 Q. Now, when the hoverboards -- these
15 20,000 pieces arrived, were they all received at the
16 Interworks warehouse?
17 A. Yes.
18 Q. And the approximately 10,000 pieces were
19 drop-shipped to -- pardon me -- were -- withdrawn.
20 10,000 pieces, approximately, were shipped to
21 the QVC distribution center, and another 10,000 over
22 time, approximately, went to the Phoenix warehouse for
23 Digital Gadgets?
24 A. Correct.
25 Q. Was there one PO to Chic, from Interworks, for

Page 27

1 these 20,000 pieces, or more than one?
2 A. Through the year or...? I mean --
3 Q. These 20,000 pieces that we've been talking
4 about.
5 A. I don't remember how many POs. But it could be
6 one; it could be two.
7 Q. Okay. And what was ordered on the POs?
8 A. The Model C hoverboards.
9 Q. And the Model C hoverboards that were shipped
10 to the QVC distribution center, were they from the same
11 POs that were shipped by Interworks to -- to Phoenix,
12 the warehouse for Digital Gadgets?
13 A. Yes.
14 Q. So that the hoverboards that went from
15 Interworks to QVC should have been identical to the
16 hoverboards that went from Digital to -- drop-shipped to
17 QVC's customers?
18 A. Yes.
19 Q. And when -- withdrawn.
20 Of the nine employees that Interworks has, were
21 they all there in calendar year 2016 and '17?
22 A. I believe so.
23 Q. And how many of those employees were at the
24 warehouse or worked at the warehouse?
25 A. So when you say "worked at the warehouse," are

Page 28

1 you referring to working in the pick-and-pack, or are
2 you talking about working in the office?
3 I mean -- you know, the question is kind of
4 vague. Like, you know, working in the warehouse -- my
5 employees who do processing don't really work in the
6 warehouse.
7 Q. Then you answered the question.
8 A. Yeah.
9 Q. How many work in the warehouse?
10 A. About three, four.
11 Q. Okay. And how many work in the office
12 associated with the warehouse?
13 A. About five.
14 Q. Is Mr. Tu one of those?
15 A. He's one of the five.
16 Q. Do the four warehouse workers have different
17 duties from one another?
18 A. No.
19 Q. Okay. What do they do? What do they do when
20 goods are received?
21 A. They unload containers, pick-and-pack.
22 Q. So our record is clear, when you say
23 "pick-and-pack," what does that mean?
24 A. That means they take the product, label the
25 product with the shipping information, and get it ready

Page 29

1 and prepare to ship.
2 Q. And in the ordinary course, do they inspect the
3 received units?
4 A. They do not inspect goods.
5 Q. Why not?
6 A. Well, let me rephrase that.
7 When you talk about "inspect the goods" -- so
8 are you talking about opening the boxes and looking into
9 the products and inspecting the products, or are you
10 talking about making sure that the boxes are not damaged
11 from the outside?
12 Q. Okay. Whichever one you want.
13 Do they inspect the goods or not?
14 A. Well, they do inspect the goods, looking --
15 making sure that the product is not damaged from the
16 outside.
17 Q. So they don't open the box?
18 A. They do not open the box. However, we do do
19 spot checks. So what we do is Tony -- he goes out there
20 and opens certain boxes, turn it on, turn it off to test
21 the products. (Verbatim.) And after that is done, then
22 everything goes out.
23 Q. Do you know that Mr. Tony Tu did that with
24 respect to the hoverboards that were delivered, by
25 Interworks, to Digital Gadgets?

Page 30

1  A. Yeah, he did do the inspection.
2  Q. How do you know?
3  A. Because he inspects the product. That's part
4  of his job.
5  Q. Okay. But do you know that he inspected these
6  goods?
7  A. Yes.
8  Q. How do you know that?
9  A. Because he -- he communicated with
10 Digital Gadgets that, you know, the products that went
11 out -- (inaudible) his inspections.
12     MR. LAZARUS: Could you repeat the --
13     THE REPORTER: Did you say "passed his
14 inspections"?
15     THE WITNESS: Huh?
16     THE REPORTER: "Because he -- he communicated
17 with Digital Gadgets that, you know, the products that
18 went out" --
19     Did you say "passed his inspection"? Is that
20 what you said?
21     THE WITNESS: "Passed inspection"?
22     THE REPORTER: I'm asking you.
23     THE WITNESS: Oh, okay.
24     Yeah, make sure that the products are spot
25 checked and tested, and make sure they're good.

Page 31

1  BY MR. LAZARUS:
2  Q. So how do you know he did this?
3  A. How do I know he did that?
4     Well, that's part of his job. I mean, I don't
5  know if did he it or not, but he -- that's -- he claimed
6  that he did. He said that he did. And that's part of
7  his job. And that's not only for QVC. That's for every
8  customer that we ship the products to.
9     One thing is -- that we do clearly is, when the
10 goods come in, instead of having the guys that did the
11 pick-and-pack, I have Tony, which is a more knowledge
12 and detailed person, inspect the product.
13 Q. And the inspection that you referred to was he
14 opened boxes and turned the product on and off?
15 A. Right. Testing the product if everything is
16 functioning correctly.
17 Q. Which means turning it on and turning it off?
18 A. Turning it on, making sure the wheels spin
19 and -- you know, that's a typical test that we do.
20 Q. Do you keep records of those tests?
21 A. We don't have records of those tests.
22 Q. Do you know if Mr. Tony Tu kept records of his
23 testing?
24 A. I don't think he -- we keep testing records.
25 Q. Now, when the products arrive -- the hoverboard

