Case 3:18-cv-00828-MHS   Document 16-18   Filed 09/06/19   Page 1 of 11 PageID #: 390
Case 2:17-cv-04983-JHH-KS   Document 50-2   Filed 12/14/18   Page 6 of 108   Page ID #:907
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC                    Deposition of Charles Tebele

```
 1   UNITED STATES DISTRICT COURT
 2   CENTRAL DISTRICT OF CALIFORNIA
 3   ------------------------------------------x
 4   INTERWORKS UNLIMITED, INC., a
 5   California Corporation,
 6                    Plaintiff,
 7              -against-
 8   DIGITAL GADGETS, LLC; a New Jersey
 9   limited liability company,
10                    Defendant.
11   Case No:  2:17-cv-4983 AB KSx
12   ------------------------------------------x
13                         488 Madison Avenue
14                         New York, New York
15
16                         August 21, 2018
17                         10:01 a.m.
18
19        Examination Before Trial of the
20   Defendant by CHARLES TEBELE, pursuant to
21   Notice, before CINDY A. AFANADOR, a Notary
22   Public of the State of New York.
23
24
25
```

EXHIBIT 18

EXHIBIT 10        **H I N E S   R E P O R T E R S**                    123   1 (1)

Case 2:17-cv-04963-MHLS Document 16-18 Filed 09/26/19 Page 2 of 11 PageID #:291
Case 2:17-cv-04963-MHLS Document 50-2 Filed 12/14/18 Page 10 of 108 PageID #:911
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC     Deposition of Charles Tebele

**Page 14**

1  in the interviews?
2     A.   No.
3     Q.   Have you heard of Interworks
4  Unlimited, Inc.?
5     A.   I've heard of the term
6  Interworks, I don't know about the comma Inc.
7     Q.   Okay.
8         When did you first hear of this
9  company?
10    A.   I don't recall.
11    Q.   Have you ever met an individual
12 named Eric Lu?
13    A.   Yes.
14    Q.   Do you recall when you met him?
15    A.   I believe it would be in
16 January 2017.
17    Q.   Did you meet him in New York?
18    A.   I don't believe so.
19    Q.   Do you recall where you met him
20 first?
21    A.   I recall that I met him in
22 Las Vegas.  I don't know if there were other
23 meetings, but that's one that I recall.
24    Q.   Were you in Vegas for a trade
25 show?

**Page 15**

1     A.   Yes.
2     Q.   And what trade show was that?
3     A.   The CES trade show.
4     Q.   CES would stand for?
5     A.   Consumer Electronics.  I don't
6  know what the "S" is for.  Show.
7     Q.   That's a good guess.
8         When you first met Eric Lu in
9  Las Vegas for this trade show, what did you
10 guys talk about?
11    A.   (No response.)
12    Q.   Do you remember anything that you
13 discussed with Eric Lu when you first met him?
14    A.   No.
15    Q.   Did he ever offer any of his
16 merchandise to your company as a vendor?
17    A.   I believe when I met him we were
18 already involved in some sort of business, but
19 I don't know the sequence.  I don't recall
20 offhand the sequence of events.
21    Q.   Was Chris Mitchell there to?
22    A.   Yes.
23    Q.   At the meeting -- do you recall
24 at the time the meeting taking place your
25 company had already made purchase of

**Page 16**

1  hoverboards from --
2     A.   Are you stating that as a fact or
3  are you asking me -- what's the question?
4     Q.   Do you remember at the time you
5  first met Eric Lu your company had already
6  made purchases from his company?
7     A.   Do I remember if my company
8  already made purchases?
9     Q.   Yes.
10    A.   Again, just like I said before,
11 I'm not clear on the timeline, but we
12 purchased purchases from him and I met him.
13 I'm not recalling the sequence of events.
14    Q.   So you don't remember when your
15 company first purchased products from his
16 company?
17    A.   In relation to when I met him,
18 I'm not sure.
19    Q.   Okay.
20        Do you know what was the
21 merchandise your company purchased from his
22 company?
23    A.   Hoverboards.
24    Q.   Before you came today, did you
25 review any documents, intra-company, relating

**Page 17**

1  to the purchase of these hoverboards?
2     A.   I reviewed certain documents.
3     Q.   And what were these documents
4  that you had reviewed?
5     A.   There were a production of
6  documents, they were voluminous, I reviewed
7  them to refresh my memory, but I don't know
8  which documents -- I can't recall which
9  documents or why.  There were a lot of
10 documents.
11    Q.   Did you review your company's
12 purchase orders?
13    A.   Not particularly.  I may have
14 scanned them.  I'm sure I scanned them.
15    Q.   Did you review the invoices
16 issued by Interworks to your company?
17    A.   What do you mean by "review"?
18    Q.   Review, meaning look at the
19 document and have -- for a certain purpose,
20 and when you finished reading it, well, I
21 can't give you a definition of review.  Review
22 means review.
23    A.   Then I can't answer it.
24    Q.   Well, have you had a chance to
25 look at those documents?

