Case 3:18-cv-00828-MHL Document 22-18 Filed 05/14/21 Page 1 of 11 PageID# 644
Case 2:17-cv-04983-JHH-KS Document 30-2 Filed 12/14/18 Page 6 of 108 Page ID #:907
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC                    Deposition of Charles Tebele

```
 1   UNITED STATES DISTRICT COURT
 2   CENTRAL DISTRICT OF CALIFORNIA
 3   ------------------------------------------x
 4   INTERWORKS UNLIMITED, INC., a
 5   California Corporation,
 6                  Plaintiff,
 7            -against-
 8   DIGITAL GADGETS, LLC; a New Jersey
 9   limited liability company,
10                  Defendant.
11   Case No:  2:17-cv-4983 AB KSx
12   ------------------------------------------x
13                       488 Madison Avenue
14                       New York, New York
15
16                       August 21, 2018
17                       10:01 a.m.
18
19        Examination Before Trial of the
20   Defendant by CHARLES TEBELE, pursuant to
21   Notice, before CINDY A. AFANADOR, a Notary
22   Public of the State of New York.
23
24
25
```

**EXHIBIT 18**

EXHIBIT 10        H I N E S   R E P O R T E R S        123   1 (1)

Case 2:17-cv-04963-MHL-KS Document 56-2 Filed 12/14/18 Page 10 of 108 PageID #:911
Case 2:18-cv-00828-MHL Document 22-10 Filed 05/14/21 Page 2 of 11 PageID #:645
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC     Deposition of Charles Tebele

**Page 14**

1   in the interviews?
2     A.   No.
3     Q.   Have you heard of Interworks
4   Unlimited, Inc.?
5     A.   **I've heard of the term**
6   **Interworks, I don't know about the comma Inc.**
7     Q.   Okay.
8       When did you first hear of this
9   company?
10    A.   **I don't recall.**
11    Q.   Have you ever met an individual
12   named Eric Lu?
13    A.   **Yes.**
14    Q.   Do you recall when you met him?
15    A.   **I believe it would be in**
16   **January 2017.**
17    Q.   Did you meet him in New York?
18    A.   **I don't believe so.**
19    Q.   Do you recall where you met him
20   first?
21    A.   **I recall that I met him in**
22   **Las Vegas. I don't know if there were other**
23   **meetings, but that's one that I recall.**
24    Q.   Were you in Vegas for a trade
25   show?

**Page 15**

1     A.   **Yes.**
2     Q.   And what trade show was that?
3     A.   **The CES trade show.**
4     Q.   CES would stand for?
5     A.   **Consumer Electronics. I don't**
6   **know what the "S" is for. Show.**
7     Q.   That's a good guess.
8       When you first met Eric Lu in
9   Las Vegas for this trade show, what did you
10   guys talk about?
11    A.   **(No response.)**
12    Q.   Do you remember anything that you
13   discussed with Eric Lu when you first met him?
14    A.   **No.**
15    Q.   Did he ever offer any of his
16   merchandise to your company as a vendor?
17    A.   **I believe when I met him we were**
18   **already involved in some sort of business, but**
19   **I don't know the sequence. I don't recall**
20   **offhand the sequence of events.**
21    Q.   Was Chris Mitchell there to?
22    A.   **Yes.**
23    Q.   At the meeting -- do you recall
24   at the time the meeting taking place your
25   company had already made purchase of

**Page 16**

1   hoverboards from --
2     A.   **Are you stating that as a fact or**
3   **are you asking me -- what's the question?**
4     Q.   Do you remember at the time you
5   first met Eric Lu your company had already
6   made purchases from his company?
7     A.   **Do I remember if my company**
8   **already made purchases?**
9     Q.   Yes.
10    A.   **Again, just like I said before,**
11   **I'm not clear on the timeline, but we**
12   **purchased purchases from him and I met him.**
13   **I'm not recalling the sequence of events.**
14    Q.   So you don't remember when your
15   company first purchased products from his
16   company?
17    A.   **In relation to when I met him,**
18   **I'm not sure.**
19    Q.   Okay.
20       Do you know what was the
21   merchandise your company purchased from his
22   company?
23    A.   **Hoverboards.**
24    Q.   Before you came today, did you
25   review any documents, intra-company, relating

**Page 17**

1   to the purchase of these hoverboards?
2     A.   **I reviewed certain documents.**
3     Q.   And what were these documents
4   that you had reviewed?
5     A.   **There were a production of**
6   **documents, they were voluminous, I reviewed**
7   **them to refresh my memory, but I don't know**
8   **which documents -- I can't recall which**
9   **documents or why. There were a lot of**
10   **documents.**
11    Q.   Did you review your company's
12   purchase orders?
13    A.   **Not particularly. I may have**
14   **scanned them. I'm sure I scanned them.**
15    Q.   Did you review the invoices
16   issued by Interworks to your company?
17    A.   **What do you mean by "review"?**
18    Q.   Review, meaning look at the
19   document and have -- for a certain purpose,
20   and when you finished reading it, well, I
21   can't give you a definition of review. Review
22   means review.
23    A.   **Then I can't answer it.**
24    Q.   Well, have you had a chance to
25   look at those documents?