Page 32

1  products arrived at your warehouse, what paperwork came
2  with the hoverboards?
3  A. That would be standard bill of lading. And I
4  believe the -- the performer invoices from -- from
5  the -- from the factory that comes along with the bill
6  of lading.
7  Q. Now, prior to the 20,000 pieces that we're
8  talking about arriving at the Interworks warehouse, and
9  in the process of Interworks making sales to QVC, did
10 Interworks supply product specifications to QVC for
11 these hoverboards?
12 A. Yes.
13 Q. Okay. And how do you know that that happened?
14 A. Well, that's -- that's a requirement for
15 documentations that they request and that we submitted
16 to them.
17 Q. What are those documentations?
18 A. The UL certifications and patent. And I
19 think -- I think those are the two major ones that we
20 have submitted to them.
21 Q. Do you know if third-party test reports were
22 submitted?
23 A. I believe so.
24 Q. And who at Interworks was tasked with sending
25 those documents for the --

Page 33

1  A. Tony sent those documents.
2  Q. Did Tony set up the hoverboard product on the
3  QVC vendor portal?
4  A. Yes.
5  Q. What does that mean? What did he do?
6  A. So I don't handle that aspect. Okay? So what
7  that means is -- to my knowledge, is putting up the
8  vendor number, the UPC number, you know, the cost.
9  Basic setup information.
10 Q. Okay. And do you know if QVC has a process
11 whereby they pass or fail proposed products?
12 A. I think so.
13 Q. Are you a participant, you personally, in that
14 process?
15 A. No, I'm not.
16 Q. Who is?
17 A. Tony was the one who did the processing.
18 Q. Okay. Does Tony -- was it Tony's job to
19 physically send a hoverboard to QVC for their
20 inspection?
21 A. Yes.
22 Q. And do you know how many hoverboards were sent
23 to QVC for QVC's approval before delivery of the
24 10,000 pieces by Interworks?
25 A. I'm not -- I'm not sure how many pieces they

Page 38

1  that correct?
2  A.  That's correct.
3       MR. LAZARUS:  Did you keep your exhibits?  You
4  don't have to --
5       THE REPORTER:  There are a lot of papers; so
6  let's not get them mixed up.
7       MR. LAZARUS:  Okay.  With that in mind, if
8  you'll just take out Tu 10.
9  Q.  Have you ever seen Tu 10 before?
10 A.  I don't remember seeing this.
11 Q.  You do know that Interworks has commenced an
12 action against Digital Gadgets; correct?
13 A.  Correct.
14 Q.  And do you see that this document, Tu 10, is
15 titled, on the first page, the right side, "Complaint
16 for Breach of Contract," and it continues?
17 A.  What page?
18      MR. HSU:  The first page.
19      THE WITNESS:  Okay.
20 BY MR. LAZARUS:
21 Q.  Okay.  Have you ever seen this document before?
22      And feel free to look through it.
23 A.  Yes.  This one -- this one, yes.  I thought
24 this was a Tony file.  So -- okay.  Yes.
25 Q.  Okay.  So you have seen this before?

Page 39

1  A.  Yes.
2  Q.  Okay.  I want you to look at Paragraph 9 of the
3  complaint, at Page 4, which says that -- "Even though
4  the hoverboards were conforming and accepted, defendant
5  has failed to fully pay for these orders."
6       Do you see that?
7  A.  Mm-hmm.
8  Q.  How do you know the hoverboards were
9  conforming?
10 A.  Again, the hoverboards were made by the
11 original creator of this product.  Okay?  The specs, the
12 quality control -- it is the best quality hoverboard in
13 the market.  Okay?
14      In China, the factories -- I've inspected the
15 factory, seen the quality of the product.  So when the
16 products come in, when we do our spot check, it
17 determines how many units turn on or don't turn on.
18 That's what we're trying to determine.  That's the only
19 way that we can determine that these goods are good or
20 bad.  Okay?  There's no other way.  If we open the
21 product, that voids the contract -- or voids the
22 warranty.
23 Q.  Now, when it says here at Paragraph 9, "Even
24 though the hoverboards were conforming," what do you
25 understand the reference to -- "conforming" to mean?

Page 40

1  A.  Conforming, meaning that the specs that they
2  have in the patent and how they made this product, all
3  the components, all the ICs, are per the specs of the
4  creator of the product.
5  Q.  Okay.  And the specs that you are referring to
6  were specs that were approved by QVC?
7  A.  Well, yes.
8  Q.  Okay.  And so the products that were delivered
9  by Interworks, to Digital Gadgets, were conforming to
10 the QVC specs?
11 A.  Yes.
12 Q.  Do you know that?
13 A.  I know that.
14 Q.  How do you know that?
15 A.  I know that because the shipments that came in
16 from Chic -- I know that the qualities -- are a good
17 quality product, and the fact that we did do our due
18 diligence of spot checking the products.  And products
19 that went out to Digital Gadgets had no issues.
20 Q.  Okay.  So you're assuming that they were the
21 same because you followed a course of conduct that you
22 typically follow with respect to the receipt and
23 delivery of goods?
24 A.  Correct.
25 Q.  Now, when -- withdrawn.

Page 41

1       Do you know how big a factory Chic is?
2  A.  They're -- they're a big factory.
3  Q.  Okay.  Do you know how many workers they have?
4  A.  At least 100-something, plus.
5  Q.  100 or --
6  A.  I never counted how many they have.  But, you
7  know, I would say there are 100-plus.
8  Q.  And do you know how many hoverboards they
9  produced annually in 2016?
10 A.  That, I do not know.
11 Q.  Do you know whether Chic, in 2016, continually
12 manufactured hoverboards?
13 A.  Yes.
14 Q.  Yes, they did?
15 A.  Yes, they did.
16 Q.  Do you know whether the hoverboards that you
17 purchased from Chic in 2016 -- do you know whether they
18 were all from the same production run?
19 A.  That, I'm not sure.  Okay?  So I am assuming
20 that, you know, it's all from the one factory.
21 Q.  You're assuming that it's all from one factory,
22 but you do not know if it's all from one production
23 line?
24 A.  I assume that, when I PO to Chic, it's coming
25 from Chic.