Case 2:17-cv-04983-MHL-KS Document 16-18 Filed 09/26/19 Page 3 of 11 PageID #:292
Case 2:17-cv-04983-MHL-KS Document 30-2 Filed 12/14/18 Page 15 of 108 PageID #:916
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC       Deposition of Charles Tebele

```
 1   A.   Me personally?
 2   Q.   Yes.
 3   A.   No.  Doesn't preclude me from
 4  reviewing any.
 5   Q.   If you want to, you could?
 6   A.   Yes.
 7        MR. HSU:  Let me attach these two
 8  documents; why don't we mark them as
 9  Exhibit 1 and 2.
10        (Tebele Exhibit 1, Second Amended
11  Notice of Taking Deposition of Charlie
12  Tebele, marked for identification.)
13        (Tebele Exhibit 2, Second Amended
14  Notice of Taking Deposition of
15  Defendant/Counterclaimant Digital
16  Gadgets, LLC, marked for
17  identification.)
18   Q.   These two exhibits or notices of
19  deposition of you individually and notice of
20  taking deposition of defendant, Digital
21  Gadgets.
22        The -- my understanding is that
23  you have been designated as the person most
24  knowledgeable about the issues in this case by
25  your company, Digital Gadgets, right?
                                        Page 34
```

```
 1   A.   (No response.)
 2        MR. LAZARUS:  Yes.
 3        MR. HSU:  Okay.
 4   Q.   Now, fairly quickly, if you look
 5  at the Exhibit 2, the second amended notice of
 6  taking deposition of defendant, if you can
 7  help me go to the second page.
 8   A.   (Witness complying.)
 9   Q.   Look at the third page.
10   A.   (Witness complying.)
11   Q.   And you can see these categories
12  being described on top of the pages number 10
13  all the way through number 21, right?
14   A.   Yes.
15   Q.   Did you look at those categories
16  before you came today?
17   A.   You are asking me if I saw this
18  document before I came today?
19   Q.   Yes.
20   A.   I don't recall.
21   Q.   14, if you look at that 14, says
22  in a return of merchandise to the defendant
23  that were previously purchased from the
24  plaintiff.
25        Do you have any personal
                                        Page 35
```

```
 1  knowledge of any returns of hoverboards made
 2  by Digital Gadgets to Interworks?
 3   A.   Personal knowledge that I'm
 4  carrying in my head, no.  There may be
 5  documents to support in whatever we would
 6  submit.
 7   Q.   Okay.
 8   A.   Whether there were or weren't...
 9   Q.   That's fair.
10        Have you ever seen any documents
11  in the possession of your company that had
12  anything to do with the return that was
13  referenced in number 14 here?
14   A.   I don't recall any specific
15  documents.
16   Q.   Okay.
17   A.   That doesn't mean there aren't
18  documents, that doesn't mean I didn't see
19  them, but I don't know of any specific
20  documents.
21   Q.   You might have seen them, but you
22  don't remember at that point?
23   A.   Correct.
24        MR. LAZARUS:  Give me one second
25  with Charlie.
                                        Page 36
```

```
 1        THE WITNESS:  Yeah.
 2        (Recess taken.)
 3   A.   So just to clarify, any returns,
 4  there would be paperwork if it was requested,
 5  that would substantiate whether there were
 6  terms or not in the submissions.
 7   Q.   My previous question to you is,
 8  do you recall seeing any of those documents?
 9   A.   In the ordinary course of
10  business we returned product, so I don't
11  recall specific documents, but, like I said,
12  if there were documents and reports showed to
13  me, I can identify whether they were returns
14  or not based on those documents.
15   Q.   Sitting there, you don't have any
16  specific recollections on any specific
17  documents?
18   A.   Correct.  However, you know,
19  there are registers and documents and backup
20  to what was returned and wasn't returned.
21   Q.   Let's move on to the next one.
22  This will be -- you guys can share.
23        It is a letter dated May 19,
24  2017.
25        MR. HSU:  This will be Number 3.
                                        Page 37
```

EXHIBIT 10          H I N E S   R E P O R T E R S          10 (34 - 37)

Case 2:17-cv-04963-MHL-KS Document 16-18 Filed 09/26/19 Page 4 of 11 PageID: 295
Case 2:17-cv-04963-MHL-KS Document 30-2 Filed 12/14/18 Page 16 of 108 PageID: 917

Interworks Unlimited, Inc. vs. Digital Gadgets, LLC                    Deposition of Charles Tebele