Case 2:18-cv-00828-MHL Document 22-18 Filed 05/14/21 Page 3 of 11 PageID# 646
Case 2:17-cv-04983-MHL-KS Document 50-2 Filed 12/14/18 Page 15 of 108 PageID#:916
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC    Deposition of Charles Tebele

| | |
|---|---|
| 1  A.   Me personally?<br>2  Q.   Yes.<br>3  A.   No. Doesn't preclude me from<br>4 reviewing any.<br>5  Q.   If you want to, you could?<br>6  A.   Yes.<br>7       MR. HSU: Let me attach these two<br>8 documents; why don't we mark them as<br>9 Exhibit 1 and 2.<br>10      (Tebele Exhibit 1, Second Amended<br>11 Notice of Taking Deposition of Charlie<br>12 Tebele, marked for identification.)<br>13      (Tebele Exhibit 2, Second Amended<br>14 Notice of Taking Deposition of<br>15 Defendant/Counterclaimant Digital<br>16 Gadgets, LLC, marked for<br>17 identification.)<br>18  Q.   These two exhibits or notices of<br>19 deposition of you individually and notice of<br>20 taking deposition of defendant, Digital<br>21 Gadgets.<br>22      The -- my understanding is that<br>23 you have been designated as the person most<br>24 knowledgeable about the issues in this case by<br>25 your company, Digital Gadgets, right?<br>Page 34 | 1 knowledge of any returns of hoverboards made<br>2 by Digital Gadgets to Interworks?<br>3  A.   Personal knowledge that I'm<br>4 carrying in my head, no. There may be<br>5 documents to support in whatever we would<br>6 submit.<br>7  Q.   Okay.<br>8  A.   Whether there were or weren't...<br>9  Q.   That's fair.<br>10      Have you ever seen any documents<br>11 in the possession of your company that had<br>12 anything to do with the return that was<br>13 referenced in number 14 here?<br>14  A.   I don't recall any specific<br>15 documents.<br>16  Q.   Okay.<br>17  A.   That doesn't mean there aren't<br>18 documents, that doesn't mean I didn't see<br>19 them, but I don't know of any specific<br>20 documents.<br>21  Q.   You might have seen them, but you<br>22 don't remember at that point?<br>23  A.   Correct.<br>24      MR. LAZARUS: Give me one second<br>25 with Charlie.<br>Page 36 |
| 1  A.   (No response.)<br>2       MR. LAZARUS: Yes.<br>3       MR. HSU: Okay.<br>4  Q.   Now, fairly quickly, if you look<br>5 at the Exhibit 2, the second amended notice of<br>6 taking deposition of defendant, if you can<br>7 help me go to the second page.<br>8  A.   (Witness complying.)<br>9  Q.   Look at the third page.<br>10  A.   (Witness complying.)<br>11  Q.   And you can see these categories<br>12 being described on top of the pages number 10<br>13 all the way through number 21, right?<br>14  A.   Yes.<br>15  Q.   Did you look at those categories<br>16 before you came today?<br>17  A.   You are asking me if I saw this<br>18 document before I came today?<br>19  Q.   Yes.<br>20  A.   I don't recall.<br>21  Q.   14, if you look at that 14, says<br>22 in a return of merchandise to the defendant<br>23 that were previously purchased from the<br>24 plaintiff.<br>25      Do you have any personal<br>Page 35 | 1       THE WITNESS: Yeah.<br>2       (Recess taken.)<br>3  A.   So just to clarify, any returns,<br>4 there would be paperwork if it was requested,<br>5 that would substantiate whether there were<br>6 terms or not in the submissions.<br>7  Q.   My previous question to you is,<br>8 do you recall seeing any of those documents?<br>9  A.   In the ordinary course of<br>10 business we returned product, so I don't<br>11 recall specific documents, but, like I said,<br>12 if there were documents and reports showed to<br>13 me, I can identify whether they were returns<br>14 or not based on those documents.<br>15  Q.   Sitting there, you don't have any<br>16 specific recollections on any specific<br>17 documents?<br>18  A.   Correct. However, you know,<br>19 there are registers and documents and backup<br>20 to what was returned and wasn't returned.<br>21  Q.   Let's move on to the next one.<br>22 This will be -- you guys can share.<br>23      It is a letter dated May 19,<br>24 2017.<br>25      MR. HSU: This will be Number 3.<br>Page 37 |

EXHIBIT 10    H I N E S  R E P O R T E R S    10 (34 - 37)

Case 2:18-cv-00828-MHL Document 22-10 Filed 05/14/21 Page 4 of 11 PageID# 647
Case 2:17-cv-04983-MHL-KS Document 30-2 Filed 12/14/18 Page 16 of 108 PageID #:917
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC                                    Deposition of Charles Tebele

**Page 38**

(Tebele Exhibit 3, Document bearing Bates stamp Interworks 7, marked for identification.)