Page 42

1  Q. Okay. But do you know if the units you
2  purchased from Chic were manufactured by Chic all at the
3  same time?
4  A. To my understanding, yes.
5  Q. Do you know what a "lot" is?
6  A. I know what a "lot" is.
7  Q. What is a "lot"?
8  A. A "lot" is what they produce in a group, what
9  goes out.
10 Q. Were these goods -- I'm sorry.
11    Were the goods received by Interworks in the
12 fall of 2016 from one lot or more than one lot?
13 A. Again, we PO for 20,000 pieces. And what we
14 receive should be from one lot.
15 Q. Why do you say it should be from one lot?
16 A. Or it is from one lot.
17 Q. How do you know?
18 A. I don't know.
19 Q. And do you know that -- or do you know if, in
20 the course of manufacturing consumer electronic
21 products, there's a variation, from time to time, in the
22 product of goods from lot to lot?
23 A. I'm a distributor. So I'm not a manufacturer.
24 So I'm not very familiar with that.
25 Q. And you don't check for it?

Page 43

1  A. I look at, I visit the factory. I see the
2  production line. And from what is proven and shown to
3  me at the factory, I have all reason to believe that
4  these are high-quality goods. They've presented the
5  patent. So, you know, the -- my understanding, these
6  are the superior products, compared to what's in the
7  market.
8  Q. Referring again to Paragraph 9, "Even though
9  the hoverboards were conforming and accepted" -- what do
10 you mean when you say they were accepted?
11 A. They're accepted because, again, the products
12 are from Chic. And they have the patent to support
13 their product, and they have the quality control to
14 support their product.
15 Q. But what do you mean, they were -- these
16 hoverboards were accepted?
17    MR. HSU: Objection. Calls for a legal
18 conclusion. And calls for speculation.
19    MR. LAZARUS: Okay. No speaking objections.
20    The witness can answer.
21    MR. HSU: That's not a speaking objection.
22    MR. LAZARUS: That's a speaking objection.
23    MR. HSU: That's my document, not his document.
24 How --
25    MR. LAZARUS: It's a speaking objection and --

Page 44

1     MR. HSU: That is a speaking objection. But
2  prior to that, it wasn't.
3  BY MR. LAZARUS:
4  Q. How do you know the goods were accepted?
5  A. Same thing as conforming, you know. We
6  understand that the product is -- the product that we
7  receive and accept are the quality product that Chic
8  produces, based on what they have on their patent,
9  what -- their claims on the patents, and what components
10 they use in their patented product.
11 Q. And the products that you received that were
12 sent or delivered by Interworks to the QVC distribution
13 center were supposed to be conforming and the same as
14 the products that were delivered by Interworks to
15 Digital Gadgets for drop-shipment; is that correct?
16 A. Correct.
17    MR. LAZARUS: Let's take a two-minute break.
18    (Brief recess.)
19    MR. LAZARUS: Back on the record.
20 Q. Mr. Lu, do you know a person Charlie Tebele?
21 A. Yes.
22 Q. Have you ever met him?
23 A. Yes.
24 Q. When did you meet him first?
25 A. CES 2017.

Page 45

1  Q. And what is CES?
2  A. Consumer Electronics Show.
3  Q. And that show is usually in January, is it not?
4  A. Beginning of January.
5  Q. Prior to meeting Mr. Tebele at CES 2017, had
6  you ever spoken to him?
7  A. Yes.
8  Q. How much prior to CES had you spoken to him?
9  A. I don't recall how many times, but there were a
10 few conference calls.
11 Q. How much backwards in time was that?
12    Weeks? Days? Months?
13 A. Probably months.
14 Q. Was Mr. Tebele the first person you spoke to
15 after the introduction by Meghan?
16 A. No.
17 Q. Who you did you speak to first?
18 A. Chris Mitchell.
19 Q. Okay. And how many times did you speak to
20 Chris Mitchell before you met with Mr. Tebele?
21 A. Numerous times.
22    So can I ask a question?
23    So it's my understanding that Mr. Mitchell is
24 no longer with the company. Is that... just asking if
25 he's still with the company.

Page 54

1 would pass the quality control inspection in industry
2 standard -- the QC control is done on the factory level,
3 which is the manufacturer, which is Chic. So the
4 products that we received and the products that we sell
5 are warranted by Chic, which is a factory. So this
6 statement here, this clause here is really incorrect.
7  Q. It's incorrect?
8  A. Yes, because we're not the manufacturer.
9  Q. Okay. So are you -- is it your testimony that
10 you did not warrant to Digital Gadgets that the goods
11 would pass QVC quality control?
12  A. Well, we -- we don't warrant the goods because
13 that's the manufacturer's job. So if there is a problem
14 with the product, it would be returned back to the
15 factory for credit. Okay? So it's not our
16 responsibility, because we're a distributor and not the
17 manufacturer; so we don't warrant the goods.
18  Q. Well, DG could not have returned the goods to
19 Chic for credit because they weren't billed by Chic.
20  A. But DG has -- when -- we've requested DG to
21 ship the goods back to us, but they refused.
22  Q. But that's not my question. My --
23  A. But that's my answer to --
24  Q. My question is that DG had no contract with
25 Chic and, therefore, could not have returned the goods