**Page 38**

      (Tebele Exhibit 3, Document
   bearing Bates stamp Interworks 7, marked
   for identification.)
   Q.  This letter apparently was
written by Thomas Carulli, supposedly a lawyer
working for this firm.  I'm looking at the
letterhead; Kaplan, Massamillo & Andrews.
Have you ever seen this document?
   A.  Yes.
   Q.  Did you hire this law firm to
write this letter to Interworks?
   A.  Yes.
   Q.  And let's look at the first
paragraph.
      Says "Dear Mr. Lu, we represent
Digital Gadgets, LLC.  This is to place you on
notice that Interworks has violated the
exclusive right granted DG," that's Digital
Gadgets, "to sell Interworks products to and
through QVC, moreover, at a price less than
offered by Digital Gadgets, resulting in
significant and irreparable harm to Digital
Gadgets."
   A.  Yes, it was terrible.
   Q.  There are two issues raised by

**Page 39**

this paragraph.  One, the first one was the
exclusive right.  You don't recall seeing any
written documents or written agreements signed
by Interworks and Digital Gadgets pertaining
to this exclusive right?
   A.  I don't know about a written
agreement, however there is a certain
agreement without question between Interworks
and Digital Gadgets that when Digital Gadgets
was selling those goods to QVC, which
Interworks was stuck with and QVC canceled
their orders with, that Digital Gadgets would
fill Interworks' shoes as the exclusive
partner, there's no doubt about that.
   Q.  When you say "there's no doubt
about that," you know, what proof do you
recall?
      MR. LAZARUS:  Objection to the
   form of the question.
   Q.  Let me ask you this:  When you
say there's no doubt about this exclusive
right, have you ever seen any e-mails sent by
Eric Lu?
   A.  I've seen e-mails, I was on
conversations, I spoke to Chris Mitchell on

**Page 40**

multiple occasions, I spoke to QVC.  I mean
this was a heavy issue, this wasn't a light
issue and we would never, as our company
policy, sell something that someone else
makes, to then have that company go and
compete with us on the same thing.
   Q.  Well, that's fair.
      So Chris Mitchell reported this
to you; what did he tell you, if anything,
that you recall pertaining to this exclusive
right?
   A.  Look, I had many conversations
with Chris Mitchell and with Eric, but what I
will say is Interworks was in a jam, we helped
them, and explicit in the help was this
exclusive, which was being honored for a time,
but then at some point, Interworks decided to
go rogue and go behind our backs, so it was
not just implied, it was the tone of the
entire relationship.  And, moreover, we were
discussing further exclusive and further
accounts, so it wasn't that it was this one
little thing, it was beyond that.
      At some point, Interworks just
decided that they were gonna not honor it.

**Page 41**

   Q.  Okay.
      To your knowledge, is --
   A.  Which caused us a tremendous
amount of lost work and time and reputation.
   Q.  Do you know if Interworks is
currently selling hoverboards to QVC?
   A.  I don't understand the question.
   Q.  To your personal knowledge, is
Interworks selling hoverboards to QVC now?
   A.  At this moment, I don't know.
Are they in business?
   Q.  Which party is in business?
   A.  Is Interworks still in business?
   Q.  That's why I'm here.
   A.  I don't understand.
   Q.  Well, you know, maybe your
attorney can ask my client that question two
weeks from now.
   A.  Okay.  I don't know if they are
selling it.  I don't even know if they are in
business.  I'm hearing all kinds of things in
the trade about deceptive things that they are
doing, so I don't know if they are there, they
are not there, they are selling, they are not
selling, I don't know.

EXHIBIT 10                 H I N E S   R E P O R T E R S                    11 (38 - 41)

**Page 42**

Q. You heard something about Interworks going out of business?
A. I'm speculating. I'm wondering. I'm asking you.
Q. Unfortunately, I can't give you that answer.
    But your attorney can ask my client a couple weeks from now, two, three weeks from now.
A. Okay. I just don't wanna -- you are asking me if they are selling something, I don't even know if they are in business, so I'm trying to --
Q. All I'm trying to get --
A. How would I know what they are doing?
Q. Did you hear from QVC that they are still selling to QVC?
A. It's not something that I discussed with QVC on a daily basis.
Q. Okay. That's a good answer.
    The -- if you look at the second paragraph, a reference of insurance coverage was mentioned. Do you know why lack of insurance coverage was an important issue at

**Page 43**

the time when this letter was written?
A. Why insurance is important?
Q. Why lack of insurance coverage was an important issue?
A. It's a requirement of doing business, and part of the product -- when QVC approves a product for sale, there are certain requirements. If insurance on that product is part of the approval, it becomes part of the -- you can't separate the insurance from the product. If QVC approves the product that has this cup with this holder with this lid, and you take off the lid, it's no longer the cup.
    You follow what I'm saying?
Q. Yes, I follow.
A. So if the board doesn't have the insurance and it was approved with the insurance, then the lack of the insurance makes the product not what it was represented to be.
Q. Okay.
    The -- at the time, did you, I mean Digital Gadgets, have serious concern on lack of insurance coverage with respect to