Q. This letter apparently was written by Thomas Carulli, supposedly a lawyer working for this firm. I'm looking at the letterhead; Kaplan, Massamillo & Andrews. Have you ever seen this document?
A. Yes.
Q. Did you hire this law firm to write this letter to Interworks?
A. Yes.
Q. And let's look at the first paragraph.
Says "Dear Mr. Lu, we represent Digital Gadgets, LLC. This is to place you on notice that Interworks has violated the exclusive right granted DG," that's Digital Gadgets, "to sell Interworks products to and through QVC, moreover, at a price less than offered by Digital Gadgets, resulting in significant and irreparable harm to Digital Gadgets."
A. Yes, it was terrible.
Q. There are two issues raised by

**Page 39**

this paragraph. One, the first one was the exclusive right. You don't recall seeing any written documents or written agreements signed by Interworks and Digital Gadgets pertaining to this exclusive right?
A. **I don't know about a written agreement, however there is a certain agreement without question between Interworks and Digital Gadgets that when Digital Gadgets was selling those goods to QVC, which Interworks was stuck with and QVC canceled their orders with, that Digital Gadgets would fill Interworks' shoes as the exclusive partner, there's no doubt about that.**
Q. When you say "there's no doubt about that," you know, what proof do you recall?
MR. LAZARUS: Objection to the form of the question.
Q. Let me ask you this: When you say there's no doubt about this exclusive right, have you ever seen any e-mails sent by Eric Lu?
A. **I've seen e-mails, I was on conversations, I spoke to Chris Mitchell on**

**Page 40**

**multiple occasions, I spoke to QVC. I mean this was a heavy issue, this wasn't a light issue and we would never, as our company policy, sell something that someone else makes, to then have that company go and compete with us on the same thing.**
Q. Well, that's fair.
So Chris Mitchell reported this to you; what did he tell you, if anything, that you recall pertaining to this exclusive right?
A. **Look, I had many conversations with Chris Mitchell and with Eric, but what I will say is Interworks was in a jam, we helped them, and explicit in the help was this exclusive, which was being honored for a time, but then at some point, Interworks decided to go rogue and go behind our backs, so it was not just implied, it was the tone of the entire relationship. And, moreover, we were discussing further exclusive and further accounts, so it wasn't that it was this one little thing, it was beyond that.**
**At some point, Interworks just decided that they were gonna not honor it.**

**Page 41**

Q. Okay.
To your knowledge, is --
A. **Which caused us a tremendous amount of lost work and time and reputation.**
Q. Do you know if Interworks is currently selling hoverboards to QVC?
A. **I don't understand the question.**
Q. To your personal knowledge, is Interworks selling hoverboards to QVC now?
A. **At this moment, I don't know. Are they in business?**
Q. Which party is in business?
A. **Is Interworks still in business?**
Q. That's why I'm here.
A. **I don't understand.**
Q. Well, you know, maybe your attorney can ask my client that question two weeks from now.
A. **Okay. I don't know if they are selling it. I don't even know if they are in business. I'm hearing all kinds of things in the trade about deceptive things that they are doing, so I don't know if they are there, they are not there, they are selling, they are not selling, I don't know.**

EXHIBIT 10                   HINES REPORTERS                   11 (38 - 41)

Case 2:17-cv-04963-MHL-KS Document 30-2 Filed 12/14/18 Page 17 of 108 PageID: 948
Case 2:17-cv-00828-MHL Document 22-18 Filed 05/14/21 Page 5 of 11 PageID# 648
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC | Deposition of Charles Tebele

**Page 42**

1 Q. You heard something about
2 Interworks going out of business?
3 A. I'm speculating. I'm wondering.
4 I'm asking you.
5 Q. Unfortunately, I can't give you
6 that answer.
7 But your attorney can ask my
8 client a couple weeks from now, two, three
9 weeks from now.
10 A. Okay. I just don't wanna -- you
11 are asking me if they are selling something, I
12 don't even know if they are in business, so
13 I'm trying to --
14 Q. All I'm trying to get --
15 A. How would I know what they are
16 doing?
17 Q. Did you hear from QVC that they
18 are still selling to QVC?
19 A. It's not something that I
20 discussed with QVC on a daily basis.
21 Q. Okay. That's a good answer.
22 The -- if you look at the second
23 paragraph, a reference of insurance coverage
24 was mentioned. Do you know why lack of
25 insurance coverage was an important issue at