Page 55

1 to Chic for credit because they didn't buy them from
2 Chic.
3  A. But they could have returned it back to us, and
4 we would have returned it back to the factory.
5  Q. Because you were their supplier?
6  A. Correct.
7  Q. Okay. And the question, however, that led us
8 down this path was, did you, Interworks, warrant the
9 quality of these goods to Digital Gadgets?
10  A. So the factory warrants the products to
11 Interworks, which -- we warrant the product to
12 Digital Gadgets. So should Digital Gadgets have any
13 issues with the quality, it would be a -- it should be
14 returned back to us, and then we would pass it back to
15 the factory.
16     However, Digital Gadgets never paid for the
17 goods; so I don't know how it can credit them for the
18 goods.
19  Q. Did you tell Digital Gadgets that the goods
20 would pass QVC quality control?
21  A. Well, that's the only way we can sell to QVC,
22 is to pass the QVC quality control.
23  Q. So you told DG that these goods would pass QVC
24 quality control?
25  A. Correct.

Page 56

1  Q. I want you to look, please, at Paragraph --
2 withdrawn.
3     I want you to look, please, at Lu 2, and
4 specifically at Page Number 6. I apologize. Page
5 Number 5.
6     Do you see there's a Paragraph 44 there?
7  A. Mm-hmm.
8  Q. And if I told you that each paragraph of the --
9 your answer corresponds to a similarly numbered
10 paragraph of the complaint, would you agree?
11  A. Not understanding the question.
12  Q. Okay. Well, do you see Paragraph 44 of the
13 third counterclaim, which is the one that we were
14 looking at?
15  A. The first counter -- the first one?
16  Q. Third counterclaim, Page 7.
17  A. Okay.
18  Q. And that's the paragraph we just looked at.
19     Do you see that?
20  A. Mm-hmm.
21  Q. And do you see that that's the one where
22 Interworks warrants the quality -- would pass quality
23 control inspection and industry standards? Do you see
24 that?
25  A. Right.

Page 57

1  Q. And do you see, at Paragraph 44 of the answer,
2 Interworks admits that?
3  A. That it passed the quality control?
4  Q. You admit that it would pass the quality
5 control?
6  A. Correct.
7  Q. And you admit that it would pass the quality
8 control of QVC?
9  A. Yes.
10     MR. LAZARUS: Okay. I'd like to have marked as
11 the next exhibit, which would be Lu 3, an e-mail chain
12 consisting of two pages, the first of which is an e-mail
13 from Chris Mitchell to Eric, the next is an e-mail from
14 Eric to Chris Mitchell, and the next is from
15 Chris Mitchell to Eric. It's dated June 7th, the
16 Chris Mitchell e-mail, at the top; and June 6th is below
17 that.
18     (Defendant/Counter-Claimant's Exhibit
19     Lu 3 was marked for identification by
20     the Court Reporter, and a copy is
21     attached hereto.)
22 BY MR. LAZARUS:
23  Q. If you'll take a minute to look at these
24 e-mails.
25  A. Okay.

Page 78

1 Chic. I will issue an RA tomorrow. I
2 could only provide you with the documents
3 that I have which are provided from Chic,
4 and those are the documents that I provided
5 to you. And what they gave me is also what
6 I have provided to QVC the first time
7 around. If there's QA submission issues,
8 please send me the reports, and I can have
9 Chic provide the documents to me."
10 Do you see that?
11 A. Mm-hmm.
12 Q. Did Mr. Mitchell ever submit the submissions to
13 you?
14 A. I don't recall.
15 Q. Okay. But you do know -- or you did see
16 Ms. Kane's e-mail, where they were trying to contact you
17 relative to these products, and Ms. Kane maintains that
18 you refused to cooperate.
19 You saw that; right?
20 A. Again, this is not CC'd to me; so I -- I'm not
21 aware of that. Okay? I don't have any e-mails of them
22 sending me requests of that.
23 MR. LAZARUS: Okay. It's a quarter after
24 12:00.
25 MR. HSU: You want to take an hour?

Page 79

1 MR. LAZARUS: Yeah.
2 MR. HSU: Okay.
3 (Lunch recess taken at 12:14 P.M.)
4 (Proceedings resumed at 1:15 P.M.)
5 BY MR. LAZARUS:
6 Q. Mr. Lu, good afternoon.
7 Did you ever discuss the possibility of
8 entering into an exclusive arrangement with
9 Digital Gadgets for the hoverboard?
10 A. It was brought to me. It was asked on behalf
11 of Digital Gadgets. It was never confirmed. And it was
12 never said that we would go into exclusivity, but it was
13 something that they wanted.
14 Q. When you say, "it was something that they
15 wanted," with whom did you discuss exclusivity?
16 A. This was with Chris Mitchell and Chris Tebele.
17 Q. And did you discuss it with them via e-mail, in
18 person, or by phone, or all of them?
19 A. All of them.
20 Q. And did you discuss exclusivity with Mr. Tebele
21 in person?
22 A. It was asked for exclusivity, by Mr. Tebele,
23 during the CES meeting that we had.
24 Q. And what did you say?
25 A. I said we would think about it and see how our

Page 80

1 business would progress, then we can consider it.
2 Q. And did you ever further discuss it after CES?
3 A. It was requested again by Chris Mitchell on
4 e-mails, requesting if they can have an exclusivity.
5 Q. And what did you say?
6 A. The answer was "No."
7 Q. Did you actually say "No"?
8 A. Yes.
9 Q. Okay. And you said that in an e-mail?
10 A. It said it in an e-mail and in a phone
11 conversation.
12 Q. Do you have that e-mail with you --
13 A. No.
14 Q. -- or available?
15 How about with Mr. Tebele? Did you ever tell
16 Mr. Tebele, "No, there will not be exclusivity"?
17 A. He was probably CC'd on the e-mails too.
18 Q. I want to show you the next e-mail that was
19 previously Bates stamped Digital Gadgets 35 and have
20 that marked as Lu 5.
21 (Defendant/Counter-Claimant's Exhibit
22 Lu 5 was marked for identification by
23 the Court Reporter, and a copy is
24 attached hereto.)
25 THE WITNESS: Okay.