**Page 44**

these hoverboards supplied by Interworks?
A. Doesn't the letter state that?
Q. Yes, it does say that. I mean, I'm asking you -- well, let me try to ask another question.
    When you had this letter written to Interworks, did Interworks promptly show you sufficient insurance coverage to alleviate your such concern?
A. Are you saying -- are you asking me if we had insurance I would still go and pay money to hire a lawyer and write a letter that we didn't have insurance?
Q. No. The question is, after you sent this letter, after, did you or anybody else at Digital Gadgets receive satisfactory explanations from Interworks?
A. I know that there was attempt to resolve the insurance issue by Interworks. I don't know if it was quote/unquote satisfactory, but I do know that there was certain actions taken as a result of this letter to mitigate what -- maybe what Interworks felt it needed to provide.
Q. Subsequent to sending this

**Page 45**

letter, did you realize that it was actually a non-issue?
A. No.
Q. Are you aware Digital Gadgets had to purchase insurance subsequent to sending this letter to Interworks?
A. Am I aware that Digital Gadgets had to purchase -- if Interworks didn't solve the problem, then Digital Gadgets would have had to purchase insurance. I don't know the dates and times, but if we had to do something to mitigate damages, we would have done that based on our relationship with QVC.
Q. Right, QVC would have required you, meaning your company, to provide that coverage, if Interworks failed to provide one, right?
A. If it was provideable (sic) by us. It's not like you could just go out and like buying a pack of gum in the store, not like saying, okay, you don't have it, I'll do it, it's an intricate piece of equipment that many insurance companies will not insure.
Q. Do you personally involve in obtaining or procuring such insurance coverage

EXHIBIT 10            HINES REPORTERS            12 (42 - 45)

Case 2:17-cv-04963-MHLK-S Document 16-18 Filed 09/26/19 Page 6 of 11 PageID#:295
Case 2:17-cv-04963-MHLK-S Document 56-2 Filed 12/14/18 Page 20 of 108 PageID:921
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC      Deposition of Charles Tebele

### Page 54

```
 1    A.   The number might be correct, but
 2 there might be a reason for it, so what he is
 3 he stating is he got $400,000 and there was a
 4 balance of 35k.
 5    Q.   35k he says here is not so much,
 6 so I don't want to chase you guys; do you
 7 remember what was the unit price for each
 8 hoverboard?
 9    A.   I don't know.
10    Q.   Was it about a-hundred-something
11 bucks?
12    A.   I really don't remember.  If it
13 was 35k outstanding, there would be a reason
14 for the 35k to be outstanding.
15    Q.   What would be the reason?
16    A.   There could be various reasons.
17    Q.   I don't want you to speculate.
18    A.   If you are asking me the reason
19 for this particular -- particular 35k --
20    Q.   I'm asking you that.  I was
21 asking you for that.
22    A.   I don't have that reason.  I
23 could refresh my memory looking at documents,
24 but off the top of my head, just as general
25 business practice there are many reasons that
```

### Page 55

```
 1 one company says that the amount owed is this,
 2 the other company says what we owe is this and
 3 there are mitigating reasons for the
 4 reconciling differences.
 5         You could send a client a bill
 6 for $13,600 for "X" amount of hours, and the
 7 client can come back and say well, I have
 8 record that you worked this many hours and pay
 9 you that, and then there is reconciling
10 differences.
11    Q.   Well, one of the reasons,
12 generally speaking, between merchants for
13 mitigating or for disputing the invoices is
14 defective products, right?
15    A.   Could be one of the reasons.
16    Q.   Was it -- was a defective product
17 the reason that Digital Gadgets had not paid
18 or owed a balance of 35,000?
19    A.   It could be one of the reasons.
20 In a general sense QVC, due to the nature of
21 their business, returns products on a regular
22 basis, so there could be a reserve against
23 returns in transit or the reserve based on
24 what the estimated returns would be, that
25 could be.
```

### Page 56

```
 1    Q.   Okay.
 2         Also it could be -- it could be
 3 based on approved discount by the vendor?
 4    A.   Could be -- could be on a
 5 discount, could be an advertising program,
 6 could be.
 7    Q.   Could be a lot of things?
 8    A.   Could be a lot of things, but it
 9 doesn't look out of line that on $400,000
10 worth of payments there might be $35,000 worth
11 of these things.
12    Q.   Right, and the 400k for the first
13 shipment, at the time only $35,000 was owed
14 which is less than ten percent?
15    A.   Right.
16    Q.   But if you look at this e-mail
17 and the subsequent e-mail, there's nothing
18 mentioning about the reason for this balance
19 of 35k?
20    A.   Well, there is an e-mail trail
21 below it, but it's not there.  This is just a
22 snippet of one e-mail.
23    Q.   Okay.
24         THE WITNESS:  Can we take a
25    one-minute break or two-minute
```