**Page 43**

1 the time when this letter was written?
2 A. Why insurance is important?
3 Q. Why lack of insurance coverage
4 was an important issue?
5 A. It's a requirement of doing
6 business, and part of the product -- when QVC
7 approves a product for sale, there are certain
8 requirements. If insurance on that product is
9 part of the approval, it becomes part of
10 the -- you can't separate the insurance from
11 the product. If QVC approves the product that
12 has this cup with this holder with this lid,
13 and you take off the lid, it's no longer the
14 cup.
15 You follow what I'm saying?
16 Q. Yes, I follow.
17 A. So if the board doesn't have the
18 insurance and it was approved with the
19 insurance, then the lack of the insurance
20 makes the product not what it was represented
21 to be.
22 Q. Okay.
23 The -- at the time, did you, I
24 mean Digital Gadgets, have serious concern on
25 lack of insurance coverage with respect to

**Page 44**

1 these hoverboards supplied by Interworks?
2 A. Doesn't the letter state that?
3 Q. Yes, it does say that. I mean,
4 I'm asking you -- well, let me try to ask
5 another question.
6 When you had this letter written
7 to Interworks, did Interworks promptly show
8 you sufficient insurance coverage to alleviate
9 your such concern?
10 A. Are you saying -- are you asking
11 me if we had insurance I would still go and
12 pay money to hire a lawyer and write a letter
13 that we didn't have insurance?
14 Q. No. The question is, after you
15 sent this letter, after, did you or anybody
16 else at Digital Gadgets receive satisfactory
17 explanations from Interworks?
18 A. I know that there was attempt to
19 resolve the insurance issue by Interworks. I
20 don't know if it was quote/unquote
21 satisfactory, but I do know that there was
22 certain actions taken as a result of this
23 letter to mitigate what -- maybe what
24 Interworks felt it needed to provide.
25 Q. Subsequent to sending this

**Page 45**

1 letter, did you realize that it was actually a
2 non-issue?
3 A. No.
4 Q. Are you aware Digital Gadgets had
5 to purchase insurance subsequent to sending
6 this letter to Interworks?
7 A. Am I aware that Digital Gadgets
8 had to purchase -- if Interworks didn't solve
9 the problem, then Digital Gadgets would have
10 had to purchase insurance. I don't know the
11 dates and times, but if we had to do something
12 to mitigate damages, we would have done that
13 based on our relationship with QVC.
14 Q. Right, QVC would have required
15 you, meaning your company, to provide that
16 coverage, if Interworks failed to provide one,
17 right?
18 A. If it was provideable (sic) by
19 us. It's not like you could just go out and
20 like buying a pack of gum in the store, not
21 like saying, okay, you don't have it, I'll do
22 it, it's an intricate piece of equipment that
23 many insurance companies will not insure.
24 Q. Do you personally involve in
25 obtaining or procuring such insurance coverage

EXHIBIT 10 | HINES REPORTERS | 12 (42 - 45)

Case 2:18-cv-00823-MHL Document 22-18 Filed 05/14/21 Page 6 of 11 PageID# 649
Case 2:17-cv-04983-MHL-KS Document 30-2 Filed 12/14/18 Page 20 of 108 PageID #:921
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC     Deposition of Charles Tebele

**Page 54**

1  A. The number might be correct, but there might be a reason for it, so what he is he stating is he got $400,000 and there was a balance of 35k.
5  Q. 35k he says here is not so much, so I don't want to chase you guys; do you remember what was the unit price for each hoverboard?
9  A. I don't know.
10 Q. Was it about a-hundred-something bucks?
12 A. I really don't remember. If it was 35k outstanding, there would be a reason for the 35k to be outstanding.
15 Q. What would be the reason?
16 A. There could be various reasons.
17 Q. I don't want you to speculate.
18 A. If you are asking me the reason for this particular -- particular 35k --
20 Q. I'm asking you that. I was asking you for that.
22 A. I don't have that reason. I could refresh my memory looking at documents, but off the top of my head, just as general business practice there are many reasons that

**Page 55**

1  one company says that the amount owed is this, the other company says what we owe is this and there are mitigating reasons for the reconciling differences.
5  You could send a client a bill for $13,600 for "X" amount of hours, and the client can come back and say well, I have record that you worked this many hours and pay you that, and then there is reconciling differences.
11 Q. Well, one of the reasons, generally speaking, between merchants for mitigating or for disputing the invoices is defective products, right?
15 A. Could be one of the reasons.
16 Q. Was it -- was a defective product the reason that Digital Gadgets had not paid or owed a balance of 35,000?
19 A. It could be one of the reasons. In a general sense QVC, due to the nature of their business, returns products on a regular basis, so there could be a reserve against returns in transit or the reserve based on what the estimated returns would be, that could be.