Page 81

1 BY MR. LAZARUS:
2 Q. Have you seen that e-mail before?
3 A. Yes.
4 Q. And did you discuss exclusivity with Mr. Tebele
5 at CES?
6 A. Not in great detail.
7 And, again, it was their request and asking me
8 permission for exclusivity.
9 Q. Now, during the period of the fall of 2016, and
10 after you delivered to the QVC distribution center the
11 10,000 pieces that we spoke of this morning, did you
12 continue to deliver High Roller Model Cs to QVC
13 directly?
14 A. No.
15 Q. What was the reason?
16 A. The reason being is QVC wanted to have a
17 drop-ship vendor to drop-ship the goods.
18 Q. And did there come a time when you approached
19 QVC and asked to resume shipping hoverboards to QVC
20 directly from Interworks?
21 A. No.
22 Q. You never went back to them and asked them to
23 resume direct hoverboard purchases from you?
24 A. Because at that time, QVC did not set up a --
25 an airing, to my knowledge, to air the product during

Page 82

1 the summer -- during the period of time. So they had it
2 online, which -- Digital Gadgets did the fulfillment.
3   Q.   I'll show you next an e-mail chain Bates
4 stamped 244 through 246.
5       I'll have that marked as Lu 6.
6       (Defendant/Counter-Claimant's Exhibit
7       Lu 6 was marked for identification by
8       the Court Reporter, and a copy is
9       attached hereto.)
10      THE WITNESS: Okay.
11 BY MR. LAZARUS:
12   Q.   Do you see that, in this e-mail chain, the red
13 comments are yours?
14   A.   Correct.
15   Q.   And do you see that, at Page 244, towards the
16 bottom, you write, "Also, these are goods that I
17      could have sold to my other accounts, and
18      I've given you guys a lower cost for
19      servicing QVC"?
20      Do you see that?
21   A.   Mm-hmm.
22   Q.   What do you mean, that you gave them a lower
23 cost for servicing QVC?
24      (Interruption in proceedings due to cell
25 phone.)

Page 83

1      MR. LAZARUS: I'll call you back.
2      THE WITNESS: I offered them a better cost to
3 continue to service QVC.
4 BY MR. LAZARUS:
5   Q.   And how were they servicing QVC?
6   A.   Drop-shipping.
7   Q.   What did you mean when you used the expression
8 "servicing"?
9   A.   "Servicing" is drop-shipping, because you're a
10 drop-ship vendor or not a drop-ship vendor.
11   Q.   The same exhibit, Bates Stamp Page 244 -- 245.
12 Again your red comment, beginning, "As I've been up
13 front with you."
14      "As I have been upfront with you and told
15      you that I was going to visit QVC, and we
16      want to lay to rest all these claims and
17      update the buyers the currently situation
18      (sic) with the ITC lawsuit and all the
19      legal issues surrounding the hoverboards."
20      What were you referring to?
21   A.   The ITC lawsuit is a -- it is a case of --
22 surrounding Chic suing all the copycats in the market
23 making hoverboards.
24   Q.   What were you approaching or going to go to QVC
25 about?

Page 84

1   A.   Well, explaining to them that -- the legal
2 process and how the progress of the case is going for
3 Chic and their -- and their -- how they're holding up
4 with their patent against all the copycats.
5   Q.   In the same portion at Bates stamp Page 245,
6 you continue, "and also pitch the new Model F and K2
7      Mini. As I have told you, I am there to
8      discuss the product, either Digital Gadget
9      (sic) or Interworks sells to QVC is not my
10      concern."
11      Do you see that?
12   A.   Mm-hmm.
13   Q.   What was that in reference to?
14   A.   It's in reference to us pitching the new
15 products to QVC; and whether QVC wants to buy directly
16 from Interworks for the store, or we can be set up as a
17 direct vendor at the time, or Digital Gadgets can
18 also -- we can allow Digital Gadgets to sell the Model F
19 and K2, the new products, to QVC as a drop-ship vendor.
20   Q.   And was it your contemplation that, while
21 Digital Gadgets was drop-shipping QVC, you would
22 simultaneously be shipping direct to their DC?
23   A.   Could be, yeah.
24   Q.   Did you ever agree with Digital Gadgets that,
25 for so long as they were drop-shipping QVC, you would

Page 85

1 not ship direct to the QVC --
2   A.   No.
3   Q.   -- DC?
4   A.   No.
5   Q.   What -- why would QVC need both sources of --
6   A.   QVC don't -- I'm sorry. Go ahead.
7   Q.   -- of the hoverboard?
8   A.   So QVC does not need both parties. Okay? So
9 for me, I can sell QVC directly, which -- they have to
10 have an air time. And with the air time, they would do
11 the -- their airing of the hoverboards. And then we
12 would, like the first round, ship the goods directly to
13 the DC, and they would send it out to the consumers.
14      Now, I can use Digital Gadgets. I can use
15 distributor A, B, C, D, E -- whoever I want to use. It
16 doesn't have to be Digital Gadgets. So I can assign
17 whomever I want to be the drop-ship vendor per QVC
18 wanting -- "Hey, we like to work with this guy," "this
19 guy," "this guy."
20      I can sell it to whomever I want. But
21 initially we were working with Digital Gadgets. So, you
22 know, we talked about how, if I'm going to sell the
23 product and if this has to go to a drop-ship, then I'll
24 allow them to sell it.
25   Q.   You would allow Digital Gadgets to do the