### Page 57

```
 1    break?
 2         MR. SHU:  Sure.
 3         (Recess taken.)
 4         MR. HSU:  Next in order will be
 5    number 6.
 6         (Tebele Exhibit 6, Document
 7    bearing Bates stamps Interworks 42
 8    through Interworks 54, marked for
 9    identification.)
10    Q.   Number 6 consists of e-mails of
11 twelve pages, a string of e-mails.
12         These document pages were
13 Bates stamped from number 42 through 54.
14 Let's start with number -- page number 1 or
15 Interworks 42, bottom right of the page.
16         The top e-mail was composed and
17 sent by Chris Mitchell to Sam, Gillian Yip,
18 Eric Lu and have you cc'd on it, the subject
19 was High Roller Model C Returns.  The date of
20 this e-mail was April 6, 2017.  Chris Mitchell
21 said "Hi, Sam, the goods are at the
22 warehouse."
23         The goods that he referred to in
24 this e-mail were Model C hoverboards?
25         MR. LAZARUS:  That's a question?
```

Case 2:18-cv-00828-MHL Document 16-18 Filed 09/26/19 Page 7 of 11 PageID #:296
Case 2:17-cv-04963-MHL-KS Document 56-2 Filed 12/14/18 Page 26 of 108 PageID #:927
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC                        Deposition of Charles Tebele

| | |
|---|---|
| Q. Where did this conversation take place?<br>A. With buyers, with quality assurance people, many different conversations.<br>Q. Do you recall when?<br>A. No.<br>Q. Do you recall where?<br>A. At QVC.<br>Q. And were you present?<br>A. I was present.<br>Q. And do you recall -- do you recall who else was present at QVC for that issue?<br>A. Our reps and buyers and sales reps.<br>Q. Are you able to recall the names of QVC's employees attending that meeting?<br>A. I would need to look at e-mails to refresh my memory.<br>Q. To your knowledge, was there any QVC customers returned any of the hoverboards supplied by Interworks because of the battery issue?<br>A. I don't know. I don't know what<br>Page 78 | what I guess the implication is we would need to have some complaint or some evidence to take action, and what I'm telling you is, as soon as we discovered the problem and the problem rose to a level where it was serious, we stopped.<br>Q. And what did you do after you stopped? You mentioned about a few things that -- other than those things that you mentioned, any other efforts that you had set in place to confront this issue?<br>A. I don't know, but at some point it became a legal issue, and once it became a legal issue it took on a life of its own and I guess that's why we are sitting here.<br>Q. Well, QVC discovered this issue and --<br>A. No. QVC told us that this is not what we submitted. We submitted this and when we opened the box it was that. That's not good. If I tell you I'm handing you a wallet with $10 in it, and you took it home and you got $5 and somebody calls you and says I only got $5, not 10, the 10 that you promised me, that's a problem.<br>Page 80 |
| reason customers use for returns, I wouldn't have access to that.<br>Q. That's fair.<br>Did you receive any notice from QVC concerning how many returns made by their customers, because of the battery issues?<br>A. Again, we don't get the reason for the return, we just get the return. **If you knew you were providing fraudulent services to one of your clients, would you wait for one of your clients to say -- if you realize you were providing fraudulent services to your client and you realized that by accident, and are you gonna wait for your client to complain that you are providing fraudulent services before you take action?**<br>Q. Well, I would not be able to answer that question, because I --<br>A. I don't think you need to answer it.<br>Q. I wouldn't know the definition of fraudulent.<br>A. I don't think you need to answer it. So what you are asking me is, did we get notice or did someone at QVC complain, and<br>Page 79 | Q. Right.<br>A. Right.<br>Q. Right.<br>And --<br>A. And if I go back and say the guy who gave me all these $10 wallets only put $5 in them, I'm gonna start looking to see where the problems lie.<br>Does that make sense to you?<br>Q. When you receive indications or reports that led you to believe that there -- the batteries supplied by Interworks were defective, not matching with whatever they submitted for sample testing by QVC, is that your statement (sic)?<br>A. Say that one more time.<br>Q. When you -- by the way, do you know your company had to submit some samples to QVC before you started selling the hoverboards to QVC?<br>A. That's not entirely accurate.<br>Q. Oh.<br>Which part was not entirely accurate?<br>A. All of it.<br>Page 81 |

EXHIBIT 10        H I N E S   R E P O R T E R S        21 (78 - 81)
143

Case 2:17-cv-04963-MHLKS Document 16-18 Filed 09/26/19 Page 8 of 11 PageID #: 297
Case 2:17-cv-04963-MHLKS Document 30-2 Filed 12/14/18 Page 27 of 108 PageID #: 928

Interworks Unlimited, Inc. vs. Digital Gadgets, LLC                               Deposition of Charles Tebele

---

**Page 82**

Q. The question, very simple: Did you know Digital Gadgets had to submit samples to QVC for testing and approval before you started selling them?
A. That's not true.
Q. Not true?
A. No. In this case, because Interworks purported to sell us the unit that was already approved by QVC, QVC allowed us to sell it based on our reputation and vouching for the fact that it was the same model, so we began to sell it without submitting a sample. And only after five months later when we needed to submit a sample for a new program and new orders did we then submit them a sample, and then determined that what we were selling them all along was fraudulent.
Q. You are 100 percent sure about that?
A. I'm sure of what I just said.
Q. Okay.
    That's very good answer. I'm just --
A. That doesn't mean that's 100 percent of what occurred.