**Page 56**

1  Q. Okay. Also it could be -- it could be based on approved discount by the vendor?
4  A. Could be -- could be on a discount, could be an advertising program, could be.
7  Q. Could be a lot of things?
8  A. Could be a lot of things, but it doesn't look out of line that on $400,000 worth of payments there might be $35,000 worth of these things.
12 Q. Right, and the 400k for the first shipment, at the time only $35,000 was owed which is less than ten percent?
15 A. Right.
16 Q. But if you look at this e-mail and the subsequent e-mail, there's nothing mentioning about the reason for this balance of 35k?
20 A. Well, there is an e-mail trail below it, but it's not there. This is just a snippet of one e-mail.
23 Q. Okay.
24 THE WITNESS: Can we take a one-minute break or two-minute

**Page 57**

1  break?
2  MR. SHU: Sure.
3  (Recess taken.)
4  MR. HSU: Next in order will be number 6.
6  (Tebele Exhibit 6, Document bearing Bates stamps Interworks 42 through Interworks 54, marked for identification.)
10 Q. Number 6 consists of e-mails of twelve pages, a string of e-mails.
12 These document pages were Bates stamped from number 42 through 54. Let's start with number -- page number 1 or Interworks 42, bottom right of the page.
16 The top e-mail was composed and sent by Chris Mitchell to Sam, Gillian Yip, Eric Lu and have you cc'd on it, the subject was High Roller Model C Returns. The date of this e-mail was April 6, 2017. Chris Mitchell said "Hi, Sam, the goods are at the warehouse."
23 The goods that he referred to in this e-mail were Model C hoverboards?
25 MR. LAZARUS: That's a question?

Case 2:18-cv-00828-MHL Document 22-10 Filed 05/14/21 Page 7 of 11 PageID #:650
Case 2:17-cv-04965-MHL-KS Document 30-2 Filed 12/14/18 Page 26 of 108 PageID #:927
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC | Deposition of Charles Tebele

### Page 78

Q. Where did this conversation take place?
A. With buyers, with quality assurance people, many different conversations.
Q. Do you recall when?
A. No.
Q. Do you recall where?
A. At QVC.
Q. And were you present?
A. I was present.
Q. And do you recall -- do you recall who else was present at QVC for that issue?
A. Our reps and buyers and sales reps.
Q. Are you able to recall the names of QVC's employees attending that meeting?
A. I would need to look at e-mails to refresh my memory.
Q. To your knowledge, was there any QVC customers returned any of the hoverboards supplied by Interworks because of the battery issue?
A. I don't know. I don't know what

### Page 79

reason customers use for returns, I wouldn't have access to that.
Q. That's fair.
Did you receive any notice from QVC concerning how many returns made by their customers, because of the battery issues?
A. Again, we don't get the reason for the return, we just get the return. If you knew you were providing fraudulent services to one of your clients, would you wait for one of your clients to say -- if you realize you were providing fraudulent services to your client and you realized that by accident, and are you gonna wait for your client to complain that you are providing fraudulent services before you take action?
Q. Well, I would not be able to answer that question, because I --
A. I don't think you need to answer it.
Q. I wouldn't know the definition of fraudulent.
A. I don't think you need to answer it. So what you are asking me is, did we get notice or did someone at QVC complain, and

### Page 80

what I guess the implication is we would need to have some complaint or some evidence to take action, and what I'm telling you is, as soon as we discovered the problem and the problem rose to a level where it was serious, we stopped.
Q. And what did you do after you stopped? You mentioned about a few things that -- other than those things that you mentioned, any other efforts that you had set in place to confront this issue?
A. I don't know, but at some point it became a legal issue, and once it became a legal issue it took on a life of its own and I guess that's why we are sitting here.
Q. Well, QVC discovered this issue and --
A. No. QVC told us that this is not what we submitted. We submitted this and when we opened the box it was that. That's not good. If I tell you I'm handing you a wallet with $10 in it, and you took it home and you got $5 and somebody calls you and says I only got $5, not 10, the 10 that you promised me, that's a problem.