|  | Page 86 |  | Page 88 |
|---|---|---|---|
| 1 | drop-ship -- | 1 | number, a PO number, in the left-hand columns? |
| 2 | A. Correct. | 2 | A. Correct. |
| 3 | Q. -- because you did not want to do the | 3 | Q. Who assigned the PL number? |
| 4 | drop-ship? | 4 | A. That would be from Digital Gadgets. |
| 5 | A. No. Because we're not a certified drop-ship | 5 | Q. What does that stand for? |
| 6 | vendor. That's a whole different process. | 6 | A. Purchase order number. |
| 7 | Q. What does that mean, "a certified drop-ship | 7 | Q. The PL number stands for the purchase order |
| 8 | vendor"? | 8 | number? |
| 9 | A. So you have to apply to be a drop-ship vendor | 9 | A. I'm sorry. The PL number is our sales order |
| 10 | because the process labeling and that stuff is different | 10 | number. |
| 11 | than shipping it directly to a DC, because now you're | 11 | Q. Okay. So is there an internal document called |
| 12 | shipping directly to a consumer on behalf of QVC so. We | 12 | a sales order? |
| 13 | were not the drop-ship vendor at the time. | 13 | A. Yes. |
| 14 | Q. So when you say you're not a certified | 14 | Q. And is it something that is printed, or is it |
| 15 | drop-ship vendor, you mean that QVC had not certified | 15 | maintained solely in the computer systems of Interworks? |
| 16 | Interworks as a drop-ship vendor? | 16 | A. It is in the system. |
| 17 | A. Right. We do not have that part of the vendor. | 17 | Q. And what -- |
| 18 | Q. And QVC, at the point in time of November or | 18 | A. And it's -- it's also printed. |
| 19 | thereabouts of 2016, wanted drop-ship goods as opposed | 19 | Q. And what does it show on the sales orders? |
| 20 | to shipments directly to their DC? | 20 | A. The same information that's on the invoice. |
| 21 | A. Well, the second shipment which we used | 21 | Q. Okay. And this invoice, do you see that the |
| 22 | Digital Gadgets for was that -- because of the timing | 22 | terms state "Net 60 days"? |
| 23 | issue. And that's why we sold the goods to Digital | 23 | A. Correct. |
| 24 | Gadgets. | 24 | Q. What does that mean? |
| 25 | Q. What about the next shipment? | 25 | A. That means this invoice is due 60 days upon the |

|  | Page 87 |  | Page 89 |
|---|---|---|---|
| 1 | A. Well, the second shipment was also the | 1 | ship date. |
| 2 | continuation. Because they needed more goods, and the | 2 | Q. And if you turn, in the document, further on, |
| 3 | products were selling; so Digital Gadgets continued to | 3 | and if you can find the document Bates stamped |
| 4 | order. | 4 | Digital Gadgets 199. |
| 5 | Q. What was the reason that you did not ship these | 5 | A. Okay. |
| 6 | later shipments direct to QVC? | 6 | Q. What is this document? |
| 7 | A. Because we were looking at the new models. | 7 | A. That's a picking sheet. |
| 8 | MR. LAZARUS: I want to put in front of the | 8 | Q. And what is a picking sheet? |
| 9 | witness a group of documents that was previously marked | 9 | A. A picking sheet is what we would put out for |
| 10 | Asamoah 1 through Asamoah 5, which we've described on | 10 | the shippers to pick the product, and then confirm that |
| 11 | yesterday's transcript with Mr. Tu. | 11 | it's shipped the units that it was -- it was supposed to |
| 12 | Q. If you could take a look at that, please. | 12 | be packed. |
| 13 | A. Okay. | 13 | Q. And do you see on that document, one of the |
| 14 | Q. Mr. Lu, have you had an opportunity to review | 14 | notations is "Consignment"? |
| 15 | the documents in front of you, Asamoah 1 through 5? | 15 | A. Mm-hmm. |
| 16 | A. Yeah. | 16 | Q. What does that mean? |
| 17 | Q. Okay. I want you to turn to the page -- fourth | 17 | A. Consignment means we assign the products to the |
| 18 | page in, which is marked Asamoah 2. | 18 | customer, and they -- yeah, and then they pay the goods. |
| 19 | A. Okay. | 19 | Q. And then they what? |
| 20 | Q. And do you know what this document is? | 20 | A. They pay the goods as we ship the goods. |
| 21 | A. Yeah. This is our invoice to Digital Gadgets. | 21 | Q. Okay. And did you enter into an arrangement |
| 22 | Q. Okay. And what product were you invoicing? | 22 | with Digital Gadgets for consignment sales? |
| 23 | A. High Roller Model C black and High Roller | 23 | A. We did not engage in a consignment deal with |
| 24 | Model C white. | 24 | Digital Gadgets. |
| 25 | Q. Do you see the Interworks document has a PL | 25 | There was a discussion of consignment under the |

Page 90

1  condition and stipulation of Digital Gadgets providing
2  their financials to our factor to see how much credit
3  that they are creditworthy of (verbatim), in which we've
4  requested for two and a half months. And Charlie Tebele
5  would give us the runaround.
6      And, also, the bank -- I'm going to use the
7  word "conspired" with Charlie, saying that they had
8  faxed the information numerous times and our insurance
9  company had never got anything. And we followed up; we
10 called. No response from anybody, and never was any
11 financials documents sent to our insurance company.
12     And finally they had a credit reference from
13 Digital Gadgets's bank account. And this is prior to
14 Charlie telling us that he has got a gazillion dollars,
15 "Don't worry about financial." The bank statement came
16 back from Charlie's bank with only $26,000. And I've
17 given them one -- almost a million dollars' worth of
18 products. So --
19   Q.   Before you made your shipments to
20 Digital Gadgets, did you -- did you do a credit check on
21 them?
22   A.   We did not do a credit check because of the --
23 first of all, we didn't do the credit check because it
24 was very, very time-consuming that QVC needed the
25 product. And we rushed it. But Chris Mitchell and