---

**Page 83**

Q. Well, that's based on your recollection that's what happened, right?
A. Yes.
Q. Okay.
    MR. HSU: Let's mark this as 8.
    (Tebele Exhibit 8, Document bearing Bates stamps Interworks 212 through Interworks 221, marked for identification.)
Q. Exhibit 8 is a computer generated form on top of the first page says QVC, QA sample, evaluation report?
A. Correct.
Q. And have you ever seen this entire report?
A. I have seen this form. I don't know if I've seen this report before, but I'm familiar with the form.
Q. And if you look at those days, probably the seventh or eighth line from the top, indicates that the sample evaluation due date, pick due date, requested due date, look at those days, do those tell you that the samples were submitted to QVC by Interworks in early October?

---

**Page 84**

A. That's what it says.
Q. Okay.
    Does it say that the -- by the way, what is the products described on this report?
A. (No response.)
Q. Description on top, you see Chic High Roller Self Balancing Hoverboard W? I don't know what that "W" means. Do you know, W slash --
A. What are you asking me?
Q. I'm asking if you know what that means? I have no idea what that means. What the W at the end and slash, what does that mean?
A. Probably is truncated that there's some words after that, but it doesn't pick up on the form.
Q. The reason I was asking you, because I don't know what that means.
    If you go through this report, it seems like the samples submitted by Interworks to QVC passed the testing?
A. Yes.
Q. Is there anything -- you see the

---

**Page 85**

second page of this exhibit, the Bates number Interworks 213 in the midsection of the page where it says battery identification, four battery packaging, four general electrical requirement test, Interworks passed all of those things, right?
A. I don't know what -- I mean you are making a statement, I guess, yeah.
Q. So you were saying that Interworks -- I'm trying to understand what your claim is. One of your claims is that Interworks fraudulently --
A. Interworks had got this board approved.
Q. Right.
    MR. LAZARUS: Referring to?
A. Interworks 212.
Q. This is 8.
A. The item on this Exhibit Number 8 was approved for sale by QVC.
Q. And QVC --
A. And you want me to continue to answer, make it easier?
Q. Sure.
A. Interworks sold us this board,

EXHIBIT 10         HINES REPORTERS         22 (82 - 85)
144

Case 2:17-cv-04983-MHL Document 16-18 Filed 09/26/19 Page 9 of 11 PageID #: 396
Case 2:17-cv-04983-MHL-KS Document 30-2 Filed 12/14/18 Page 29 of 108 PageID #:930

Interworks Unlimited, Inc. vs. Digital Gadgets, LLC     Deposition of Charles Tebele

Page 90

```
 1    A.   I don't know QVC had boards on
 2  inventory. I don't know where you are making
 3  that assumption from.
 4    Q.   Well, did you ask QVC how many
 5  boards QVC still has sitting in its warehouse?
 6    A.   Again, I don't know that that
 7  would be part of the general line of
 8  questioning. The way I understand it is we
 9  would ship the boards for QVC so they wouldn't
10  have them in their warehouse.
11    Q.   Now, yesterday, I don't know if
12  you were here or not, did you hear that
13  Ms. Gillian testified, Gillian Yip?
14    A.   Yes.
15    Q.   She testified yesterday that
16  the -- your company would ordinarily ship
17  hoverboards to QVC's warehouse and QVC's
18  customers?
19    A.   That's correct.
20    Q.   So when she was talking about
21  QVC's customers, she's saying these end users,
22  right?
23    A.   Right. The way I understand it,
24  these boards were being shipped to end users.
25    Q.   So there are boards that shipped
```

Page 91

```
 1  directly to QVC's warehouse in New Jersey and
 2  being stored there?
 3    A.   QVC doesn't have a warehouse in
 4  New Jersey.
 5    Q.   Or maybe she was saying some
 6  other warehouse located in New York?
 7    A.   Let's cut to what you are trying
 8  to say. I don't believe that QVC had boards
 9  in their warehouse at the time of this.
10    Q.   You don't believe there was any
11  remaining inventory being stored at QVC's
12  warehouse?
13    A.   For sale.
14    Q.   What is the location of QVC's
15  warehouse?
16    A.   They have warehouses all over the
17  country, but they don't have one in New
18  Jersey.
19    Q.   Do they have any warehouse in
20  New York?
21    A.   I don't believe so.
22         (Tebele Exhibit 9, Document
23    bearing Bates stamp Interworks 299,
24    marked for identification.)
25    Q.   Number 9 is a certificate of
```