### Page 81

Q. Right.
A. Right.
Q. Right.
And --
A. And if I go back and say the guy who gave me all these $10 wallets only put $5 in them, I'm gonna start looking to see where the problems lie.
Does that make sense to you?
Q. When you receive indications or reports that led you to believe that there -- the batteries supplied by Interworks were defective, not matching with whatever they submitted for sample testing by QVC, is that your statement (sic)?
A. Say that one more time.
Q. When you -- by the way, do you know your company had to submit some samples to QVC before you started selling the hoverboards to QVC?
A. That's not entirely accurate.
Q. Oh.
Which part was not entirely accurate?
A. All of it.

EXHIBIT 10 | HINES REPORTERS | 21 (78 - 81)
143

**Page 82**

Q. The question, very simple: Did you know Digital Gadgets had to submit samples to QVC for testing and approval before you started selling them?
A. That's not true.
Q. Not true?
A. No. In this case, because Interworks purported to sell us the unit that was already approved by QVC, QVC allowed us to sell it based on our reputation and vouching for the fact that it was the same model, so we began to sell it without submitting a sample. And only after five months later when we needed to submit a sample for a new program and new orders did we then submit them a sample, and then determined that what we were selling them all along was fraudulent.
Q. You are 100 percent sure about that?
A. I'm sure of what I just said.
Q. Okay.
That's very good answer. I'm just --
A. That doesn't mean that's 100 percent of what occurred.

**Page 83**

Q. Well, that's based on your recollection that's what happened, right?
A. Yes.
Q. Okay.
MR. HSU: Let's mark this as 8.
(Tebele Exhibit 8, Document bearing Bates stamps Interworks 212 through Interworks 221, marked for identification.)
Q. Exhibit 8 is a computer generated form on top of the first page says QVC, QA sample, evaluation report?
A. Correct.
Q. And have you ever seen this entire report?
A. I have seen this form. I don't know if I've seen this report before, but I'm familiar with the form.
Q. And if you look at those days, probably the seventh or eighth line from the top, indicates that the sample evaluation due date, pick due date, requested due date, look at those days, do those tell you that the samples were submitted to QVC by Interworks in early October?

**Page 84**

A. That's what it says.
Q. Okay.
Does it say that the -- by the way, what is the products described on this report?
A. (No response.)
Q. Description on top, you see Chic High Roller Self Balancing Hoverboard W? I don't know what that "W" means. Do you know, W slash --
A. What are you asking me?
Q. I'm asking if you know what that means? I have no idea what that means. What the W at the end and slash, what does that mean?
A. Probably is truncated that there's some words after that, but it doesn't pick up on the form.
Q. The reason I was asking you, because I don't know what that means.
If you go through this report, it seems like the samples submitted by Interworks to QVC passed the testing?
A. Yes.
Q. Is there anything -- you see the

**Page 85**

second page of this exhibit, the Bates number Interworks 213 in the midsection of the page where it says battery identification, four battery packaging, four general electrical requirement test, Interworks passed all of those things, right?
A. I don't know what -- I mean you are making a statement, I guess, yeah.
Q. So you were saying that Interworks -- I'm trying to understand what your claim is. One of your claims is that Interworks fraudulently --
A. Interworks had got this board approved.
Q. Right.
MR. LAZARUS: Referring to?
A. Interworks 212.
Q. This is 8.
A. The item on this Exhibit Number 8 was approved for sale by QVC.
Q. And QVC --
A. And you want me to continue to answer, make it easier?
Q. Sure.
A. Interworks sold us this board,

EXHIBIT 10    HINES REPORTERS    22 (82 - 85)

Case 2:17-cv-04963-MHL-KS Document 22-18 Filed 05/14/21 Page 9 of 11 PageID #: 652
Case 2:17-cv-04963-MHL-KS Document 30-2 Filed 12/14/18 Page 25 of 108 PageID #: 930

Interworks Unlimited, Inc. vs. Digital Gadgets, LL Deposition of Charles Tebele

Page 90

    A.  I don't know QVC had boards on
inventory. I don't know where you are making
that assumption from.
    Q.  Well, did you ask QVC how many
boards QVC still has sitting in its warehouse?
    A.  Again, I don't know that that
would be part of the general line of
questioning. The way I understand it is we
would ship the boards for QVC so they wouldn't
have them in their warehouse.
    Q.  Now, yesterday, I don't know if
you were here or not, did you hear that
Ms. Gillian testified, Gillian Yip?
    A.  Yes.
    Q.  She testified yesterday that
the -- your company would ordinarily ship
hoverboards to QVC's warehouse and QVC's
customers?
    A.  That's correct.
    Q.  So when she was talking about
QVC's customers, she's saying these end users,
right?
    A.  Right. The way I understand it,
these boards were being shipped to end users.
    Q.  So there are boards that shipped