Page 91

1  Charlie promised that they would supply the documents to
2  us and we would do it simultaneously. And I think
3  there's numerous e-mails, me chasing them for the
4  financials. And they've never complied and gave us the
5  financials.
6    Q.   And you mentioned a "factor."
7        What is a "factor"?
8    A.   A "factor" is our insurance company for product
9  that is shipped to a customer. And they would need to
10 do the credit check and ensure what would be the credit
11 line or what is the company's credit worthy (verbatim)
12 of, you know, amount of credits to grant them.
13   Q.   And who was your factor in 2016?
14   A.   Our factor is called Bibby Financial.
15   Q.   Okay. And are you aware that various of the
16 invoices in this lawsuit are marked assigned that
17 the invoices were assigned and payable to
18 Bibby Financial?
19   A.   These invoices were submitted to Bibby at the
20 time that we were trying to get the credit check and
21 credit reference, as Charlie had said that he's totally
22 creditworthy of millions of dollars.
23   Q.   Were the invoices assigned -- the invoices to
24 Digital Gadgets assigned and payable to Bibby Financial?
25   A.   It was submitted to them, but they were

Page 92

1  declined.
2    Q.   Do you know a business, Cash Capital?
3    A.   Yes.
4    Q.   Who is Cash Capital?
5    A.   Cash Capital is our -- it's a lender.
6    Q.   And when were they your lender?
7    A.   I believe it's around 2016.
8    Q.   Are they still your lender today?
9    A.   No, they're not.
10   Q.   Do you have another lender today?
11   A.   No, I do not.
12       MR. LAZARUS: Can we have this marked, please.
13       (Defendant/Counter-Claimant's Exhibit
14       Lu 7 was marked for identification by
15       the Court Reporter, and a copy is
16       attached hereto.)
17       THE WITNESS: Okay.
18 BY MR. LAZARUS:
19   Q.   Do you recall receiving this notification on or
20 about July 10th of 2016?
21       I would appreciate counsel not directing his
22 attention to specific portions of the document. I don't
23 think that's fair or appropriate.
24       MR. HSU: Well, I'm looking at the very last
25 page, which I've never seen before. I'm not asking any

Page 93

1  questions, not pointing out. But go ahead.
2  BY MR. LAZARUS:
3    Q.   Okay. Do you recall receiving this document in
4  or about July of 2016?
5    A.   I think the date is incorrect. The date should
6  be 2017, not 2016.
7    Q.   Okay. Do you recall receiving this document in
8  July of 2017?
9    A.   I don't recall receiving this letter.
10   Q.   Did there come a time when you entered into an
11 agreement with Cash Capital?
12   A.   Yes.
13   Q.   What was the nature of that agreement?
14   A.   It was for financing -- financing purchasing.
15   Q.   Okay. And do you see that the letter of --
16 dated July 10th, of 2016, at the end of the first
17 paragraph, it writes, "Pursuant to the language of
18       the merchant agreement, the merchant has
19       sold, assigned and transferred to CCG a
20       certain percentage of its future
21       receivables"? Do you see that?
22   A.   Okay.
23   Q.   Is that true?
24   A.   No.
25   Q.   So they lied?

Page 102

1  MR. HSU: Okay. Let's hear it.
2  MR. LAZARUS: Would the reporter read the
3  attempted question.
4  (Whereupon, the record was read back
5  by the Court Reporter as follows:
6  "Q. And what happened with that
7  judgment?
8  "A. That was settled.
9  "Q. When?
10 "A. It was settled, off my head,
11 around like April --")
12 MR. HSU: He just answered. He answered.
13 THE WITNESS: Can I get excused to the restroom
14 real quick?
15 MR. HSU: Sure.
16 (Brief recess.)
17 MR. LAZARUS: What was the last question?
18 (Whereupon, the record was read back
19 by the Court Reporter as follows:
20 "Q. And what happened with that
21 judgment?
22 "A. That was settled.
23 "Q. When?
24 "A. It was settled, off my head,
25 around like April --")

Page 103

1  BY MR. LAZARUS:
2  Q.   April of what year?
3  A.   2018.
4  Q.   '18?
5  A.   Yes.
6  Q.   At the time this lawsuit was commenced, had --
7  are you aware of whether Cash Capital had filed a lien
8  on all of the assets of Interworks?
9  A.   I'm not aware of who or when they sent any
10 liens out.
11 MR. LAZARUS: Can we have this marked as the
12 next exhibit. I apologize. I just want to identify it.
13 Tu 9 is Bates stamped CCG 1. Thank you.
14 (Defendant/Counter-Claimant's Exhibit
15 Tu 9 was marked for identification by
16 the Court Reporter, and a copy is
17 attached hereto.)
18 BY MR. LAZARUS:
19 Q.   Have you ever seen this document before?
20 A.   No, I have not.
21 Q.   Okay. Have you -- do you have any
22 understanding of what a UCC financing statement is?
23 A.   To my understanding, an UCC filing is the
24 position in which the financial institution holds the --
25 what do you call it? The first rights of whatever

Page 104

1  income that comes in.
2  Q.   And do you see that this lien filing is a
3  filing on all assets of the debtor?
4  A.   Where is that?
5  Q.   It's in the box number 4, "Collateral."
6  A.   I was not aware of this filing.
7  Q.   At the date that you commenced this lawsuit
8  against Digital Gadgets, had you settled your claims
9  with Cash Capital?
10 A.   Yes.
11 Q.   So by the time this lawsuit was started in July
12 of 2017, you had settled with Cash Capital?
13 A.   No. The Cash Capital was settled in and around
14 April of 2018.
15 Q.   While the lawsuit was pending?
16      While this lawsuit was pending?
17 A.   Yes.
18 Q.   Okay. So when the lawsuit was commenced, by
19 Interworks, against Digital Gadgets, were you aware that
20 Cash Capital owned the receivables on which you were
21 suing?
22 A.   I was not aware of that.
23      Again, if Digital Gadgets paid the receivables
24 to them, then it would have probably been cleared a long
25 time ago.