Page 92

```
 1  liability insurance.
 2         Before you came today, did you
 3  review all of the certificates of liability
 4  insurance provided by Interworks to your
 5  company?
 6    A.   No.
 7    Q.   So you've never seen this
 8  document before?
 9    A.   I'm not familiar with it. I may
10  have seen it.
11    Q.   Okay.
12         Let's mark the next one and see
13  if you have seen this one.
14         (Tebele Exhibit 10, Document
15    bearing bates stamp Interworks 300,
16    marked for identification.)
17    Q.   If you look at this certificate
18  of liability insurance dated July 13, 2017,
19  have you ever seen this document before?
20    A.   I may have.
21    Q.   But you are not sure about it?
22    A.   I'm not sure that I have seen it
23  before. I may have.
24         (Tebele Exhibit 11, Document
25    bearing Bates stamp Interworks 301,
```

Page 93

```
 1    marked for identification.)
 2    Q.   Number 11, have you ever seen
 3  this certificate of insurance?
 4    A.   I may have.
 5    Q.   Let me go back to that QVC QA
 6  sample testing report, that was Exhibit 8.
 7         Do you recall receiving a report
 8  from QVC stating that the battery that came
 9  with the hoverboard failed the testing and
10  also on the report says that the battery that
11  came with the samples do not match with what
12  was previously submitted?
13    A.   Again, let me take you through
14  how it would be. We would get a failure, it
15  would outline many areas of failure. Only
16  through going back and forth and resubmitting
17  and trying again and resubmitting and trying
18  again, by process of elimination, finally get
19  down to the fact that batteries didn't match.
20         It wouldn't be, hey, you
21  submitted this, the battery didn't match. It
22  would be submitted, it would be failed. It's
23  like a game of ping pong, then we'd have to
24  try to mitigate the failures, all the while
25  not knowing, not even thinking in a million
```

Case 3:18-cv-00828-MHL Document 16-18 Filed 09/06/19 Page 10 of 11 PageID# 389
Case 2:17-cv-04983-MJH-KS Document 50-2 Filed 12/14/18 Page 35 of 108 Page ID #:936

Interworks Unlimited, Inc. vs. Digital Gadgets, LLC | Deposition of Charles Tebele

**Page 114**

      (Tebele Exhibit 16, Document bearing Bates stamp Digital gadgets 35, marked for identification.)

Q. 16, there is a short e-mail on top from Eric Lu to Chris Mitchell in December, specifically on December 21, 2016.

It says "Chris, see my comments below in red. I'll give you a call shortly."

In response to Chris Mitchell's e-mail to Eric Lu dated the same day earlier than that, well, yes, a little earlier than 3:04 a.m., was 9:26 a.m. in the morning, here by the way, have you received this e-mail from Chris Mitchell?

A. Did I receive this e-mail from Chris Mitchell?

Q. Right.

Did he subsequently forward it to you?

A. I don't remember.

Q. And says -- Chris Mitchell says here "Eric" starting from the second paragraph "current order QVC isn't going to be able to resolve the lithium battery reissue until next month."

**Page 115**

Are you aware of such issue existing in December of 2016?

A. That's a different issue. That's a different lithium battery issue than what we are talking about with the QA.

Q. Right.

And you say is a different issue?

A. It has nothing to do with the QA.

Q. Okay.

And was this around the time when Chris Mitchell was negotiating with Eric on the price terms along with the other terms for the sale of the hoverboards?

A. It appears to be.

Q. And when Chris Mitchell mentioned -- you see down below like one, two, three, four, fourth bullet point, if you look at the second one?

A. Yep.

Q. Received exclusive agreement to supply chip listen board to QVC for 2017 and then Eric's comment is yes, we can put this agreement to you, but let's have our meetings and see it and that's the trade show, right?

A. Yes.

**Page 116**

Q. And discuss our partnership further?

A. Yep.

Q. So you did discuss, meaning your company, did discuss this exclusive agreement with Eric Lu?

A. Yes.

Q. At the trade show, and what was your recollection on Eric Lu's response or anything that he said in Las Vegas -- when you met Eric Lu, did he agree to give that exclusive deal to you guys?

A. **There was no doubt that he agreed that as long as we had inventory in place that we remained the exclusive partner. We would never buy somebody else's goods for them to go sell them to the same customer behind our back. The discussion further was we were discussing other accounts to extend the exclusive to.**

Q. Did you also at Las Vegas discuss the payment terms such as consignment?

A. It's possible.

Q. But you don't remember sitting here?

**Page 117**

A. Again, there was a sequence of events and a lot of conversations. I don't know what conversation was at CES versus on the phone, but it was a fluid situation.

      (Tebele Exhibit 17, Document bearing Bates stamp Digital Gadgets 80, marked for identification.)

Q. Next one is 17. Have you ever seen this certificate of liability insurance?

A. Possibly.

Q. You see towards the bottom left underneath two words certificate, Digital Gadgets, LLC and that's your company, right?

A. Yes.

Q. On top -- well, it's not very top, it's like ninth or tenth or twelfth line from the top, you see under the insured Interworks Unlimited, Inc.?