Page 91

directly to QVC's warehouse in New Jersey and
being stored there?
    A.  QVC doesn't have a warehouse in
New Jersey.
    Q.  Or maybe she was saying some
other warehouse located in New York?
    A.  Let's cut to what you are trying
to say. I don't believe that QVC had boards
in their warehouse at the time of this.
    Q.  You don't believe there was any
remaining inventory being stored at QVC's
warehouse?
    A.  For sale.
    Q.  What is the location of QVC's
warehouse?
    A.  They have warehouses all over the
country, but they don't have one in New
Jersey.
    Q.  Do they have any warehouse in
New York?
    A.  I don't believe so.
        (Tebele Exhibit 9, Document
    bearing Bates stamp Interworks 299,
    marked for identification.)
    Q.  Number 9 is a certificate of

Page 92

liability insurance.
        Before you came today, did you
review all of the certificates of liability
insurance provided by Interworks to your
company?
    A.  No.
    Q.  So you've never seen this
document before?
    A.  I'm not familiar with it. I may
have seen it.
    Q.  Okay.
        Let's mark the next one and see
if you have seen this one.
        (Tebele Exhibit 10, Document
    bearing bates stamp Interworks 300,
    marked for identification.)
    Q.  If you look at this certificate
of liability insurance dated July 13, 2017,
have you ever seen this document before?
    A.  I may have.
    Q.  But you are not sure about it?
    A.  I'm not sure that I have seen it
before. I may have.
        (Tebele Exhibit 11, Document
    bearing Bates stamp Interworks 301,

Page 93

    marked for identification.)
    Q.  Number 11, have you ever seen
this certificate of insurance?
    A.  I may have.
    Q.  Let me go back to that QVC QA
sample testing report, that was Exhibit 8.
        Do you recall receiving a report
from QVC stating that the battery that came
with the hoverboard failed the testing and
also on the report says that the battery that
came with the samples do not match with what
was previously submitted?
    A.  Again, let me take you through
how it would be. We would get a failure, it
would outline many areas of failure. Only
through going back and forth and resubmitting
and trying again and resubmitting and trying
again, by process of elimination, finally get
down to the fact that batteries didn't match.
        It wouldn't be, hey, you
submitted this, the battery didn't match. It
would be submitted, it would be failed. It's
like a game of ping pong, then we'd have to
try to mitigate the failures, all the while
not knowing, not even thinking in a million

EXHIBIT 10    H I N E S   R E P O R T E R S    24 (90 - 93)
146

Case 3:18-cv-00828-MHL Document 22-18 Filed 05/14/21 Page 10 of 11 PageID# 653
Case 2:17-cv-04983-MJH-KS Document 50-2 Filed 12/14/18 Page 35 of 108 Page ID #:936
Interworks Unlimited, Inc. vs. Digital Gadgets, LLC | Deposition of Charles Tebele

**Page 114**

    (Tebele Exhibit 16, Document bearing Bates stamp Digital gadgets 35, marked for identification.)

Q. 16, there is a short e-mail on top from Eric Lu to Chris Mitchell in December, specifically on December 21, 2016.

It says "Chris, see my comments below in red. I'll give you a call shortly."

In response to Chris Mitchell's e-mail to Eric Lu dated the same day earlier than that, well, yes, a little earlier than 3:04 a.m., was 9:26 a.m. in the morning, here by the way, have you received this e-mail from Chris Mitchell?

A. Did I receive this e-mail from Chris Mitchell?

Q. Right. Did he subsequently forward it to you?

A. I don't remember.

Q. And says -- Chris Mitchell says here "Eric" starting from the second paragraph "current order QVC isn't going to be able to resolve the lithium battery reissue until next month."

**Page 115**

Are you aware of such issue existing in December of 2016?

A. That's a different issue. That's a different lithium battery issue than what we are talking about with the QA.

Q. Right. And you say is a different issue?

A. It has nothing to do with the QA.

Q. Okay. And was this around the time when Chris Mitchell was negotiating with Eric on the price terms along with the other terms for the sale of the hoverboards?

A. It appears to be.

Q. And when Chris Mitchell mentioned -- you see down below like one, two, three, four, fourth bullet point, if you look at the second one?

A. Yep.

Q. Received exclusive agreement to supply chip listen board to QVC for 2017 and then Eric's comment is yes, we can put this agreement to you, but let's have our meetings and see it and that's the trade show, right?

A. Yes.

**Page 116**

Q. And discuss our partnership further?

A. Yep.

Q. So you did discuss, meaning your company, did discuss this exclusive agreement with Eric Lu?

A. Yes.

Q. At the trade show, and what was your recollection on Eric Lu's response or anything that he said in Las Vegas -- when you met Eric Lu, did he agree to give that exclusive deal to you guys?

A. There was no doubt that he agreed that as long as we had inventory in place that we remained the exclusive partner. We would never buy somebody else's goods for them to go sell them to the same customer behind our back. The discussion further was we were discussing other accounts to extend the exclusive to.