Page 105

1  MR. LAZARUS: Helena, could you put the
2  original exhibits in front of the witness.
3  Q.   Okay. If you turn to Tu 6 in the package of
4  the original exhibits in front of you, it's an ACORD
5  Certificate of Liability Insurance.
6  MR. HSU: Tu 6.
7  THE WITNESS: Okay.
8  BY MR. LAZARUS:
9  Q.   Have you ever seen Tu 6 before today?
10 A.   Yes.
11 Q.   Okay. What is Tu 6?
12 A.   Tu 6 is a certificate of liability insurance.
13 Q.   Okay. And if you'll turn to the next document
14 in the package in front of you, which is Tu 7.
15 MR. HSU: This is Tu 7.
16 BY MR. LAZARUS:
17 Q.   Have you ever seen that document before?
18 A.   I believe so.
19 Q.   Okay. What is this document?
20 A.   It's a certificate of liability insurance.
21 Q.   Okay. And do you see that this document names
22 Digital Gadgets as a certificate holder?
23 A.   Correct.
24 Q.   And who caused this document to name
25 Digital Gadgets as a certificate holder?

Page 106

1  A. We -- we contacted our insurance company to --
2  Q. What was the reason that you contacted the
3  insurance company so as to name Digital Gadgets as a
4  certificate holder?
5  A. We added them as an additional insured.
6  Q. What was the reason you added them as an
7  additional insured?
8  A. Well, that is the -- pretty much part of the
9  process with all the retail accounts and distributors.
10 You know, we add them into our umbrella product
11 liability insurance.
12 Q. Is that something that's required by the
13 retailers?
14 A. It's required by retailers and distributors.
15 Q. Okay. And QVC -- did QVC require that you add
16 Digital Gadgets as a certificate holder under your
17 policy?
18 A. No.
19 Q. Did Digital Gadgets require that you add them
20 as a certificate holder under your insurance --
21 A. Yes.
22 Q. -- policy?
23 A. Yes.
24 Q. And did you agree to do that?
25 A. I added them.

Page 107

1  Q. Well, do you see that -- you added, but do you
2  see the indication in the section of document marked
3  "Description of Operations," "No coverage extended to
4  hoverboards"?
5  A. Well, I guess the --
6  Q. Do you see that?
7  A. I do see that.
8     But Digital Gadgets didn't give you the first
9  certificate, which doesn't have that clause in there.
10 And the reason for the clause for this certificate was
11 we were changing our insurance company. The old
12 insurance company had to cancel this policy. That's why
13 they're no longer covering the hoverboard. We added
14 another policy to cover all the retailers from covering
15 hoverboards.
16 Q. Isn't it true that there was a period of time
17 in which there were no insurance coverage for
18 Digital Gadgets?
19 A. No, because it's a -- it's a bridge-binding
20 policy that, when we did the transition, there was --
21 there was still insurance coverage.
22 Q. So there was --
23 A. There was insurance coverage.
24 Q. -- there was never a time when there was no
25 coverage for --

Page 108

1  A. No.
2  Q. -- Digital Gadgets?
3  A. No, not for Digital Gadgets and not for any of
4  my accounts.
5  Q. I want to go back to the documents that are
6  Bright Asamoah exhibits, 1 through 5, if we can.
7     MR. HSU: We're looking at the invoices; right?
8  Asamoah --
9     MR. LAZARUS: Yes.
10 Q. Okay. And I'd ask you to turn to Asamoah 5,
11 which has Bates stamp Interworks 472.
12 A. Okay.
13 Q. Do you see that Asamoah 5, Bates Stamp
14 Interworks 472, is a purchase order?
15 A. Mm-hmm.
16 Q. And do you see that it's a purchase order from
17 Digital Gadgets to Interworks?
18 A. Correct.
19 Q. Do you see that the purchase order has terms
20 and conditions?
21 A. Yes.
22 Q. Are you familiar with those terms and
23 conditions?
24 A. The purchase order terms and conditions?
25 Q. Yes, sir.

Page 109

1     Have you ever seen them before?
2  A. I personally did not read those terms and
3  conditions.
4  Q. Okay. And who -- in the ordinary course of the
5  business of Interworks, who would receive purchase
6  orders from a customer such as Digital Gadgets?
7  A. It would either go to me or it would go to
8  Tony.
9  Q. Okay. And do you know if Mr. Tu ever received
10 purchase orders from Digital Gadgets in the form in
11 front of you as Asamoah 5?
12 A. I believe so.
13 Q. Okay. Do you know if he read them?
14 A. I do not know if he did or not.
15 Q. Do you know -- did you ever discuss the
16 purchase order terms and conditions, as they appear in
17 Asamoah 5, with Mr. Tu?
18 A. No, I did not.
19 Q. And do you see that, among the terms and
20 conditions, is a term that says, "Buyer may charge
21    seller all expenses of unpacking, examining,
22    repacking and reshipping nonconforming
23    goods. In the event buyer receives goods
24    whose defects were nonconforming or not
25    apparent upon examination, buyer reserves