A. Yes.

Q. Was printed there, so the insured of this policy was Interworks?

A. Yes.

Q. And your company was made as an additional insured?

A. Yes.

Case 3:18-cv-00828-MHL Document 16-18-2 Filed 09/06/19 Page 11 of 14 PageID# 400
Case 2:17-cv-04983-MJH-KS Document 50-2 Filed 12/14/18 Page 38 of 108 PageID #:939
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC      Deposition of Charles Tebele

| | |
|---|---|
| 1 submitted this certificate to QVC around the<br>2 time Digital Gadgets received this from<br>3 Interworks?<br>4   A.   What's the question again?<br>5   Q.   Do you know if Digital Gadgets<br>6 ever submitted this certificate of liability<br>7 insurance to QVC ever?<br>8   A.   I don't know.<br>9         (Tebele Exhibit 20, Document<br>10    bearing Bates stamps Digital Gadgets 244<br>11    through Digital Gadgets 247, marked for<br>12    identification.)<br>13   Q.   20 has a number of pages.<br>14         These documents were produced by<br>15 Digital Gadgets.<br>16         If you see the second e-mail from<br>17 the top on Digital Gadgets 244, this e-mail<br>18 was sent by Chris Mitchell to Eric, presumably<br>19 Eric Lu, and you were cc'd on it.  Do you see<br>20 that?<br>21   A.   Yep.<br>22   Q.   And Chris Mitchell first said<br>23 "Eric understood about wanting the boards<br>24 back.  We were honoring the consignment backup<br>25 agreement per our conversation.  But if that's<br>Page 126 | 1 approved from my factor."<br>2         Did Eric Lu write all of these<br>3 responses in bold printed form?<br>4   A.   I don't know, looks like it.<br>5   Q.   And here he was complaining to<br>6 you guys that if you had been approved by my<br>7 vendor, I would have given this consignment<br>8 backup agreement to you guys at the time this<br>9 e-mail was sent to them, to Eric Lu, to your<br>10 recollection, Interworks' factor never<br>11 approved your company on this credit line of<br>12 $1 million, right?<br>13   A.   **I have no idea.  It looks to be**<br>14 **he shipped it, bought approval from his factor**<br>15 **and maybe he was in trouble or something.  I**<br>16 **don't know what -- I don't know what -- I**<br>17 **don't know what the inner workings between him**<br>18 **and his factor are, but we don't have any**<br>19 **obligation as Digital Gadgets to satisfy his**<br>20 **factor.  His factor relationship is between**<br>21 **him and his factor.**<br>22   Q.   If you look down below,<br>23 there's -- it seems like there is a<br>24 spreadsheet prepared by Chris Mitchell to<br>25 Eric Lu.  If you can help me go over the<br>Page 128 |
| 1 no longer an option for you, we can send back<br>2 the remaining boards."<br>3         What is the consignment backup<br>4 agreement Chris Mitchell was talking about<br>5 here, if you know?<br>6   A.   **Basically, that there were,**<br>7 **throughout the negotiations, like I said, it**<br>8 **was fluid and what they agreed to was rather**<br>9 **than shipping the boards back and forth**<br>10 **between Interworks and Digital Gadgets and**<br>11 **having them sit in one warehouse or another,**<br>12 **since they were only for QVC that we would pay**<br>13 **them based on when they were sold.  So that's,**<br>14 **I mean, call it a consignment agreement, but**<br>15 **it's not a very technical term.  Consignment**<br>16 **agreement would basically mean to me we would**<br>17 **pay for the goods per specific agreement as**<br>18 **they were sold.**<br>19   Q.   Okay.<br>20         And then the -- see there's some<br>21 bold printed lines or words starting from an<br>22 arrow pointing to the left, "I have honored<br>23 everything" that -- "everything I've said.  I<br>24 told you guys I would give you<br>25 terms/consignment if you guys would get<br>Page 127 | 1 second page of the document, where you can see<br>2 not this page, can you just briefly go to a<br>3 second page?<br>4   A.   Yes.<br>5   Q.   Second page on top to the right,<br>6 you see the total received number is 10,608<br>7 units?<br>8   A.   Yes.<br>9   Q.   Is that consistent with your<br>10 recollection of how many units of<br>11 hoverboards --<br>12   A.   **I previously answered I'm not**<br>13 **sure how many hoverboards were received, but**<br>14 **if this e-mail states -- the e-mail stands on**<br>15 **its own.  The statement is what it is.**<br>16   Q.   Okay.<br>17         But you mention about computer<br>18 data and software.  If you have to retrieve<br>19 this information or spreadsheet from your<br>20 computer you would be able to do that, right?<br>21   A.   Yes.<br>22   Q.   After you received these e-mails<br>23 from Chris Mitchell and Eric Lu, did you<br>24 remember -- did you remember you had a meeting<br>25 or a couple of meetings with Chris Mitchell?<br>Page 129 |

EXHIBIT 10        H I N E S   R E P O R T E R S        33 (126 - 129)