Q. Did you also at Las Vegas discuss the payment terms such as consignment?

A. It's possible.

Q. But you don't remember sitting here?

**Page 117**

A. Again, there was a sequence of events and a lot of conversations. I don't know what conversation was at CES versus on the phone, but it was a fluid situation.

    (Tebele Exhibit 17, Document bearing Bates stamp Digital Gadgets 80, marked for identification.)

Q. Next one is 17. Have you ever seen this certificate of liability insurance?

A. Possibly.

Q. You see towards the bottom left underneath two words certificate, Digital Gadgets, LLC and that's your company, right?

A. Yes.

Q. On top -- well, it's not very top, it's like ninth or tenth or twelfth line from the top, you see under the insured Interworks Unlimited, Inc.?

A. Yes.

Q. Was printed there, so the insured of this policy was Interworks?

A. Yes.

Q. And your company was made as an additional insured?

A. Yes.

EXHIBIT 10    HINES REPORTERS    30 (114 - 117)
152

Case 3:18-cv-00828-MHL Document 22-18 Filed 05/14/21 Page 11 of 11 PageID# 654
Case 2:17-cv-04983-MJH-KS Document 50-2 Filed 12/14/18 Page 38 of 1089 PageID

Interworks Unlimited, Inc. vs. Digital Gadgets, LLC#:939     Deposition of Charles Tebele

submitted this certificate to QVC around the
time Digital Gadgets received this from
Interworks?
    A.    What's the question again?
    Q.    Do you know if Digital Gadgets
ever submitted this certificate of liability
insurance to QVC ever?
    A.    I don't know.
        (Tebele Exhibit 20, Document
    bearing Bates stamps Digital Gadgets 244
    through Digital Gadgets 247, marked for
    identification.)
    Q.    20 has a number of pages.
        These documents were produced by
Digital Gadgets.
        If you see the second e-mail from
the top on Digital Gadgets 244, this e-mail
was sent by Chris Mitchell to Eric, presumably
Eric Lu, and you were cc'd on it. Do you see
that?
    A.    Yep.
    Q.    And Chris Mitchell first said
"Eric understood about wanting the boards
back. We were honoring the consignment backup
agreement per our conversation. But if that's

no longer an option for you, we can send back
the remaining boards."
        What is the consignment backup
agreement Chris Mitchell was talking about
here, if you know?
    A.    **Basically, that there were,
throughout the negotiations, like I said, it
was fluid and what they agreed to was rather
than shipping the boards back and forth
between Interworks and Digital Gadgets and
having them sit in one warehouse or another,
since they were only for QVC that we would pay
them based on when they were sold. So that's,
I mean, call it a consignment agreement, but
it's not a very technical term. Consignment
agreement would basically mean to me we would
pay for the goods per specific agreement as
they were sold.**
    Q.    Okay.
        And then the -- see there's some
bold printed lines or words starting from an
arrow pointing to the left, "I have honored
everything" that -- "everything I've said. I
told you guys I would give you
terms/consignment if you guys would get

approved from my factor."
        Did Eric Lu write all of these
responses in bold printed form?
    A.    I don't know, looks like it.
    Q.    And here he was complaining to
you guys that if you had been approved by my
vendor, I would have given this consignment
backup agreement to you guys at the time this
e-mail was sent to them, to Eric Lu, to your
recollection, Interworks' factor never
approved your company on this credit line of
$1 million, right?
    A.    **I have no idea. It looks to be
he shipped it, bought approval from his factor
and maybe he was in trouble or something. I
don't know what -- I don't know what -- I
don't know what the inner workings between him
and his factor are, but we don't have any
obligation as Digital Gadgets to satisfy his
factor. His factor relationship is between
him and his factor.**
    Q.    If you look down below,
there's -- it seems like there is a
spreadsheet prepared by Chris Mitchell to
Eric Lu. If you can help me go over the

second page of the document, where you can see
not this page, can you just briefly go to a
second page?
    A.    Yes.
    Q.    Second page on top to the right,
you see the total received number is 10,608
units?
    A.    Yes.
    Q.    Is that consistent with your
recollection of how many units of
hoverboards --
    A.    **I previously answered I'm not
sure how many hoverboards were received, but
if this e-mail states -- the e-mail stands on
its own. The statement is what it is.**
    Q.    Okay.
        But you mention about computer
data and software. If you have to retrieve
this information or spreadsheet from your
computer you would be able to do that, right?
    A.    Yes.
    Q.    After you received these e-mails
from Chris Mitchell and Eric Lu, did you
remember -- did you remember you had a meeting
or a couple of meetings with Chris Mitchell?